# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ASHINC Corporation, et al.,<br><br>Debtor. | Chapter 11<br><br>Case No. 12-11564 (CSS)<br>(Jointly Administered) |
| CATHERINE E. YOUNGMAN, LITIGATION TRUSTEE FOR ASHINC CORPORATION, ET AL., AS SUCCESSOR TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ASHINC CORPORATION, AND ITS AFFILIATED DEBTORS,<br><br>Plaintiff,<br><br>YUCAIPA AMERICAN ALLIANCE FUND I, LLC, YUCAIPA AMERICAN MANAGEMENT, LLC, AMERICAN AIRLINES MASTER FIXED BENEFIT PENSION PLAN TRUST, AMERICAN PRIVATE EQUITY PARTNERS II, LP, AUTOMOTIVE MACHINISTS PENSION TRUST, BOARD OF FIRE AND POLICE PENSION COMMISSIONERS OF THE CITY OF LOS ANGELES, CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, CARPENTERS PENSION TRUST FUND FOR NORTHERN CALIFORNIA, COLLER PARTNERS 702 LP INCORPORATED, CLOUSE S.A., CONSOLIDATED RETIREMENT FUND, IAM PRIVATE EQUITY, LLC, ILGWU DEATH BENEFIT FUND 4, INTERNATIONAL SIF SICAV SA, LOCALS 302 & 612 OF THE INTERNATIONAL UNION OF OPERATING ENGINEERS – EMPLOYERS CONSTRUCTION INDUSTRY RETIREMENT TRUST, LOS ANGELES CITY EMPLOYEES' RETIREMENT SYSTEM, NATIONAL RETIREMENT FUND, NEW MEXICO STATE INVESTMENT COUNCIL, NEW MEXICO STATE INVESTMENT COUNCIL LAND GRANT PERMANENT FUND, NEW MEXICO STATE INVESTMENT COUNCIL SEVERANCE TAX PERMANENT FUND, NEW YORK CITY EMPLOYEES' RETIREMENT SYSTEM, NEW YORK CITY FIRE DEPARTMENT PENSION FUND, NEW | Adv. Pro. No. 21-51179 (CSS) |

YORK CITY POLICE PENSION FUND, NORTHEAST
CARPENTERS PENSION FUND, PACIFIC COAST
ROOFERS PENSION PLAN, SANBA II INVESTMENT
AUTHORITY, STATE STREET BANK AND TRUST
COMPANY (AS TRUSTEE ON BEHALF OF
AMERICAN AIRLINES MASTER FIXED BENEFIT
PENSION PLAN TRUST); STEAMSHIP TRADE
ASSOCIATION OF BALTIMORE, INC. –
INTERNATIONAL LONGSHOREMEN'S
ASSOCIATION (AFL- CIO) PENSION FUND,
TEACHERS' RETIREMENT SYSTEM OF THE CITY
OF NEW YORK, UNITED FOOD AND COMMERCIAL
WORKERS INTERNATIONAL UNION PENSION
PLAN FOR EMPLOYEES, WESTERN CONFERENCE
OF TEAMSTERS PENSION TRUST

                    Defendants.

## MEMORANDUM OF LAW IN SUPPORT OF THE LIMITED PARTNER
## DEFENDANTS' MOTION TO DISMISS ADVERSARY COMPLAINT

**LOWENSTEIN SANDLER LLP**
Michael Etkin
Andrew Behlmann
Nicole Fulfree
Scott Cargill
Colleen Restel
One Lowenstein Drive
Roseland, New Jersey 07068
Telephone: (973) 597-2500

**BAYARD P.A.**
Erin R. Fay (No. 5268)
Gregory J. Flasser (No. 6154)
600 N. King Street, Suite 400
Wilmington, Delaware 19801
Telephone: (302) 655-5000

*Counsel to the LP Defendants*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT.................................................................2

JURISDICTION AND VENUE ...........................................................4

STATEMENT OF FACTS ....................................................................5

    I.     THE LP DEFENDANTS ...........................................................5

         A.     The Limited Partnership Agreements ...........................5

         B.     Allied's 2005 Georgia Chapter 11 Cases .......................9

         C.     Allied's 2012 Bankruptcy .........................................11

         D.     Post-Confirmation Litigation in the Adversary Proceedings ...................14

         E.     The Remaining Claims and the Trial Opinion ...........................16

         F.     This Adversary Proceeding ......................................17

ARGUMENT ...................................................................................19

    I.     GROUNDS FOR DISMISSAL APPLICABLE TO ALL LP DEFENDANTS ...........................................................19

         A.     Standard for dismissal under Fed. R. Civ. P. 12(b)(6) ...............19

         B.     Count One of the Complaint fails to state a claim for avoidance and recovery of the Distributions as actual fraudulent transfers...............21

         C.     Count Two of the Complaint fails to state a claim for avoidance and recovery of the Distributions as constructively fraudulent transfers.....................................25

         D.     Count Three must be dismissed with respect to the LP Defendants because Plaintiff lacks standing to seek enforcement of the LPAs. ...........27

         E.     Any cause of action to recover the 2017 Distribution is time-barred. ........................................33

    II.    ADDITIONAL GROUNDS FOR DISMISSAL APPLICABLE TO CERTAIN LP DEFENDANTS ...........................................35

         A.     The Court lacks personal jurisdiction over the Foreign LPs.....................35

B.  The Complaint must be dismissed with respect to the State
Defendants because they are immune from suit under the Eleventh
Amendment. .............................................................................................45

C.  The Court lacks subject-matter jurisdiction over the claims against
the NYC Funds because Plaintiff failed to serve statutorily
mandated notices of claim. ......................................................................51

D.  Counts One and Two of the Complaint must be dismissed as to the
ERISA Defendants because ERISA provides absolute protection
for plan benefits. .....................................................................................56

E.  State Street is not a transferee from which Plaintiff can recover. ...........62

CONCLUSION ...........................................................................................................64

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

Cases

<u>Aetna Health v. Davila</u>,
   542 U.S. 200 (2004)...............................................................................56, 61

<u>Allen v. Cooper</u>,
   140 S. Ct. 994 (2020)....................................................................................45

<u>In re Am. International Refinery</u>,
   2009 WL 8602809 (Bankr. W.D. La. Dec. 22, 2009).............................40

<u>Asahi Metal Indust. Co. v. Superior Court of Cal., Solano Cty.</u>,
   480 U.S. 102 (1987).........................................................................42, 43, 44

<u>Ashcroft v. Iqbal</u>,
   556 U.S. 662 (2009)................................................................................19, 20

<u>In re Astropower Liquidating Trust</u>,
   Adv. No. 05-50867, 2006 WL 2850110 (Bankr. D. Del. Oct. 6, 2006) .....................35, 37, 41

<u>Ballentine v. United States</u>,
   486 F.3d 806 (3d Cir. 2007)..........................................................................29

<u>Barroga v. California Pub. Emps Ret. Sys. Bd. of Admin.</u>,
   No. 2:12-cv-01179 MCE KJN, 2012 WL 5337326 (E.D. Cal. Oct. 26, 2012).......................50

<u>Bell Atl. Corp. v. Twombly</u>,
   550 U.S. 544 (2007)................................................................................19, 20

<u>Benn v. First Judicial District of Pa.</u>,
   426 F.3d 233 (3d Cir. 2005)..........................................................................45

<u>Boggs v. Boggs</u>
   520 U.S. 833 (1997)........................................................................................59

<u>Bonded Fin. Serv., Inc. v. European Am. Bank</u>,
   838 F.2d 890 (7th Cir. 1988) ........................................................................63

<u>Bradley v. W. Chester Univ. of Pa. State Sys. of Higher Educ.</u>,
   880 F.3d 643 (3d Cir. 2018)..........................................................................45

<u>Burger King Corp. v. Rudzewicz</u>,
   471 U.S. 462 (1985)........................................................................................39

Burrell v. Teacher's Ret. Sys. of Ala.,
    353 Fed. Appx. 182 (11th Cir. 2009)..........................................................................47

Cal. Serv. Emps. Health & Welfare Trust Fund v. Advance Bldg. Maint.,
    No. C 06-34078, 2007 WL 3232444 (N.D. Cal. Nov. 1, 2007)...............................61

California Pub. Emps. Ret. Sys. v. Moody's Corp.,
    No. C 0903628 SI, 2009 WL 3809816 (N.D. Cal. Nov. 10, 2009) ...................49, 50

Camacho v. New York,
    187 A.D.2d 262 (1st Dep't 1992) ............................................................................53

Cannavo v. N.Y.C. Dep't of Hous. Pres. & Dev.,
    No. SCR 783/16-1, 2017 WL 4202816 (Civ. Ct., Richmond Cty. Sept. 8,
    2017) ........................................................................................................................55

Carpet Grp. Int'l v. Oriental Rug Importers Ass'n, Inc.,
    227 F.3d 62 (3d Cir. 2000)......................................................................................29

Cent. States S.E. & S.W. Areas Pension Fund v. LaCasse,
    254 F. Supp. 2d 1069 (N.D. Ill. 2003) ...................................................................61

Christy v. Alexander & Alexander of N.Y., Inc. (In re Finley, Kumble, Wagner,
    Heine, Underberg, Manley, Myerson & Casey),
    130 F.3d 52 (2d Cir.1997)........................................................................................64

In re Circle Y of Yoakum, Tex.,
    354 B.R. 349 (Bankr. D. Del. 2006) .......................................................................22

CML V, LLC v. Bax,
    6 A.3d 238 (Del. Ch. 2010), aff'd, 28 A.3d 1037 (Del. 2011) ................................31

In re Commodore Int'l, Ltd.,
    242 B.R. 243 (Bankr. S.D.N.Y. 1999) ....................................................................41

Daimler AG v. Bauman,
    571 U.S. 117 (2014)............................................................................................37, 44

Davis v. California Pub. Emps Ret. Sys. Bd. of Admin.,
    Case No. 2:20-cv-01543-JAM-JDP (PS), 2021 WL 4192661 (E.D. Cal. Sept.
    15, 2021) .............................................................................................................49, 50, 51

Deutsche Bank AG v. Devon Park Bioventures, LP,
    C.A. No. 2017-0822-SG, 2021 WL 2711472 (Del. Ch. June 30, 2021)
    (unpublished) ..........................................................................................................41

Diamond v. Friedman (In re Century City Drs. Hosp., LLC),
    466 B.R. 1 (Bankr. C.D. Cal. 2012)....................................................................34, 35

Easton Technical Prods., Inc. v. FeraDyne Outdoors, LLC,
    No. 18-1222, 2019 WL 1513463 (D. Del. Apr. 8, 2019) .........................................21

Egelhoff v. Egelhoff,
    532 U.S. 141 (2001) .........................................................................................59, 61

Ernst v. Rising,
    427 F.3d 351 (6th Cir. 2005) ..................................................................................47

Febres v. Camden Bd. of Educ.,
    445 F.3d 227 (3d Cir. 2006) ..............................................................................47, 51

Fed. Mar. Comm'n v. S.C. State Ports Auth.,
    535 U.S. 743 (2002) ................................................................................................45

In re Fedders N. Am., Inc.,
    405 B.R. 527 (Bankr. D. Del. 2009) ......................................................................22

In re Fisker Auto. Holdings Inc. S'holder Litig.,
    No. 13-cv-2100-DBS-SRF, 2018 WL 4036412 (D. Del. Aug. 21, 2018) .........39, 41

Fitchik v. N.J. Transit Rail Operations, Inc.,
    873 F.2d 655 (3d Cir. 1989) .......................................................................... passim

Fitzpatrick v. Bitzer,
    519 F.2d 559 ............................................................................................................47

In re Flores,
    426 B.R. 350 (Bankr. D. Kan. 2010) ......................................................................41

Forbes v. Lucas (In re Lucas),
    924 F.2d 597 (6th Cir. 1991) ..................................................................................58

Fowler v. UPMC Shadyside,
    578 F.3d 203 (3d Cir. 2009) ...................................................................................20

Freeman v. Williamson,
    890 N.E.2d 1127 (Ill. App. 2008) ..........................................................................34

Gavin/Solomonese LLC v. Citadel Energy Partners LLC (In re Citadel Watford
    City Disposal Partners),
    603 B.R. 897 (Bankr. D. Del. 2019) ................................................................29, 30

Gehling v. St. George's Sch. Of Med., Ltd.,
    773 F.2d 539 (3d Cir. 1985) ...................................................................................37

Gen. Elec. Co. v. Deutz AG,
    270 F.3d 144 (3d Cir. 2001) ...................................................................................44

General Motors Corp. v. New A.C. Chevrolet, Inc.,
263 F.3d 296 (3d Cir. 2001)............................................................................20

In re Global Link Telecom Corp.,
327 B.R. 711 (Bankr. D. Del. 2005) ...............................................................26

Gobeille v. Liberty Mut. Ins. Co.,
577 U.S. 312 (2016).................................................................................59, 61

Goodyear Dunlop Tires Operations, S. A. v. Brown,
564 U.S. 915 (2011).......................................................................................37

Grand Entm't Grp., Ltd. v. Star Media Sales, Inc.,
988 F.2d 476 (3d Cir. 1993)............................................................................42

Greene v. Teachers' Ret. Sys.,
107 Misc. 2d 508 (Sup. Ct., N.Y. Cty. 1980) .................................................55

Grossman v. Suffolk Cnty. Dist. Att'y's. Office,
777 F. Supp. 1101 (E.D.N.Y.1991) .................................................................48

Guardian Constr. Co. v. Tetra Tech Richardson, Inc.,
583 A.2d 1378 (Del. Super. 1990)...................................................................28

Guidry v. Sheet Metal Workers Nat'l Pension Fund,
493 U.S. 365 (1990)...................................................................................58, 60

Halperin v. Careers USA, Inc. (In re FBI Wind Down, Inc.),
614 B.R. 460 (Bankr. D. Del. 2020) ...............................................................62

Hampe v. Butler,
263 F.3d 90 (3d Cir. 2004)..............................................................................45

Helicopteros Nacionales de Colombia, S.A. v. Hall,
466 U.S. 408 (1984).......................................................................................37

In re Hellas Telecomms. (Luxembourg) II SCA,
524 B.R. 488 (Bankr. S.D.N.Y. 2015).............................................................41

Ingersoll–Rand v. McClendon,
498 U.S. 133 (1990).......................................................................................57

Insituform of N. Am., Inc. v. Chandler,
534 A.2d 257 (Del. Ch. 1987).........................................................................28

Int'l Shoe Co. v. Washington,
326 U.S. 310 (1945)...................................................................................36, 42

JMB Grp. Trust IV v. Penn. Mun. Ret. Sys.,
    986 F.Supp. 534 (N.D.Ill.1997) (Pennsylvania Municipal Retirement System) ....................48

Jones v. Pub. Emp. Ret. Pensions Div.,
    No. CIV. 09-5894 SDW, 2011 WL 6003122 (D.N.J. Nov. 29, 2011) ...................................47

Karns v. Shanahan,
    879 F.3d 504 (3d Cir. 2018)..................................................................................................45, 46

Kestler v. N. Carolina Loc. Gov't'l Emps. Ret. Sys.,
    808 F.Supp. 1220 (W.D.N.C. 1992), overruled on other grounds, 48 F.3d 800
    (4th Cir. 1995)....................................................................................................................47, 48

Klemme v. Shaw,
    No. 2:05-CV-01263, 2007 WL 838958 (D. Nev. Mar. 16, 2007) ..........................................61

KPERS v. Boatmen's First Nat. Bank of Kansas City,
    982 F.Supp. 806 (D. Kan.1997)..............................................................................................48

In re La Paloma Generating Co.,
    588 B.R. 695 (Bankr. D. Del. 2018) .......................................................................................46

Lang v. Pa. Higher Edu. Assistance Agency,
    610 Fed.Appx. 158 (3d Cir. 2015).........................................................................................45

Lang v. Pa. Higher Educ. Assistance Agency,
    610 F. App'x 158 (3d Cir. 2015) ............................................................................................45

In re Liquid Holdings Grp. Inc.,
    No. 16-10202, 2018 WL 2759301 (Bankr. D. Del. June 6, 2018)..........................................24

Lum v. Bank of Am.,
    361 F.3d 217 (3d Cir. 2004)...................................................................................................22

Lumbermans Mut. Cas. Co. v. Port Auth. of N.Y. & N.J.,
    137 A.D.2d 796, 525 N.Y.S.2d 343 (App. Div. 1988) ...........................................................52

Majteles v. AVL Corp.,
    182 Misc. 2d 140 (N.Y. Sup. Ct. 1999) .................................................................................60

Maliandi v. Montclair State Univ.,
    845 F.3d 77 (3d Cir. 2016)............................................................................... passim

MarkDutchCo 1 B.V. v. Zeta Interactive Corp.,
    411 F. Supp. 3d 316 (D. Del. 2019).......................................................................................22

Max Daetwyler Corp. v. Meyer,
    762 F.2d 290 (3d Cir. 1985)...................................................................................................36

In re Maxwell Commc'n Corp.,
    93 F.3d 1036 (2d Cir. 1996)...................................................................................44

McGinty v. New York,
    251 F.3d 84 (2d Cir. 2001).....................................................................................47

In re Meinen,
    228 B.R. 368 (Bankr. W.D. Pa. 1998) ..................................................................59

Merck & Co, v. Ban Labs, Inc.,
    179 F. Supp. 2d 368 (D. Del. 2002)......................................................................45

Mervyn's LLC v. Lubert-Adler Group IV LLC (In re Mervyn's Holdings LLC),
    426 B.R. 96 (Bankr. D. Del. 2010) ............................................................62, 63, 64

N.M. State Inv. Council v. Weinstein,
    382 P.3d 923 ....................................................................................................49, 50

N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,
    514 U.S. 645 (1995)...................................................................57, 59, 60, 61

In re Nazi Era Cases Against German Defendants Litig.,
    153 F. App'x 819 (3d Cir. 2005) (unpublished) ...................................1, 17, 43, 59

Ne. Power Co. v. Balcke-Durr, Inc.,
    49 F. Supp. 2d 783 (E.D. Pa. 1999) .....................................................................43

New Mexico ex rel. Nat'l Educ. Ass'n of N.M., Inc. v. Austin Capital Mgmt.,
    671 F. Supp. 2d 1248 (D.N.M. 2009) .............................................................50, 51

New York Teachers Pension Ass'n, Inc. v. Teachers' Ret. Sys. of the City of New
    York,
    71 A.D.2d 250, 422 N.Y.S. 2d 389 (1st Dep't 1979) ..........................................54

Nordberg v. Societe Generale (In re Chase & Sanborn Corp.),
    848 F.2d 1196 (11th Cir. 1988) ............................................................................64

O'Connor v. Sandy Lane Hotel Co.,
    496 F.3d 312 (3d Cir. 2007)..................................................................................42

In re Oakwood Homes Corp.,
    325 B.R. 696 (Bankr. D. Del. 2005) .....................................................................24

Oliver v. Roquet,
    858 F.3d 180 (3d Cir. 2017).......................................................................19, 20, 25

Or. Laborers-Emp'rs Health & Welfare Tr. Fund v. All State Indus. & Marine
    Cleaning,
    850 F. Supp. 905 (D. Or. 1994) .........................................................................61

In re OSC 1 Liquidating Corp.,
    529 B.R. 825 (Bankr. D. Del. 2015) ..................................................................20

Parochial Bus Sys., Inc. v. Bd. of Educ.,
    60 N.Y.2d 539 (1983) .......................................................................................55

Patterson v. Shumate,
    504 U.S. 753 ......................................................................................................58

PBS Bldg. Sys. v. City of New York,
    No. 94 Civ. 3488 (JGK), 1996 WL 583380 (S.D.N.Y. Oct. 10, 1996) ..................55

Peachtree Special Risk Brokers, LLC v. Kartman (In re Rocco Co., Inc.),
    2014 WL 7404566 (D.N.J. Dec. 29, 2014) ........................................................63

Pennhurst State Sch. & Hosp. v. Halderman,
    465 U.S. 89 ........................................................................................................46

In re PennySaver USA Publishing, LLC
    587 B.R. 445 (Bankr. D. Del 2018) ...................................................................30

Pennzoil Prods. Co. v. Colelli & Assocs., Inc.,
    149 F.3d 197 (3d Cir. 1998)..............................................................................42

Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,
    998 F.2d 1192 (3d Cir. 1993).............................................................................5

Pinker v. Roche Holdings, Ltd.,
    292 F.3d 361 (3d Cir. 2002)..............................................................................35

Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co.,
    967 F.3d 218 (3d Cir. 2020)..............................................................................61

Pritchard v. Curtis,
    101 A.D.3d 1502, 957 N.Y.S.2d 440 (App. Div. 2012) .......................................52

Reclaimant Corp. v. Deutsch,
    211 A.3d 976 (Conn. 2019) ...............................................................................34

Regents of the Univ. of Cal. v. Doe,
    519 U.S. 425 (1997)...........................................................................................46

Ret. Ass'n of N.M. v. Clearlend Sec.,
    798 F.Supp.2d 1265 (D.N.M. 2011) ..................................................................47

Ret. Sys. v. Citigroup,
   No. CIV. 11-2583, 2011 WL 19937737 (E.D. Pa. May 20, 2011)..........................................47

Ret. Sys. v. Credit Suisse, N.Y. Branch,
   No. 09–4224–CV–C–NKL, 2010 WL 318652 (W.D. Mo. Jan. 21, 2010)............................48

Rutledge v. Pharm. Care Mgmt. Ass'n,
   141 S. Ct. 474 (2020)..................................................................................................59, 61

Sands v. McCormick,
   502 F.3d 263 (3d Cir. 2007).................................................................................................20

Scott v. Vantage Corp.,
   336 F.Supp.3d 366 (D. Del. 2018).......................................................................................28

Shaffer v. Heitner,
   433 U.S. 186 (1977).............................................................................................................40

Shah v. Baloch,
   418 P.3d 902 (Ariz. Ct. App. 2017).....................................................................................58

Shaw v. Delta Air Lines, Inc.,
   463 U.S. 85 (1983)........................................................................................................56, 59

Shearer v. Oberdick (In re Oberdick),
   490 B.R. 687 (Bankr. W.D. Pa. 2013) .................................................................................58

Shinehouse v. Guerin,
   No. 95-7070 1996 U.S. Dist. LEXIS 6680 (E.D. Pa. May 14, 1996)....................................59

Snyder v. Dolphin Encounters Ltd.,
   235 F. Supp. 2d 433 (E.D. Pa. 2002) ...................................................................................37

In re SRC Liquidation LLC,
   581 B.R. 78 (D. Del. 2017)...........................................................................................20, 23

Stuchen v. Duty Free Int'l, Inc.,
   No. CIV.A. 94C-12-194, 1996 WL 33167249 (Del. Super. Apr. 22, 1996) .........................28

In re Tandycrafts, Inc.,
   317 B.R. 287 (Bankr. D. Del. 2004) ....................................................................................36

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
   551 U.S. 308 (2007)...............................................................................................................5

Teresta v. City of New York,
   304 N.Y. 440 (1952) ...........................................................................................................53

Thomann v. City of Rochester,
    256 N.Y. 165 (1931) .................................................................55

Travelers Indem. Co. v. Cephalon, Inc.,
    620 F. App'x 82 (3d Cir. 2015) ..................................................21

In re Tribune Co.,
    418 B.R. 116 (Bankr. D. Del. 2009) ..........................................36

United Food & Commercial Workers Int'l Union-Indus. Pension Fund v. EC
    Mgmt. Servs. Of Ga., Inc.,
    No. 3:19cv247, 2021 WL 1234511 (E.D. Va. Mar. 31, 2021) ...............60

Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.,
    No. 15238, 1996 WL 652773 (Del.Ch. Nov. 4, 1996), rev'd on other grounds,
    691 A.2d 609 (Del.1996) ...........................................................31

W.Va. Inv. Mgmt. Bd. v. Residential Accredited Loans, Inc.,
    No. 2:10–CV–00461, 2010 WL 3418314 (S.D.W.Va. Aug. 26, 2010)...............48

Weingarten v. Bd. of Trustees of N.Y.C. Teachers' Ret. Sys.,
    98 N.Y.2d 575 (2002) ...............................................................55

In re Westinghouse Sec. Litig.,
    90 F.3d 696 (3d Cir. 1996).........................................................21

Westly v. California Pub. Emps Ret. Sys. Bd. of Admin.,
    105 Cal.App.4th 1095 (Cal.Ct.App. 2003) ..................................49

World-Wide Volkswagen Corp. v. Woodson,
    444 U.S. 286 (1980)...........................................................39, 42

Youngman v. Western Conference of Teamsters Pension Plan, et al.,
    Case No. 21-2-13349-1 .............................................................61

Yucaipa Am. All. Fund I, LP v. Ehrlich,
    716 F. App'x 73 (3d Cir. 2017) .............................................5, 10

Zito v. N.Y.C. Office of Payroll Admin.,
    130 A.D.3d 1326, 15 N.Y.S.3d 245 (App. Div. 2015) .........................52

STATUTES AND REGULATIONS

6 Del. C. § 17-101 et seq..............................................................3

6 Del. C. § 17-607(c) ..........................................................3, 33, 34

6 Del. C. § 17-1001...................................................................29

6 Del. C. § 17-1002 .................................................................................................................29, 30

6 Del. C. § 1301 *et seq.* ...................................................................................................................21

6 Del. C. § 1304(a) .........................................................................................................18, 22, 25

6 Del. C. § 1304(b) ...........................................................................................................................23

6 Del. C. § 1305(a) ...........................................................................................................................18

28 U.S.C. § 157 .............................................................................................................................4, 19

28 U.S.C. § 1334 ...................................................................................................................................4

28 U.S.C. § 1409 ...................................................................................................................................4

29 U.S.C. § 1001, *et seq.* ...................................................................................................................4

29 U.S.C. § 1056(d)(1) ...........................................................................................................4, 57, 58

29 U.S.C. § 1144(a) ...........................................................................................................................59

Cal. Gov't Code § 20001 .................................................................................................................51

Cal. Gov't Code § 20002 .................................................................................................................50

New York Public Officers Law § 87 .............................................................................................54

N.M.S.A. §§ 6-8-1, 6-8-2 .................................................................................................................50

New York General Municipal Law § 50-i(1) ..............................................................................52

N.M.S.A. 1978, §§ 6-8-2 to -7 (1957, as amended through 2015) ............................................49

N.M.S.A. 1978, § 7-27-3.1 (1983) ...................................................................................................49

N.Y.C. Admin. Code § 7-201 .........................................................................................................55

N.Y.C. Admin. Code § 13-103 .......................................................................................................53

N.Y.C. Admin. Code §§ 13-127 to -129 .......................................................................................54

N.Y.C. Admin. Code § 13-133 .............................................................................................1, 53, 54, 55

N.Y.C. Admin. Code § 13-136 .......................................................................................................54

N.Y.C. Admin. Code § 13-137 .......................................................................................................54

N.Y.C. Admin. Code § 7-201(a) ....................................................................................................53

Treas. Reg. 1.401(a)-13(b), 26 C.F.R. § 1.401(a)-13(b)...............................................................57

**RULES**

Fed. R. Bankr. P. 2004 ..................................................................................................14, 15, 16, 24

Fed. R. Bankr. P. 7004 ...............................................................................................................36

Fed. R. Bankr. P. 7009 ...........................................................................................................1, 21

Fed. R. Bankr. P. 7012 ...................................................................................................1, 28, 35

Fed. R. Civ. P. 9(b) .......................................................................................................... passim

Fed. R. Civ. P. 12(b)(1) ...............................................................................................1, 27, 28

Fed. R. Civ. P. 12(b)(2) ...................................................................................................1, 35

Fed. R. Civ. P. 12(b)(6) ...........................................................................................1, 19, 20, 24

Fed. R. Civ. P. 12(h) ........................................................................................................2

Del. Bankr. L. R.  9013-1(f)..............................................................................................4

**TREATISES**

PENSION AND EMPLOYEE BENEFIT LAW 547 (2d ed.1995)..............................................................60

Pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(1), 12(b)(2), and 12(b)(6), made applicable herein by Rules 7009 and 7012 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the following defendants (collectively, the "LP Defendants")[1] respectfully move to dismiss with prejudice the complaint filed against them in the above-captioned adversary proceeding (the "Complaint") and each claim asserted therein: (a) American Airlines Master Fixed Benefit Pension Plan Trust ("American Airlines Trust"); Carpenters Pension Trust Fund For Northern California; Consolidated Retirement Fund; IAM Private Equity, LLC; ILGWU Death Benefit Fund 4; Locals 302 & 612 Of The International Union Of Operating Engineers – Employers Construction Industry Retirement Trust; National Retirement Fund; Northeast Carpenters Pension Fund; Pacific Coast Roofers Pension Plan; State Street Bank And Trust Company (As Trustee On Behalf Of American Airlines Master Fixed Benefit Pension Plan Trust) ("State Street"); Steamship Trade Association Of Baltimore, Inc. – International Longshoremen's Association (AFL-CIO) Pension Fund; United Food And Commercial Workers International Union Pension Plan For Employees; and Western Conference Of Teamsters Pension Trust (collectively, the "ERISA Defendants"); (b) California Public Employees' Retirement System ("CalPERS"); (c) New Mexico State Investment Council ("NMSIC"), New Mexico State Investment Council Land Grant Permanent Fund, and New Mexico State Investment Council Severance Tax Permanent Fund (collectively, the "New Mexico Funds" and together with CalPERS, the "State Defendants"); (d) New York City Employees' Retirement System ("NYCERS"), New York City Fire Department Pension Fund ("Fire Department Fund"), New York City Police Pension Fund ("Police Department Fund"), Teachers' Retirement System of The

---

[1]   A schedule identifying each LP Defendant that asserts individualized grounds for dismissal is annexed hereto as **Schedule 1**.

City Of New York ("TRS" and collectively, the "NYC Funds"); (e) Coller Partners 702 LP Incorporated ("Coller"), Clouse S.A., acting in respect of its Compartment 11 ("Clouse"), International SIF SICAV SA ("ISS"), and Sanba II Investment Company ("Sanba II" and together with Coller, Clouse, and ISS, the "Foreign LPs"); and (f) American Private Equity Partners II, LP.[2]

## PRELIMINARY STATEMENT[3]

Plaintiff is a post-confirmation litigation trustee pursuing claims against the LP Defendants for the primary benefit of two institutional money managers, Black Diamond and Spectrum, who purchased their first-lien debt at a deep discount. The LP Defendants, by contrast, include a number of the largest public and private pension funds in the United States, among others. In essence, Plaintiff seeks to render those funds—and the hundreds of thousands of public- and private-sector employees and retirees for whose benefit they invest—collateral damage in a feud between private equity titans. On that basis alone, the Court should be enormously skeptical of Plaintiff's motives and those of the parties behind the scenes driving a nearly decade-long assault on the Partnerships (and, in turn, the LP Defendants and their beneficiaries).

Plaintiff is not a typical post-confirmation litigation trustee pursuing estate claims to provide a modest recovery to unsecured creditors. Rather, Plaintiff's primary beneficiaries, Black Diamond and Spectrum,[4] are sophisticated alternative asset managers that were senior secured lenders to Allied, a financially distressed trucking company whose debt they reportedly acquired at a very deep discount. In 2012, in an effort to usurp ownership of Allied from the Partnerships, Black Diamond and Spectrum forced Allied into chapter 11 bankruptcy, a gambit that ultimately

---

[2]   By filing this brief and its related motion, the LP Defendants do not waive any rights, arguments, or defenses, including but not limited to (a) any grounds for dismissal of the Complaint (including any claims asserted therein) that are not subject to waiver pursuant to Fed. R. Civ. P. 12(h) or other applicable law and (b) the right to seek mandatory and/or permissive abstention.

[3]   Capitalized terms used in this Preliminary Statement but not yet defined have the meanings given below.

[4]   See Bankr. D.I. 3360 (Plan § 5.14 (Litigation Proceeds Waterfall)). Citations to ECF documents filed in the Delaware Chapter 11 Cases (defined below) are cited as "Bankr. D.I. __".

resulted in a liquidation that did not pay their secured claims in full.  Having failed to obtain a par recovery on Allied's distressed debt through the sale to JCT, Black Diamond and Spectrum are now using Plaintiff—behind the veil of a facially sympathetic creditor trust—to seize the legitimate Distributions that the Partnerships were contractually required to make to the LP Defendants from the proceeds of investments unrelated to Allied.  The Court should not countenance this effort by Black Diamond and Spectrum to obtain an outsized return on their discounted investment at the expense of masses of employees and retirees.

The Complaint must be dismissed as to all of the LP Defendants because:

- Count One fails to plead with particularity any facts or circumstances that, taken as true, would demonstrate that the Distributions were made with actual fraudulent intent;

- Count Two fails to allege that the Partnerships were insolvent at the time they made each of the Distributions or were rendered insolvent by any individual Distribution;

- Plaintiff is neither a party to, nor an intended third-party beneficiary of the LPAs, and thus lacks standing to seek to enforce the Return of Distributions Provision in the LPAs through Count Three; and

- any claims to recover the October 2017 Distribution are time-barred pursuant to section 17-607(c) of the Delaware Revised Uniform Limited Partnership Act, 6 Del. C. § 17-101 *et seq.* (the "<u>RULPA</u>").

The Complaint must also be dismissed as to certain LP Defendants based upon the following specific grounds:

- **Foreign LPs**: This Court does not have general or specific personal jurisdiction over the Foreign LPs, and this Court's exercise of jurisdiction over the Foreign LPs would not comport with due process.

- **State Defendants**:  The State Defendants are immune from suit under the Eleventh Amendment to the United States Constitution.

- **NYC Funds**:  Plaintiff failed to satisfy applicable statutory notice requirements that are an absolute threshold condition to asserting claims against the NYC Funds, and thus the Court lacks subject matter jurisdiction over those claims.

- **ERISA Defendants**:  The assets of the ERISA Defendants are exempt from recovery by Plaintiff pursuant to section 206(d) of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. 1001, *et seq.* ("ERISA"), which provides absolute protection for benefits under ERISA plans and the assets held in trust to pay such benefits and, as such, precludes and preempts Plaintiff's claims against the ERISA Defendants.

- **State Street**:  In its capacity as trustee, State Street was a mere conduit for any Distributions made to or for the benefit of American Airlines Trust and lacked dominion or control over such Distributions, and thus is not a party from which Plaintiff can recover.

For each of the foregoing reasons, and as discussed more fully below, the Complaint should be dismissed with prejudice as to all of the LP Defendants.

## JURISDICTION AND VENUE

This Court is alleged to have jurisdiction over this adversary proceeding and this motion pursuant to 28 U.S.C. §§ 157(a) and 1334(b).  Venue is proper in this District under 28 U.S.C. § 1409.  The LP Defendants deny that this adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and (2) for the reasons set forth in their motion to withdraw the bankruptcy reference currently pending before the District Court.

For the avoidance of doubt, nothing in this jurisdictional statement waives, or may be construed to waive, any of the LP Defendants' arguments or defenses that this Court lacks personal jurisdiction over any LP Defendant or subject-matter jurisdiction over any claim now or hereafter asserted in this adversary proceeding.

The LP Defendants demand a jury trial.  Under Rule 9013-1(f) of the *Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware* (the "Local Rules"), to the extent that any matters in this adversary proceeding are heard by the Bankruptcy Court (defined below), the LP Defendants do not consent to the Bankruptcy

Court entering any final orders and maintain that the Bankruptcy Court lacks the constitutional authority to do so.

## STATEMENT OF FACTS

### I.     THE LP DEFENDANTS

Each of the LP Defendants is a limited partner of Yucaipa American Alliance Fund I, L.P. and/or Yucaipa American Alliance (Parallel) Fund I, L.P. (collectively, the "Partnerships").

### A.     The Limited Partnership Agreements

The Partnerships are governed by limited partnership agreements dated as of March 4, 2005 (together, as amended from time to time, the "LPAs").[5]  Under the LPAs, the day-to-day and other routine activities of the Partnerships are controlled by Yucaipa Alliance Management, LLC (the "Manager") and/or other Yucaipa-affiliated entities and individuals.[6]   In addition, Yucaipa American Alliance Fund I, LLC (the "General Partner"),[7] owes an express fiduciary duty to the Partnerships.  See LPAs, Art. 2.5.

The Partnerships' limited partners did not and do not participate in management of the Partnerships or otherwise exercise control over the Partnerships' affairs.  LPAs, Art. 3.1. The LPAs also contain a "Limitation of Liability" provision that provides, with certain exceptions, that "the

---

[5]     Copies of the LPAs are attached as **Exhibits A** and **B** to the *Declaration of Michael S. Etkin* filed contemporaneously herewith (the "Etkin Declaration").  Citations to "LPAs, Art. __" refer to substantially identical articles in each of the LPAs unless otherwise indicated.  The Complaint references, but does not attach, the LPAs.  Count Three of the Complaint presumes the terms of the LPAs.  For that reason, the Court should consider the actual terms of the LPAs and they may be attached to a motion to dismiss.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308,322 (2007); Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993) ("a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document").

[6]     Nothing in this *Memorandum of Law* is intended to or shall limit or waive any of the LP Defendants' rights, claims, or causes of action against any person or entity, including but not limited to the right to assert that other entities, individuals, or both, controlled the Partnerships or the assets thereof, or exercised investment discretion or control over the assets of the Partnerships, and in connection therewith, breached their duties to the Partnerships, the LP Defendants, or both.  Upon information and belief, such other parties exist and likely face significant liability to the LP Defendants in connection with the Partnerships' investment in Allied.

[7]     The "General Partner" is defined in the LPAs as "Yucaipa American Alliance Fund I, LLC, a Delaware limited liability company and any additional or successor general partner of the Partnership in its capacity as the general partner of the Partnership".  LPAs, Art. 14.

liability of each Limited Partner for the debts, liabilities and obligations of the [Limited] Partnership[s] shall not exceed such Limited Partner's Capital Commitment."  LPAs, Art. 3.2.

The LPAs also set forth various criteria for determining when the General Partner is required to make distributions from the Partnerships to their limited partners. Article 6.6(a) provides that distributions are permitted only to the extent of "Available Assets" and in compliance with the RULPA and other applicable law.  Therefore, prior to making any distributions, the General Partner has a good-faith obligation to determine the extent of the Partnerships' "Available Assets," which the LPAs define as:

> excess of cash, cash equivalent items and temporary Investments held by the Partnership over the sum of the amount of such items ***determined by the General Partner to be reasonably necessary for the Payment of the Partnership's expenses, liabilities, and other obligations (whether fixed or contingent)***, and for the establishment of appropriate reserves for such expenses, liabilities and obligations as may arise, including the maintenance of adequate working capital for the continued conduct of the Partnership's business.

LPAs, Art. 14.  In addition, any "<u>Distributable Cash</u>"[8] may not be reinvested or retained by the Partnerships.  Instead, Distributable Cash ***must be distributed*** in accordance with the LPAs within ninety days after receipt.  LPAs, Art. 6.3.

The maximum term of the Partnerships is the tenth anniversary of the Final Closing Date, subject to extension for up to three successive one-year terms, if certain approvals are met.  The Final Closing Date for each of the Partnerships is defined in the LPAs as the earlier of the date on which the last limited partner was admitted thereto and the "Outside Admission Date."  LPAs, Art. 1.4.  The Outside Admission Dates for the Partnerships were March 31, 2005 and July 31, 2005.

---

[8]   Distributable Cash is defined in the LPAs as "the excess of (a) the sum of cash receipts of all kinds, other than Capital Contributions that are being held by the Partnership pending investment, over (b) cash disbursements for expenses of the Partnership (or amounts reserved against liabilities, contingent or otherwise, or other obligations of the Partnership to pay Partnership Expenses or to pay Organizational Expenses)."  LPAs, Art. 14.

Therefore, the tenth anniversary of the Final Closing Date occurred no earlier than 2015 and may have been extended through 2018 at the latest.

The LPAs further provide that upon the first occurrence of certain enumerated events, including the expiration of the Partnerships' term, the Partnerships' affairs shall be wound up within a reasonable time period so as to allow for the orderly liquidation of their assets.  LPAs, Art. 13.1(a); see also LPAs, Art. 13.4 ("A reasonable time period shall be allowed for the orderly winding up and liquidation of the assets of the Partnership and the discharge of liabilities to creditors so as to enable the General Partner to seek to minimize potential losses upon such liquidation.").

In addition to the General Partner's ongoing obligation to make distributions of Available Assets and Distributable Cash, the LPAs further require the General Partner to dispose of all Portfolio Investments as soon as reasonably practicable following an extension of the Partnerships' term, as follows:

> In the event the Term is extended past the tenth anniversary of the Final Closing Date, the General Partner shall use its reasonable best efforts to dispose of all Portfolio Investments then held by the Partnership as soon as reasonably practicable after such tenth anniversary, taking into account, such factors as the General Partner deems appropriate in its sole discretion, including whether appropriate disposition opportunities are readily available, the likelihood that such Portfolio Investments would increase or decrease in value if the Partnership were to continue to hold such Portfolio Investments, transfer restrictions applicable to such Portfolio Investments, general market conditions, and the costs to the Partnership if the Partnership were to continue to hold such Portfolio Investments.

LPAs, Art. 1.4.

Upon information and belief, the tenth anniversary of the Final Closing Date occurred no later than 2015, and the Partnerships' term was extended several times.  Thus, as a result of those

extensions, the General Partner was ***required*** by the terms of the LPAs to dispose of the Partnerships' Portfolio Investments and, in turn, to distribute the Available Assets and Distributable Cash created by each such disposition.  Unsurprisingly, as would any other private equity limited partnership nearing the end of its life cycle, and as mandated by the LPAs, the Partnerships made a series of distributions to their investors—including the LP Defendants—between approximately 2015 and 2019.  The Distributions were among those required liquidating distributions, and were made in the ordinary course of the Partnerships' business.

The LPAs allow, but do not require, the General Partner to seek a return of distributions from the limited partners for the purpose of meeting the Partnerships' indemnity obligations set forth in Article 10.1(a).  LPAs, Art. 10.1(b) ("the General Partner ***may*** require each Partner (including any former Partner) to return any and all distributions made to such Partner up to an amount equal to such Partner's pro rata share of the Partnership's indemnity obligations for Damages under Section 10.1(a), regardless of whether the Portfolio Investments which gave rise to such distributions are related to the Damages for which indemnity is sought.") (the "Return of Distributions Provision") (emphasis added).

Articles 10.1(c) and (e) of the LPAs limit each limited partner's potential obligation to return its distributions for the purpose of meeting the Partnerships' indemnity obligations.  Specifically, Article 10.1(c) states that no limited partner shall be required to return any distribution after the second anniversary of the date of such distribution.  Article 10.1(c) further provides that each limited partner's obligation to return distributions for the purpose of meeting the Partnerships' indemnity obligations is limited to 25% of such LP's capital commitment.  LPAs, Art. 10.1.

Only the Partnerships, the General Partner, the limited partners, and the Manager have contractual rights under the LPAs.  Significantly, the LPAs expressly state that nothing in Article

10.1 (which includes the Return of Distributions Provision) shall be construed to confer any rights or claims upon anyone not party to the LPAs:

> Nothing in this Section 10.1, express or implied, is intended or shall be construed to give any Person other than the Partnership, the Partners or the Manager any legal or equitable right, remedy or claim under or in respect of this Section 10.1 or any provision contained herein.

LPAs, Art. 10.1(e). Accordingly, third parties—including judgment creditors of the Partnerships such as Plaintiff—have no independent right to seek the return of any distributions made to limited partners pursuant to the LPAs, or to compel the General Partner to do so.

### B.   Allied's 2005 Georgia Chapter 11 Cases

Allied,[9] once a unionized automobile and truck hauler that contracted with various automobile manufacturers to transport new vehicles in North America, filed a petition for relief under title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Georgia (the "Georgia Bankruptcy Court") on July 31, 2005 (the "Georgia Chapter 11 Cases"). Compl. ¶ 54–55.

In May 2006, the Partnerships purchased a majority stake in Allied's senior debt for $81.6 million. Together with other related transactions during the same period, the Partnerships' initial investment in Allied totaled approximately $95 million.

Through the plan of reorganization confirmed in the Georgia Chapter 11 Cases in 2007 (the "2007 Plan"), the Partnerships' initial investment in Allied was converted into 67% of reorganized Allied's equity and the Partnerships obtained the right to appoint a majority of the members of Allied's Board. Compl. ¶¶ 57–58.

---

[9]   ASHINC Corp. and its debtor affiliates in the Delaware Chapter 11 Cases (defined below) will be referred to herein as "Allied."

In the Georgia Chapter 11 Cases, the Georgia Bankruptcy Court approved exit financing for Allied comprised, in part, of a $265 million first lien facility (the "First Lien Facility") governed by a First Lien Credit Agreement (the "FLCA").  Compl. ¶ 60.  BDCM Opportunity Fund II, LP, Black Diamond CLO 2005-1 Ltd. (together, "Black Diamond"), Spectrum Investment Partners, L.P. ("Spectrum"), and CIT Group/Business Credit, Inc. ("CIT") were among the lenders (the "First Lien Lenders") under the First Lien Facility.  Black Diamond and Spectrum together held a minority stake in Allied's first-lien secured debt under the FLCA (the "First Lien Debt").[10]

According to the Complaint, the FLCA, as initially executed in May 2007, prohibited the First Lien Lenders from assigning any portion of the First Lien Debt to the Partnerships, Allied's controlling shareholder.  Compl. ¶¶ 55, 64.  The FLCA also provided that only the "Requisite Lender"—one or more lenders holding more than 50% of the First Lien Debt—was entitled to take certain actions and exercise specific remedies (or refrain from doing so) on behalf of all First Lien Lenders.  Compl. ¶ 64.  In April 2008, Allied and the First Lien Lenders entered into an amendment to the FLCA (the "Third Amendment") that, among other things, allowed the Partnerships to acquire a limited amount of First Lien Debt, but required the Partnerships to make a capital contribution to Allied in connection therewith (the "Capital Contribution Provision").  Compl. ¶ 67.

In February 2009, ComVest Investment Partners ("ComVest") acquired approximately 54% of Allied's First Lien Debt and became the Requisite Lender under the FLCA.  On August 21, 2009, the Partnerships and ComVest entered into a Loan Purchase Agreement pursuant to which the Partnerships purchased ComVest's $145.1 million (principal amount) of First Lien Debt

---

[10]   See Yucaipa Am. All. Fund I, LP v. Ehrlich, 716 F. App'x 73, 74 (3d Cir. 2017) ("In May 2007, Allied borrowed $265 million of first lien debt from numerous lenders pursuant to a credit agreement. BD/S were among the lenders, and held a minority stake in the first lien debt.").

for approximately $43 million (the "ComVest Transaction").  A fourth amendment to the FLCA, approved by a majority of the First Lien Lenders, was executed on the same day.  Compl. ¶ 80. Plaintiff has asserted that the Partnerships never made a capital contribution to Allied pursuant to the Capital Contribution Provision and thus never became a Requisite Lender under the FLCA. Compl. ¶¶ 81–84.

### C.     Allied's 2012 Bankruptcy

On May 17, 2012, affiliates of Black Diamond and Spectrum filed an involuntary chapter 11 petition against Allied in this Court (the "Bankruptcy Court").  Allied subsequently consented to the entry of orders for relief under chapter 11 of the Bankruptcy Code and, along with certain affiliates, filed voluntary chapter 11 petitions for relief (the "Delaware Chapter 11 Cases").

On September 17, 2013, the Bankruptcy Court approved the sale of substantially all of Allied's assets to Jack Cooper Holdings Corp. ("JCT") pursuant to section 363 of the Bankruptcy Code for $135 million (the "JCT Sale").[11]  The net proceeds of the JCT Sale amounted to 55.2% of the amounts owing to the First Lien Lenders in accordance with the FLCA and the Sale Order.[12]

Pursuant to the JCT Sale Order, an escrow account (the "Escrow Account") was established to hold the $35 million portion of the JCT Sale proceeds allocable to the Partnerships based on their pro rata share of the First Lien Debt, pending (i) a decision on any challenges to the enforceability of the Partnerships' First Lien Debt including, inter alia, claims for recharacterization, subordination, or disallowance; or alternatively, (ii) joint instructions from the Partnerships and the Black Diamond / Spectrum-affiliated administrative agent for the First Lien Lenders (the "BD/S Agent").[13]  The BD/S Agent separately reserved over $10 million on account

---

[11]   See Bankr. D.I. 1837 (the "JCT Sale Order"), ¶ 5.
[12]   See JCT Sale Order, ¶ 13.
[13]   See JCT Sale Order, ¶ 13.

of the Partnerships' entitlement to certain defense costs in connection with litigation between the Partnerships, on the one hand, and Black Diamond and Spectrum, on the other hand.[14] Accordingly, the total of the Partnerships' escrowed and reserved funds totals approximately $45 million (the "Reserved Funds").  The Reserved Funds remain in escrow or reserve, as applicable.

Two adversary proceedings were filed during the Delaware Chapter 11 Cases: a 2013 adversary proceeding commenced by the Official Committee of Unsecured Creditors of Allied (the "Committee"), derivatively asserting estate claims against the Partnerships and several former Allied directors (the "Estate Action"),[15] and a 2014 adversary proceeding commenced by Black Diamond and Spectrum, in their individual capacities and as agents for the First Lien Lenders, asserting direct claims against the Partnerships, several former Allied directors, and Ronald Burkle (the "Lender Action"[16] and together with the Estate Action, the "Adversary Proceedings").[17] Compl. ¶ 95.

The Adversary Proceedings sought damages for, among other things, the Partnerships' alleged breach of the Capital Contribution Provision in an amount not less than $57,356,044.33 (plus pre-judgment interest accruing from the alleged August 31, 2009 breach), recovery and avoidance of millions of dollars of allegedly fraudulent transfers, damages for the Partnerships' alleged breaches of fiduciary duties, and equitable subordination of the Partnerships' portion of the First Lien Debt.  Compl. ¶ 96.

More specifically, the Adversary Proceedings asserted claims for (i) equitable subordination, (ii) recharacterization of the Partnerships' First Lien Debt and second lien debt,

---

[14]  See Del. D.C. No. 21-cv-00994, D.I. 39.

[15]  Adv. Pro. No. 13-50530 (Bankr. D. Del.).

[16]  Adv. Pro. No. 14-50971 (Bankr. D. Del.).

[17]  The Adversary Proceedings are administered under Del. Adv. Pro. No. 13-50530. Citations to ECF documents filed in the Adversary Proceedings will be cited as "Yucaipa Adv. Pro., D.I. __"

(iii) breach of contract, (iv) specific performance of the Third Amendment to the FLCA (based on the Capital Contribution Provision or alternatively for the divestiture of debt), (v) breach of fiduciary duty, (vi) aiding and abetting breaches of fiduciary duties, (vii) avoidance and recovery of avoidable transfers, (viii) disallowance of certain claims, (ix) breach of the duty of good faith and fair dealing, and (x) tortious interference with contract against certain Yucaipa-affiliated directors of Allied.

Plaintiff is the trustee of a litigation trust (the "<u>Litigation Trust</u>") created pursuant to the Plan to continue prosecuting the Adversary Proceedings. The Plan and related documents established a three-member oversight committee to govern the Litigation Trust (the "<u>Litigation Trust Oversight Committee</u>"), comprised of two members selected by Black Diamond and Spectrum (acting jointly) and a third member selected by the Committee, subject to the additional requirement that all three members be reasonably satisfactory to certain affiliates of Black Diamond and Spectrum that agreed to provide up to $15 million to fund the continued prosecution of the Adversary Proceedings.[18]

The *Findings of Fact, Conclusions of Law, and Order Confirming the Plan* (the "<u>Confirmation Order</u>")[19] entered by the Bankruptcy Court on December 9, 2015 confirmed the Plan and appointed Plaintiff as the Litigation Trustee and Plan Administrator.[20] Upon the December 20, 2016 effective date (the "<u>Effective Date</u>") of the Plan,[21] the Litigation Trustee was substituted as plaintiff in both of the Adversary Proceedings, which thereafter have been prosecuted jointly in a single action.[22] Accordingly, the Litigation Trustee stepped into the shoes

---

[18]   Bankr. D.I. 3360 (the "<u>Plan</u>"), Art. A, § 5.12(a); <u>see also</u> Bankr. D.I. 3207 (the Plan Supplement).
[19]   Bankr. D.I. 3383.
[20]   Bankr. D.I. 3360, ¶¶ 20, 22.
[21]   Bankr. D.I. 3360.
[22]   <u>See</u> *Order Substituting Plaintiffs and Amending Captions in Above-Referenced Adversary Proceedings to Reflect Litigation Trustee as Plaintiff.* Yucaipa Adv. Pro., D.I. 415.

of the Committee and Black Diamond / Spectrum in prosecuting all of the claims asserted in the Adversary Proceedings.[23]

### D.      Post-Confirmation Litigation in the Adversary Proceedings

In July 2020, Plaintiff filed a motion in the Delaware Chapter 11 Cases pursuant to Bankruptcy Rule 2004 seeking discovery from the Partnerships regarding their assets and previous distributions (the "Rule 2004 Motion").[24]   The Partnerships objected to the Rule 2004 Motion based on the substantial risks of disclosing sensitive investor information and that such a request, when brought prior to the entry of any judgment, is premature.[25]

At the hearing on the Rule 2004 Motion in September of 2020, counsel to Plaintiff acknowledged before this Court that Plaintiff learned of the Partnerships' distributions through public filings.[26]

Moreover, the Rule 2004 Motion itself directly contradicts Plaintiff's unfounded assertion that the Partnerships concealed the fact that the Distributions were made.  In fact, the Rule 2004 Motion admits that the Partnerships' counsel *voluntarily confirmed* such information in informal conversations before any discovery on this issue was ordered.[27]   In connection with the Rule 2004

---

[23]    See Bankr. D.I. 3360 at §§ 5.11(a), 5.13 ("Upon the transfer of the Litigation Trust Assets,[23] the ASHINC Litigation Trust shall succeed to all of [Allied's] and the First Lien Agents' rights, title and interest in the Litigation Trust Assets, and [Allied] and the First Lien Agents will have no further interest in or with respect to the Litigation Trust Assets (other than on account of the Litigation Trust Interests).").

[24]    Bankr. D.I. 4086.

[25]    Bankr. D.I. 4105.

[26]    See also Rule 2004 Hr'g Tr. at 5:6-9 (Sept. 24, 2020) ("The trustee learned of these distributions late last year and was able to confirm through publicly-available documents that a significant distribution had in fact occurred.").

[27]    Bankr. D.I. 4086, ¶ 1 ("Earlier [in 2020], the Trustee uncovered that [the Partnerships] made a significant distribution to one of its investors last spring.  The Trustee was subsequently told by [the Partnerships'] counsel that distributions had, in fact, been routinely made to other Yucaipa Fund investors over time. [The Partnerships'] counsel further claimed that such distributions were made in compliance with the [LPAs]"); see also Bankr. D.I. 4086, Ex. C (attached to the Rule 2004 Motion is a public filing that identifies a number of the LP Defendants and the amount of their partnership contributions, which Plaintiff concedes was available via Bloomberg).

Motion negotiations, the Partnerships even provided a declaration that the Distributions were made in compliance with the LPAs.[28]

Quite tellingly, this Court **agreed with the Partnerships' position** regarding the disclosures sought by Plaintiff, and denied the Rule 2004 Motion.[29]   Plaintiff concedes this point in the Complaint.  See Compl. ¶ 116 ("The Bankruptcy Court initially denied the Rule 2004 Motion without prejudice, noting that it would await an upcoming summary judgment argument in the Adversary Proceedings before revisiting.").   Thus, not only is Plaintiff's assertion that the Partnerships "spent years actively trying to conceal the [Distributions], including the identity of the transferees" (Compl. ¶ 140(b)) utterly baseless, it is also directly rebutted **by Plaintiff's own admissions** and this Court's ruling in connection with the Rule 2004 Motion.

On May 4, 2021, after years of litigation in the Adversary Proceedings, the Bankruptcy Court entered an Opinion and Order (the "2021 SJ Opinion")[30] granting in part and denying in part the motions for summary judgment separately filed by Plaintiff and the Partnerships.  On June 23, 2021, the Court entered judgment against the Partnerships pursuant to the 2021 SJ Opinion, awarding Plaintiff damages in the amount of $132,431,957 (inclusive of more than $60 million of pre-judgment interest), plus post-judgment interest for breach of the Capital Contribution Provision, and for recovery of certain fraudulent transfers (the "Judgment").[31]   Notwithstanding Plaintiff's attempt to paint the rulings in the Adversary Proceedings between 2012 and 2021 as a string of failures for the Partnerships, the Judgment was the **first time** monetary damages were awarded in **any** of the litigation against the Partnerships.

---

[28]   Bankr. D.I.  4086, ¶ 16.

[29]   See Rule 2004 Hr'g Tr. at 25:9-10 (Sept. 24, 2020) (In denying Plaintiff's motion without prejudice, Judge Sontchi stated: "But it seems premature to me at this particular moment to be pursuing that kind of discovery at this time.").

[30]   Yucaipa Adv. Pro., D.I. 825, 826.

[31]   Yucaipa Adv. Pro., D.I. 841.

Notably, in the 2021 SJ Opinion, this Court also granted summary judgment in favor of the Partnerships with respect to Plaintiff's claims seeking to recharacterize the Partnership's First Lien Debt and second lien debt and seeking specific performance of the Third Amendment to the FLCA, holding those claims were mooted by the Plan.  The Court denied summary judgment on Plaintiff's tortious interference claim against certain of the Yucaipa-affiliated directors of Allied, as those claims were voluntarily dismissed.[32]  On July 6, 2021, the Partnerships filed a Notice of Appeal[33] from the 2021 SJ Opinion and Judgment, which remains pending before District Court Judge Colm F. Connolly at Civil Action Nos. 21-cv-994 and 995 ("Yucaipa's 2021 Appeal").

On July 8, 2021, following entry of the Judgment, this Court entered an order granting Plaintiff's motion for Rule 2004 discovery regarding the Partnerships' distributions (the "Rule 2004 Order").  Compl. ¶¶ 117, 120.  The Partnerships made an initial production pursuant to the Rule 2004 Order on July 19, 2021 (Compl. ¶ 120), and responded to Plaintiff's first sets of interrogatories and document requests on August 9, 2021.[34] Plaintiff claims to have relied upon that post-judgment discovery in drafting the Complaint.  Compl. ¶ 120.

### E.    The Remaining Claims and the Trial Opinion

Following the 2021 SJ Opinion and entry of the Judgment, the claims remaining for trial in the Adversary Proceedings included (a) equitable subordination of the Partnerships' First Lien Debt, (b) breach of fiduciary duty, and (c) breach of the duty of good faith and fair dealing (the "Remaining Claims").  This Court held a trial on the Remaining Claims between March 1 and March 17, 2022.

---

[32] See 2021 SJ Opinion at 94.
[33] Yucaipa Adv. Pro., D.I. 858.
[34] See Yucaipa Adv. Pro., D.I. 871.

On May 2, 2022, this Court issued a written opinion on the Remaining Claims (the "Trial Opinion"), holding that Plaintiff was not entitled to any recovery on account of the Remaining Claims because she failed to demonstrate that the Partnerships caused any damage to Allied or its creditors in the course of negotiations with JCT, as required to establish her claims for breach of fiduciary duty and breach of the duty of good faith and fair dealing.  Moreover, since Plaintiff did not allege any other harm, she was also unable to establish there was an injury to Allied or its creditors, as required to prove her equitable subordination claim.  Subject to Plaintiff's appellate rights, the Trial Opinion effectively caps the principal amount of Plaintiff's judgment against the Partnerships (and therefore, the recovery she could seek from the LP Defendants) at approximately $132.4 million.  On May 12, 2022, Plaintiff filed a Notice of Appeal[35] seeking a review of the Trial Opinion in the District Court.[36]  Given the nature and detailed factual findings of this Court's ruling on the Remaining Claims, it appears highly unlikely that Plaintiff will obtain any relief on appeal.

F.      **This Adversary Proceeding**

On October 6, 2021, Plaintiff, as a judgment creditor of the Partnerships, filed the Complaint against the General Partner, Yucaipa American Management LLC, the LP Defendants, and several other limited partners of the Partnerships (collectively, "Defendants").   Between October 6, 2021 and October 14, 2021, Plaintiff filed an additional eight actions against certain of the Defendants based on the same allegations and theories set forth in the Complaint in state courts in California, Maryland, Massachusetts, New Jersey, New Mexico, New York, and Washington, and in the Superior Court of the District of Columbia.

---

[35]    Yucaipa Adv. Pro., D.I. 1010.
[36]    The Trial Opinion appeal is pending before the District Court at Civil Action No. 22-cv-00634.

The Complaint alleges that the Partnerships transferred approximately $379.7 million to the Defendants between October 2017 and May 2019 (the "Distributions") in an attempt to render the Partnerships judgment proof.  The Complaint contains three counts, as follows:

(i)     Count One:  to avoid and recover the Transfers made by the Partnerships to the LP Defendants as actual fraudulent transfers pursuant to the Uniform Fraudulent Transfer Act, 6 Del. C. § 1304(a)(1);

(ii)    Count Two:  to avoid and recover the Transfers as constructively fraudulent transfers pursuant to the Uniform Fraudulent Transfer Act, 6 Del. C. §§ 1304(a)(2) and 1305(a); and

(iii)   Count Three:  a declaratory judgment that the General Partner is liable for the debts of the Partnerships and requiring the General Partner to seek the return of the Transfers to satisfy any obligations that the Partnerships have, or may in the future incur, to the Litigation Trustee.

The Distributions that Plaintiff seeks to avoid and recover occurred on four separate dates, as follows:

| Date | Total Distributions[37] |
|---|---|
| October 11, 2017 | $14,353,203 |
| October 10, 2018 | $123,364,044 |
| March 15, 2019 | $55,481 |
| May 3, 2019 | $242,021,281 |

Compl. ¶¶ 130–38.

Shortly after this Adversary Proceeding was commenced, Plaintiff and the LP Defendants (among other Defendants) entered into stipulations extending the deadline to respond to the Complaint, which stipulations were approved by this Court by orders dated December 2, 10, and 26, 2021 [D.I. 9, 21 and 23], February 11, 2022 [D.I. 40], and March 3, 2022 [D.I. 44].  On April 12, 2022, this Court entered an order approving a stipulation further extending the LP Defendants' deadline to respond to the Complaint to thirty days after the earlier of (i) written notice by Plaintiff

---

[37]   The figures in this table reflect the Distributions made to all of the Defendants, including the LP Defendants. Distributions to the LP Defendants totaled $344,310,239.

and (ii) this Court's issuance of the Trial Opinion in the Adversary Proceedings (the "Extension Stipulation") [D.I. 59].

On March 4, 2022, the LP Defendants filed the *LP Defendants' Motion to Withdraw the Reference Pursuant to 28 U.S.C. § 157(d) and Federal Rule of Bankruptcy Procedure 5011* (the "Motion to Withdraw the Reference"),[38] which was subsequently transmitted to the District Court and assigned to Judge Colm F. Connolly at Civil Action No. 22-cv-302-CFC (the "District Court Action"). On May 2, 2022, Plaintiff filed a response to the Motion to Withdraw the Reference (the "Response"),[39] and on May 24, 2022, the LP Defendants filed their reply in further support of the Motion to Withdraw the Reference (the "Reply").[40]

Pursuant to the Extension Stipulation, the LP Defendants' response to the Complaint is due on June 1, 2022, thirty days from issuance of the Trial Opinion.

## ARGUMENT

## I.   GROUNDS FOR DISMISSAL APPLICABLE TO ALL LP DEFENDANTS

### A.   Standard for dismissal under Fed. R. Civ. P. 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). To state a plausible claim, a plaintiff must plead enough factual content to raise the "right to relief above the speculative level," and "reflect 'more than a sheer possibility that a defendant has acted unlawfully.'" Oliver v. Roquet, 858 F.3d 180, 192 (3d Cir. 2017) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). Factual allegations that are "merely consistent with a defendant's liability" are not sufficient to state a plausible claim for

---

[38]   D.C. Del. D.I. 1.  Citations to ECF documents filed in the District Court Action will be cited as "D.C. Del., D.I. __".

[39]   D.C. Del. D.I. 9.

[40]   D.C. Del. D.I. 16.

relief.  <u>Ashcroft</u>, 556 U.S. at 678.  A plaintiff must assert "more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do."  <u>Twombly</u>, 550 U.S. at 545.

Courts generally accept factual allegations in a complaint as true when considering a Rule 12(b)(6) motion to dismiss.  <u>Ashcroft</u>, 556 U.S. at 678.  However, courts give no credit to bald assertions, legal or unsupported conclusions, or unwarranted inferences such as those contained in the Complaint.  <u>See</u> <u>Sands v. McCormick</u>, 502 F.3d 263, 268 (3d Cir. 2007) ("[A] court need not credit a plaintiff's bald assertions or legal conclusions when deciding a motion to dismiss."); <u>In re SRC Liquidation LLC</u>, 581 B.R. 78, 85 (D. Del. 2017) ("The Court is not obligated to accept as true bald assertions, unsupported conclusions and unwarranted inferences, or allegations that are self-evidently false.").

Courts in the Third Circuit perform a two-part analysis on a Rule 12(b)(6) motion to dismiss.  <u>See</u> <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210 (3d Cir. 2009).  First, the court separates the factual and legal elements of a claim, and "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions."  <u>Id.</u> at 210-11.  Second, the court "must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'"  <u>Id.</u>  "Conclusory allegations or legal conclusions masquerading as factual conclusions" do not satisfy a plaintiff's pleading burden to survive a motion to dismiss.  <u>In re OSC 1 Liquidating Corp.</u>, 529 B.R. 825, 830 n.17 (Bankr. D. Del. 2015) (quoting <u>General Motors Corp. v. New A.C. Chevrolet, Inc.</u>, 263 F.3d 296, 333 (3d Cir. 2001)); <u>see also</u> <u>Oliver</u>, 858 F.3d at 192 ("A plaintiff's bare assertions amounting to nothing more than a 'formulaic recitation' of the elements of a [claim] will not suffice.").

**B.     Count One of the Complaint fails to state a claim for avoidance and recovery of the Distributions as actual fraudulent transfers.**

Through Count One, Plaintiff seeks to avoid and recover the Distributions as actual fraudulent transfers pursuant to the Delaware Uniform Fraudulent Transfer Act, 6 Del. C. §§ 1301 *et seq.* (the "Delaware UFTA").  However, Plaintiff has pleaded no more than a bare recitation of the statutory elements of an actual fraudulent transfer claim under the Delaware UFTA, with no particularized factual allegations that could support an inference of actual fraud.  See Compl. ¶ 140.  That is insufficient to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6) and 9(b).  Because Plaintiff had the benefit of nearly a decade of litigation and ample discovery – including substantial post-judgment discovery—when drafting the Complaint, Plaintiff is not entitled to any relaxation of the applicable standards for dismissal.  Nor should Plaintiff, having failed to plead *any* facts that would suggest actual fraud, be granted a second bite at the apple.  Count One must be dismissed, and in the interests of justice, dismissal should be with prejudice.

*i.     Heightened pleading requirements under Fed. R. Civ. P. 9(b)*

A cause of action alleging fraud, such as Count One of the Complaint, must also meet the heightened pleading standard under Federal Rule of Civil Procedure 9(b), made applicable here by Bankruptcy Rule 7009.  The pleading requirements of Rule 9(b) apply to all claims that "sound in fraud" even if fraud is not an element of the claim.  See Travelers Indem. Co. v. Cephalon, Inc., 620 F. App'x 82, 85 n.3 (3d Cir. 2015) ("Even when 'fraud is not a necessary element of a claim, claims that do sound in fraud must be pled with particularity.'") (quoting In re Westinghouse Sec. Litig., 90 F.3d 696, 717 (3d Cir. 1996)).  Rule 9(b) requires a plaintiff to state with particularity the circumstances of the alleged fraud.  Easton Technical Prods., Inc. v. FeraDyne Outdoors, LLC, No. 18-1222, 2019 WL 1513463, at *2 (D. Del. Apr. 8, 2019) (to satisfy the "requisite particularity under Rule 9(b), the pleading must identify the specific who, what, when, where, and how . . . ").

The purpose of Rule 9(b)'s heightened pleading requirement is "to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." Lum v. Bank of Am., 361 F.3d 217, 223–24 (3d Cir. 2004); MarkDutchCo 1 B.V. v. Zeta Interactive Corp., 411 F. Supp. 3d 316, 331 (D. Del. 2019) (quoting Lum).

ii.     *Fed. R. Civ. P. 9(b) applies to Count One of the Complaint.*

Under the Delaware UFTA, an actual fraudulent transfer occurs only where the transfer is made "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor" that made the transfer.  6 Del. C. § 1304(a)(1).  As such, to survive a motion to dismiss, claims to avoid and recover actual fraudulent transfers must satisfy the heightened pleading standard required by Federal Rule of Civil Procedure 9(b).  See, e.g., In re Circle Y of Yoakum, Tex., 354 B.R. 349, 356 (Bankr. D. Del. 2006) (dismissing plaintiff's state-law actual fraudulent transfer claims for failure to plead with particularity as required by Rule 9(b)).

iii.    *Plaintiff is not entitled to relaxation of the requirements of Rule 9(b).*

Under certain circumstances, bankruptcy trustees and post-confirmation litigation trustees are entitled to relaxation of the heightened pleading standard mandated by Rule 9(b).  Plaintiff is not entitled to any such deference here.  In the cases where courts have relaxed Rule 9(b), they did so because plaintiffs were relative strangers to the bankruptcy proceedings, having been appointed anew to prosecute estate litigation claims.  See, e.g., In re Fedders N. Am., Inc., 405 B.R. 527, 544 (Bankr. D. Del. 2009) (basing relaxation of Rule 9(b) on "the trustee's 'inevitable lack of knowledge concerning acts of fraud previously committed against the debtor, a third party'").  That concern does not exist here.  Plaintiff has served as litigation trustee and plan administrator since December 2015—nearly six and a half years.  During the course of the Adversary Proceedings, Plaintiff received volumes of discovery from the Partnerships, including more than two thousand

pages of targeted, collection-focused, post-judgment discovery upon which she claims to have based the Complaint.  Under such circumstances, relaxation of Rule 9(b) is unwarranted.  See, e.g., In re SRC Liquidation LLC, 581 B.R. 78, 86-87 (D. Del. 2017) ("Courts sometimes relax the heightened standard for bankruptcy trustees bringing fraud claims on behalf of a debtor and its creditors *where the trustee has not been afforded any discovery prior to filing a complaint*.") (emphasis added).  Plaintiff had the benefit of substantial discovery during years of litigation before filing the Complaint, is not a stranger to the parties or the facts, and thus is not entitled to any relief from the heightened pleading requirements of Rule 9(b).

> iv.    *Plaintiff has failed to satisfy the heightened pleading standard of Fed. R. Civ. P. 9(b).*

The Delaware UFTA sets forth a non-exhaustive list of eleven factors that courts may consider when determining whether a transfer was made with actual fraudulent intent: (1) whether the transfer was to an insider; (2) whether the transferor retained possession or control of the property transferred after the transfer; (3) whether the transfer was disclosed or concealed; (4) whether, before the transfer was made, the debtor had been sued or threatened with suit; (5) whether the transfer was of substantially all of the debtor's assets; (6) whether the debtor absconded; (7) whether the debtor removed or concealed assets; (8) whether the value of the consideration the debtor received was the reasonable equivalent to the value of the asset transferred; (9) whether the debtor was insolvent or became insolvent shortly after the transfer was made; (10) whether the transfer occurred shortly before or after a substantial debt was incurred; and (11) whether the debtor transferred the essential assets of the business to a lienholder who then transferred the assets to an insider of the debtor.  6 Del. C. § 1304(b)(1)–(11).

The Complaint does not set forth *any* facts even to suggest actual fraudulent intent, much less any detailed allegations that, taken as true, would demonstrate that the Distributions were

made with actual fraudulent intent.  Rather, the Complaint contains only a bare recitation of the factors set forth in the Delaware UFTA.  While the Complaint alleges that the Partnerships concealed the Distributions, as discussed above, that assertion is flatly controverted by Plaintiff's own admission in connection with the Rule 2004 Motion that she obtained information regarding the Distributions *from the Partnership's public filings* made years before she filed the Complaint. Moreover, this Court ruled at the time, and before judgment was entered, that the Partnerships could not be compelled to produce details concerning the Distributions.

The Complaint also fails to allege any specific financial data or other facts, including any "analysis . . . so that the court can infer [that the Partnerships'] liabilities exceed [their] assets at the time the [Distributions] took place."  In re Liquid Holdings Grp. Inc., No. 16-10202, 2018 WL 2759301, at *19 (Bankr. D. Del. June 6, 2018) (dismissing fraudulent transfer claims and holding that plaintiff failed to plead insolvency where the complaint did not include allegations regarding the debtor's "financial data" or any "financial information indicating that [the debtor] could not meet any financial obligations").  Plaintiff's conclusory statements and bare recitations of the statutory elements in the Delaware UFTA fall well short of the strict requirements of Rule 9(b) and even the lesser requirements of Rule 12(b)(6).  That failure is fatal to Count One.  See, e.g., In re Oakwood Homes Corp., 325 B.R. 696, 699 (Bankr. D. Del. 2005) (dismissing fraudulent transfer claims where plaintiff "alleged no facts or other supporting information which would establish the fraudulent nature of [the] alleged transfers and . . . essentially recited only the statutory language"). Accordingly, Count One must be dismissed.  Because Plaintiff had years of intimate involvement in the Adversary Proceedings, received ample post-judgment discovery before filing the Complaint, and even admitted in other proceedings that she learned of the Distributions from

public filings (flatly rebutting her assertion that the Partnerships "concealed" them), dismissal of Count One should be with prejudice.

### C.  Count Two of the Complaint fails to state a claim for avoidance and recovery of the Distributions as constructively fraudulent transfers.

Under the Delaware UFTA, a transfer is constructively fraudulent if the debtor "made the transfer . . . [w]ithout receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor . . . (a) [w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (b) [i]ntended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."  6 Del. C. § 1304(a)(2).   Thus, to state a constructive fraudulent transfer claim with respect to the Distributions, Plaintiff must allege facts, not conclusions and speculation, that, taken as true, would demonstrate that, *as to each Distribution*, the Partnerships (a) did not receive reasonably equivalent value and (b) were left undercapitalized or unable to pay the debts that they reasonably believed they would incur as they came due.  See id.  Plaintiff has failed to do so as to all of the Distributions, and has in fact pleaded factual allegations that demonstrate that the Partnerships *were not* insolvent before or after each Distribution.  As a result, Count Two must be dismissed.

As with Count One, Plaintiff alleges nothing more in support of Count Two than a bare, blanket recitation of the statutory elements of a constructive fraudulent transfer under the Delaware UFTA.  See Compl. ¶¶ 143–45.  That alone warrants dismissal of Count Two.  See Oliver, 858 F.3d at 192 ("A plaintiff's bare assertions amounting to nothing more than a 'formulaic recitation' of the elements of a [claim] will not suffice.").

In addition, Plaintiff's own allegations in the Complaint belie any assertion of insolvency before or after the Distributions.  Based on the allegations in the Complaint, the Partnerships

distributed another $365,440,806 after the first Distribution, $242,076,762 after the second Distribution, and $242,021,281 after the third Distribution. See Compl. ¶¶ 131–38. Accordingly, Plaintiff's own allegations, even if true, would demonstrate that the Partnerships were solvent at least after the first, second, and third Distributions.

According to the Complaint, the Partnerships had at least $242 million of assets available immediately before making the fourth Distribution (in addition to the Reserved Funds and any other cash on deposit). See Compl. ¶¶ 137–38. Thus, there can be no dispute that the Partnerships were solvent before the fourth Distribution. Plaintiff makes no allegations whatsoever that the fourth Distribution left the Partnerships without sufficient capital to pay reasonably foreseeable debts as they came due. Plaintiff yet again does no more than recite the elements set forth in the Delaware UFTA. That is because Plaintiff *cannot* allege that the fourth Distribution left the Partnerships insolvent. Indeed, aside from the assets available to the Partnerships immediately prior to the fourth Distribution, the Partnerships also had escrowed approximately $45 million of Reserved Funds in respect of their potential liability in the Adversary Proceedings. Coincidentally, the principal amount of the Judgment on Plaintiff's breach of contract claim, entered *two years after* the fourth Distribution, was only $57.4 million. Perhaps most tellingly, the Partnerships' audited annual financial statements, which were provided to Plaintiff in post-Judgment discovery, confirm that the Partnerships were solvent at the end of each year in which the Distributions were made.

Plaintiff's allegations in support of Count Two are therefore woefully insufficient to survive a motion to dismiss. See, e.g., In re Global Link Telecom Corp., 327 B.R. 711, 718 (Bankr. D. Del. 2005) (dismissing constructive fraudulent transfer claims because plaintiff "simply allege[d] the statutory elements of a constructive fraud action" and failed to plead any facts on the

debtors' "financial status or the value of what was received").  Accordingly, Count Two must be dismissed.  Because Plaintiff, with substantial litigation history in the underlying Adversary Proceedings and having received thousands of pages of post-Judgment discovery, was unable to articulate any factual allegations regarding the Partnerships' solvency in the Complaint, dismissal should be with prejudice.

### D. Count Three must be dismissed with respect to the LP Defendants because Plaintiff lacks standing to seek enforcement of the LPAs.

Count Three of the Complaint seeks a declaration that the General Partner is liable for the Judgment and/or is required, pursuant to Article 10.1(b)[41] of the LPAs, to seek a return of the Distributions made to Defendants so that the Partnerships may then satisfy the Judgment.  Compl. ¶ 150.  As set forth in more detail above, Article 10.1(b) of the LPAs (the Return of Distributions Provision) provides that, subject to the limitations set forth in Article 10.1(c), the General Partner *may* require each Partner to return any distributions up to an amount equal to their pro rata share of indemnity obligations under Article 10.1(a).  <u>See</u> LPAs Art. 10.1(b) (emphasis added).

Through Count Three, Plaintiff essentially seeks specific performance of provisions of the LPAs to which Plaintiff is not a party and of which Plaintiff is not a third-party beneficiary.  Count Three must be dismissed under Fed. R. Civ. P. 12(b)(1) because (a) Plaintiff lacks standing to seek enforcement of the LPAs pursuant to their express terms, Delaware's established precedent on contract enforcement, and the RULPA, and (b) even if Plaintiff had standing, the Return of Distributions Provision is permissive, not mandatory, and cannot be enforced at all after two years from the date of each Distribution, absent circumstances not relevant here.

---

[41] The Complaint references Section 10.2(b) of the LPAs, which describes the cumulative nature of the indemnification rights of Covered Persons (defined below).  It appears likely Plaintiff intended to reference Section 10.1(b) of the LPAs, which is the Return of Distributions Provision.  Accordingly, the LP Defendants respond based on that assumption.

       i.      *Plaintiff lacks standing to seek enforcement of the Return of Distributions Provision of the LPAs.*

First, even if Plaintiff obtains a declaration that the General Partner is liable for the Judgment, Plaintiff cannot compel the General Partner to enforce the Return of Distributions Provision because the LPAs make clear that third parties, such as Plaintiff, do not have an independent right to seek the recovery of distributions made to Limited Partners.  <u>See</u> LPAs Art. 10.1(e) ("<u>No Third Party Rights</u>. Nothing in this Section 10.1, express or implied, is intended or shall be construed to give any Person other than the Partnership, the Partners or the Manager any legal or equitable right, remedy or claim under or in respect of this Section 10.1 or any provision contained herein.").

Aside from the explicit language found in Article 10.1(e), it is a general rule under Delaware law that a non-party to a contract has no legal right to enforce it.  <u>See, e.g.</u>, <u>Insituform of N. Am., Inc. v. Chandler</u>, 534 A.2d 257, 268 (Del. Ch. 1987) ("The general rule [is] that strangers to a contract ordinarily acquire no rights under it . . . ."); <u>Stuchen v. Duty Free Int'l, Inc.</u>, No. CIV.A. 94C-12-194, 1996 WL 33167249, at *9 (Del. Super. Apr. 22, 1996) ("The general rule in this state is that a stranger or nonparty to a contract has no legal right to enforce it."); <u>see also</u> <u>Guardian Constr. Co. v. Tetra Tech Richardson, Inc.</u>, 583 A.2d 1378, 1386 (Del. Super. 1990) ("Ordinarily, a stranger to a contract acquires no rights thereunder . . . .").  Accordingly, both Delaware contract law and the express language of the LPAs make clear that Plaintiff has no legal right to enforce the Return of Distributions Provision.

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, made applicable herein by Rule 7012, a defendant may move to dismiss a cause of action for lack of subject-matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  Standing is a jurisdictional matter; therefore, Rule 12(b)(1) is also appropriate for motions to dismiss for lack of standing.  <u>Scott v. Vantage Corp.</u>, 336

F.Supp.3d 366, 372 (D. Del. 2018) (citing Ballentine v. United States, 486 F.3d 806, 810 (3d Cir. 2007)).  When jurisdiction is challenged, the party asserting subject matter jurisdiction has the burden of proving its existence.  See Carpet Grp. Int'l v. Oriental Rug Importers Ass'n, Inc., 227 F.3d 62, 69 (3d Cir. 2000).  The burden is thus on Plaintiff to demonstrate that she has standing to prosecute Count III – which she cannot, because she does not.  Accordingly, Count III must be dismissed with prejudice.

   *ii.* *Plaintiff lacks standing under the RULPA to bring a derivative claim on behalf of the Partnerships.*

  Plaintiff also lacks standing to bring a derivative action on behalf of the Partnerships.  Section 17-1001 of the RULPA enables only a limited partner or an assignee of a partnership interest to bring an action in the right of a limited partnership to recover a judgment in its favor if general partners with authority to do so have refused to bring the action. 6 Del. C. § 17-1001.  Count Three attempts to assert exactly this type of derivative action – a cause of action *in the right of the Partnerships* to satisfy the Judgment by requiring the General Partner to enforce the Return of Distributions Provision and recover the Distributions from the LP Defendants.  However, Plaintiff is neither a limited partner of nor an assignee of a partnership interest in the Partnerships, and thus lacks standing under the RULPA to bring this type of derivative action.

  It is well-settled under Delaware law that creditors of a limited partnership lack standing to sue derivatively on behalf of the partnership.  See 6 Del. C. § 17-1002; see also Gavin/Solomonese LLC v. Citadel Energy Partners LLC (In re Citadel Watford City Disposal Partners), 603 B.R. 897, 903 (Bankr. D. Del. 2019).  This principle arises from the plain and unambiguous language of section 17-1002 of the RULPA, which requires that a proper plaintiff in

a derivative action "must be a partner or an assignee of a partnership interest."[42]   6 Del. C. § 17-1002.  Bankruptcy Courts within this District that have opined on the Delaware LP Act and other similar statutory restrictions on derivative standing are highly instructive.

In In re PennySaver USA Publishing, LLC, this Court held that under a substantially similar provision of the Delaware Limited Liability Company Act, a creditor of an insolvent Delaware limited liability company does not have standing to sue derivatively on behalf of the company.  587 B.R. 445, 467 (Bankr. D. Del 2018) (Sontchi, J.) ("If the claim is derivative, it fails because derivative claims can only be brought by members or assignees of LLCs.").

Notably, the Citadel Watson court referenced and relied upon this Court's PennySaver decision, noting that "[g]iven the similarity of the relevant statutory language of the Delaware Limited Liability Company Act to that of the [RULPA], the result here should be no different for limited partnerships."  Citadel Watford, 603 B.R. at 903–05.  In holding that a liquidating trustee lacks standing to pursue derivative claims on behalf of creditors of a Delaware limited partnership, the Citadel Watford court held that the RULPA is "unambiguous on its face" and "requires that a proper derivative action plaintiff 'must be a partner or an assignee of a partnership interest.'"  Id. at 903 (quoting 6 Del. C. § 17-1002).  Thus, because the liquidating trustee in Citadel Watford, like Plaintiff here, was neither a limited partner nor an assignee of a partnership interest, the court found that the liquidating trustee, like Plaintiff here, lacked standing to bring a derivative claim on behalf of the partnership.  Id. at 903–04 (observing that "[a]uthority for derivative standing by

---

[42]   6 Del. C. § 17-1002 provides "In a derivative action, the plaintiff must be a partner or an assignee of a partnership interest at the time of bringing the action and:
    (1) At the time of the transaction of which the plaintiff complains; or
    (2) The plaintiff's status as a partner or an assignee of a partnership interest had devolved upon the plaintiff by operation of law or pursuant to the terms of the partnership agreement from a person who was a partner or an assignee of a partnership interest at the time of the transaction."

creditors who are not partners or assignees of partnership interests is plainly missing from the statutory language").

Further, the exclusive nature of derivative standing is not a recent development in the context of Delaware limited partnerships. See, e.g., CML V, LLC v. Bax, 6 A.3d 238, 246 (Del. Ch. 2010), aff'd, 28 A.3d 1037 (Del. 2011), as corrected (Sept. 6, 2011) ("Like the derivative standing provisions in the LLC Act, the comparable derivative standing provisions in the LP Act facially bar any party other than a limited partner or assignee from suing derivatively. Read literally, the provisions prevent creditors from suing, and the Delaware courts historically have interpreted them as exclusive."); see also Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc., No. 15238, 1996 WL 652773, at *1 (Del.Ch. Nov. 4, 1996) ("Since the plaintiffs are not limited partners, they may not bring a derivative action. 6 Del. C. § 17-1001."), rev'd on other grounds, 691 A.2d 609 (Del.1996).

Here, it is undisputed that Plaintiff commenced this adversary proceeding in her capacity as a judgment creditor of the Partnerships, and has not asserted – indeed, *cannot* assert – that she is a partner or an assignee of a partnership interest. Accordingly, Plaintiff lacks standing to bring a derivative action like the one asserted in Count Three of the Complaint, which must be dismissed with prejudice.

> iii.     *The Return of Distributions Provision does not apply by its own terms.*

Even if Plaintiff did have standing to seek to enforce (or to seek to compel the General Partner to enforce) the Return of Distributions Provision, that provision does not apply anyway, by its own terms. Count Three disregards both the permissive nature of the Return of Distributions Provision and the restrictions on the scope, timing, and amount of Distributions that can be recalled pursuant to the Return of Distributions Provision, as set forth in Articles 10.1(a) and (c) of the LPAs.

First, the Return of Distributions Provision provides that the General Partner, and only the General Partner, "***may*** require" (emphasis added) limited partners of the Partnerships to return distributions for the limited purpose of satisfying a claim against the Partnerships made by a person entitled to indemnification under the LPAs (defined as a "Covered Person").[43]   Article 10.1(a) provides that the Partnerships shall indemnify each Covered Person from and against all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings and actions relating to or arising out of the business and affairs of the Partnership.  See LPAs, Art. 10.1(a).  If a Covered Person makes a proper claim for indemnification, Article 10.1(b) *permits*, but does not *require*, the General Partner to recover distributions in order to satisfy the claim, subject to the limitations set forth elsewhere in the LPAs.  Plaintiff has not alleged that such an indemnity claim has been made, whether by the General Partner or by any other Covered Person.  Moreover, Plaintiff is not a Covered Person, and thus has no right to indemnification from the Partnerships.

The Return of Distributions Provision is also subject to temporal and value-based limitations.  Limited partners, including the LP Defendants, have no obligation to return distributions after the second anniversary of the date of any such distribution (subject to certain exceptions that Plaintiff does not and cannot assert), and limited partners' obligations to return distributions cannot exceed, in the aggregate, 25% of such their respective Capital Commitment (as defined in the LPAs).  See LPAs, Art 10.1(a), (c).  Accordingly, Plaintiff's demand to compel

---

[43]   Section 14.1 of the LPAs provides that "'Covered Person' shall mean the General Partner, the Manager, and each of their respective Affiliates; and each of the shareholders, officers, directors, employees, partners, members and managers of any of the General Partner, the Manager and each of their respective Affiliates; and agents of any of the General Partner, the Manager and each of their respective Affiliates; and each Person serving, or who has served, as a member of the Advisory Board and, with respect to such service, the Limited Partner such Person represents and each of such Limited Partner's officers, directors, employees, partners, members, managers and agents (collectively, 'Advisory Board Representatives'); and each Person serving, or who has served, on the Council of Advisors; provided that Covered Persons do not include Parallel Funds, Permitted Funds, and Portfolio Companies."

the General Partner to seek the return of Distributions effectively asks the Court to disregard these limitations on the General Partner's authority to recover distributions from the LP Defendants.[44]

In sum, Plaintiff seeks the functional equivalent of specific performance from the General Partner to impermissibly enforce a provision of the LPAs to which Plaintiff is not a party and of which Plaintiff is not an intended third-party beneficiary.  Accordingly, Count Three of the Complaint must be dismissed for lack of standing under the express language of the LPAs, Delaware's established precedent on contract enforcement, and the RULPA.  Moreover, the relief sought in Count Three is impermissible because the Return of Distributions Provision is not mandatory and does not apply by its own terms, and the recovery Plaintiff seeks disregards the significant protections afforded to the LP Defendants by the LPAs.

### E.       Any cause of action to recover the 2017 Distribution is time-barred.

The first challenged distribution from the Partnerships to the LP Defendants, totaling approximately $14.4 million, occurred on October 11, 2017 (the "2017 Distribution")—nearly four years before Plaintiff filed the Complaint.  However, the RULPA bars *any* action, under the RULPA or otherwise, to recover a limited partnership distribution more than three years after the distribution date, providing as follows:

> Unless otherwise agreed, a limited partner who receives a distribution from a limited partnership **shall have no liability under this chapter or other applicable law** for the amount of the distribution after the expiration of 3 years from the date of distribution.

6   Del. C. § 17-607(c) (emphasis added).

Section 17-607(c) functions as a statute of repose, affording limited partners of Delaware partnerships finality with respect to their partnership distributions after the statutory time elapses. As such, section 17-607(c) defeats claims brought under state law regardless of whether a potential

---

[44]   Any return of Distributions must be restricted according to the terms of Sections 10.1(a) and 10.1(c) of the LPAs.

plaintiff knows of his or her cause of action.  Diamond v. Friedman (In re Century City Drs. Hosp., LLC), 466 B.R. 1, 13 (Bankr. C.D. Cal. 2012); see also Freeman v. Williamson, 890 N.E.2d 1127, 1134 (Ill. App. 2008) (Section 17-607(c) "extinguishes any right a potential plaintiff has to bring a cause of action against a limited partner for a distribution without regard to whether a cause of action has actually accrued or whether any injury has resulted"); see also Reclaimant Corp. v. Deutsch, 211 A.3d 976, 987 (Conn. 2019) ("We agree with the courts in Century City Doctors Hospital, LLC, and Freeman that § 17-607(c) properly is characterized as a statute of repose because it 'clearly terminates the possibility of the limited partner's liability after a defined period of time, three years after receiving a distribution, regardless of whether a potential plaintiff knows of his or her cause of action.'") (citation omitted).

Particularly instructive here, the RULPA has been applied to prohibit a trustee's recovery of distributions to limited partners as constructive and actual fraudulent transfers under the Delaware UFTA.  See Century City, 466 B.R. at 16 ("§ 17-607(c)'s three-year bar trumps DUFTA's four-year statute of limitations in the context of an alleged wrongful distribution by a limited partnership organized under Delaware law").

In Century City, a trustee asserting claims under the Delaware UFTA to recover a distribution made to a limited partner argued that the Delaware UFTA's four-year statute of limitations was applicable, irrespective of section 17-607(c)'s three-year bar.  In granting summary judgment in favor of the limited partner defendant, the court stated that "[s]ection 17-607(c) is unambiguous: a limited partner is not liable for any distribution received from a limited partnership, regardless of whether that distribution violated section 17-607(a) or 'other applicable law,' if more than three years have passed since the distribution."  Century City, 466 B.R. at 13 (quoting Freeman, 890 N.E.2d at 1127).  The court went on to clarify that the reference to "other

-34-

applicable law" in the Delaware ULPA includes the Delaware UFTA, and "to the extent that a distribution by a limited partnership violates the Fraudulent Transfer Act, the applicable statute of limitations would be three years."  Century City, 466 B.R. at 16.

Accordingly, the Delaware RULPA's three-year statute of repose trumps the four-year lookback period under the Delaware UFTA, and extinguished any right Plaintiff otherwise may have had to seek recovery of the 2017 Distribution under the Delaware UFTA or any other applicable law.   Accordingly, the Complaint must be dismissed with respect to the 2017 Distribution.

## II.   ADDITIONAL GROUNDS FOR DISMISSAL APPLICABLE TO CERTAIN LP DEFENDANTS

In addition to the bases for dismissal of the Complaint as to all LP Defendants, separate grounds exist that also warrant dismissal of the Complaint as to certain of the LP Defendants.

### A.   The Court lacks personal jurisdiction over the Foreign LPs.

Plaintiff's claims against the four Foreign LPs—Coller, ISS, Sanba II, and Clouse—should be dismissed for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2), made applicable herein by Bankruptcy Rule 7012.  As discussed above, a court, in reviewing a motion to dismiss, accepts a plaintiff's allegations as true and draws reasonable inferences in favor of the plaintiff, but need not give any credence to mere labels and conclusions.  See pp. 19-20 above; see also Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 368 (3d Cir. 2002) (citation omitted) (Rule 12(b)(2) context). However, "[o]nce a defendant raises the defense of lack of personal jurisdiction . . . the plaintiff bears the burden of proving (by affidavit or other competent evidence) sufficient contacts with the forum to establish personal jurisdiction."  In re Astropower Liquidating Trust, Adv. No. 05-50867, 2006 WL 2850110, at *1 (Bankr. D. Del. Oct. 6, 2006).  In bankruptcy actions such as this one, the forum is the United States, and courts apply a "national contacts" standard in determining

whether a foreign defendant has sufficient contacts to support personal jurisdiction.  E.g., In re Tandycrafts, Inc., 317 B.R. 287, 289 (Bankr. D. Del. 2004); see Fed. R. Bankr. P. 7004.  The Foreign LPs do not.

Plaintiff has failed to demonstrate that the Foreign LPs had sufficient contacts with the United States to support this Court's exercise of personal jurisdiction over them.  Plaintiff's only allegations concerning the Foreign LPs in the Complaint relate to their headquarters outside of the United States (Compl. ¶¶ 26, 27, 31 and 43), their investments in the Partnerships (Compl. ¶ 50), and their receipt of Distributions from the Partnerships (Compl. ¶¶ 130, 132–38).  None of these allegations provides a basis for general or specific personal jurisdiction over the Foreign LPs.

Further supporting the absence of personal jurisdiction, each of the four Foreign LPs has provided a declaration (the "Foreign LP Declarations") indicating their foreign status, the passive nature of their investments in the Partnerships, that they received the Distributions outside the United States, and their lack of relevant contacts with the United States.[45]

The exercise of jurisdiction over the Foreign LPs would also be inconsistent with the Due Process Clause of the Fifth Amendment, which imposes "a general fairness test incorporating International Shoe's requirement that certain minimum contacts exist between the non-resident defendant and the forum such that maintenance of the suit does not offend traditional notions of fair play and substantial justice."  Max Daetwyler Corp. v. Meyer, 762 F.2d 290, 293 (3d Cir. 1985) (quotations omitted) (citing Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)); e.g., In re

---

[45]  See Declaration of Andrew Hitchon in Support of Coller Partners 702 LP Incorporated's Motion to Dismiss for Lack of Personal Jurisdiction (May 31, 2022) (the "Coller Decl."); Declaration of Evgenia Matveeva in Support of International SIF SICAV SA's Motion to Dismiss for Lack of Personal Jurisdiction (May 31, 2022) (the "ISS Decl."); Declaration of Ahmad Al-Khanji in Support of Limited Partner Sanba II Investment Company's Motion to Dismiss (May 31, 2022) (the "Sanba II Decl."); Declaration of Jörg Oster and Lynton Raath in Support of Clouse S.A.'s Motion to Dismiss for Lack of Personal Jurisdiction (May 31, 2022) (the "Clouse Decl.").

Tribune Co., 418 B.R. 116, 123 (Bankr. D. Del. 2009) (same).  Accordingly, and for the reasons

that follow, Plaintiff's claims against the Foreign LPs must be dismissed.

> i.      The Court does not have general jurisdiction over the Foreign LPs.

The Supreme Court has made clear that a court may assert general jurisdiction over a

foreign corporation "only when the corporation's affiliations with the State in which suit is brought

are so constant and pervasive 'as to render [it] essentially at home in the forum State.'"  Daimler

AG v. Bauman, 571 U.S. 117, 122 (2014) (quoting Goodyear Dunlop Tires Operations, S. A. v.

Brown, 564 U.S. 915, 919 (2011)).  The rationale is that such constant and pervasive activities by

a defendant are sufficient "that the defendant could reasonably anticipate being subject to

jurisdiction there even if the litigation does not arise from or relate to those activities."

Astropower, 2006 WL 2850110, at *3 (citation omitted).  The Third Circuit requires a "very high

showing" of extensive contacts with the forum in order to confer general jurisdiction.  Snyder v.

Dolphin Encounters Ltd., 235 F. Supp. 2d 433, 437 (E.D. Pa. 2002) (citing Gehling v. St. George's

Sch. Of Med., Ltd., 773 F.2d 539, 542 (3d Cir. 1985)).  A corporation generally only meets this

standard if it is headquartered or incorporated in the forum state.  See Daimler, 571 U.S. at 137–

38.

The Complaint does not contain any allegations that the Foreign LPs had anything close to

the "constant and pervasive" contacts with the United States necessary for general jurisdiction.  To

the contrary, Plaintiff alleges that the Foreign LPs are all headquartered outside the United States

and makes no allegations about them having a presence in the United States—let alone a constant

and pervasive one.  See, e.g., Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408,

411–16, 418–19 (1984) (finding insufficient contacts for general jurisdiction despite allegations

that defendant sent representative to forum state to negotiate a contract, purchased eighty percent

of its helicopter fleet and parts from the forum state, and sent employees to the forum state for training).

The Foreign LP Declarations further confirm the absence of any "constant and pervasive" contacts between the Foreign LPs and the United States.

- Coller is an incorporated limited partnership formed under the laws of Guernsey with its principal place of business in Guernsey. At the relevant times, including the time of its investment in the Partnerships and the transfers at issue, Coller did not have any office, branch, or employees located in the United States and was not authorized, licensed, or registered to do business anywhere in the United States. Coller Decl. ¶¶ 3–6.

- ISS is an alternative investment fund organized as a public limited liability company under the laws of the Grand Duchy of Luxembourg with its registered office located in the Grand Duchy of Luxembourg. At the relevant times, including the time of its investment in the Partnerships and the transfers at issue, ISS did not have any office, branch, or employees located in the United States and was not authorized, licensed, or registered to do business anywhere in the United States. ISS Decl. ¶¶ 3–9.

- Sanba II is a private investment company incorporated in the Cayman Islands with its registered office located in the Cayman Islands. Sanba II is headquartered in Doha, Qatar and is 100% owned by the Qatar Investment Authority, the sovereign wealth fund for the nation of Qatar. At the relevant times, including the time of its investment in the Partnerships and the transfers at issue, Sanba II did not have any office, branch, or employees located in the United States and was not and is not authorized, licensed, or registered to do business anywhere in the United States. At the relevant times, Sanba II's investments were managed by an investment team located in Doha, Qatar. Sanba II Decl. ¶¶ 3–5, 7–9.

- Clouse is a securitization company formed under the laws of Luxembourg with its principal place of business in Luxembourg. Clouse is administered by Sanne Group, an entity that is supervised by the Commission de Surveillance du Secteur Financier. At the relevant times, including the time of its investment in the Partnerships and the transfers at issue, Clouse did not have any office, branch, or employees located in the United States and was not authorized, licensed, or registered to do business anywhere in the United States. Clouse Decl. ¶¶ 3–6.

Because none of the Foreign LPs are incorporated, headquartered, or authorized, licensed, or registered to do business in the United States, and, at all relevant times, none of the Foreign LPs had offices, branches, or employees in the United States, Plaintiff has not met, and cannot meet,

her burden to show that any Foreign LP is subject to general personal jurisdiction anywhere in the United States.

                *ii.      The Court does not have specific jurisdiction over the Foreign LPs.*

The Court also lacks specific jurisdiction over the Foreign LPs.  Due process requires that a defendant's conduct and connection with the forum must be "such that [the defendant] should reasonably anticipate being haled into court there." <u>World-Wide Volkswagen Corp. v. Woodson</u>, 444 U.S. 286, 297 (1980).  A court may exercise specific jurisdiction over a non-resident defendant only when the defendant purposefully directed its activities at the forum and the cause of action arises from those forum-related activities.  <u>In re Fisker Auto. Holdings Inc. S'holder Litig.</u>, No. 13-cv-2100-DBS-SRF, 2018 WL 4036412, at *9 (D. Del. Aug. 21, 2018).  The requirement that a defendant purposefully avails itself of the privilege of conducting activities in the forum ensures that they "will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts." <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 475 (1985) (quotations and quotation marks omitted).

As an initial matter, Plaintiff's alleged causes of action do not arise from any activities of the Foreign LPs.  Plaintiff's two causes of action against the Foreign LPs, Counts One and Two, attempt to collect on a judgment against the Partnerships for claims based on the Partnerships' conduct with respect to their investment in Allied.  Plaintiff does not—and cannot—allege that the Foreign LPs engaged in any of the underlying conduct in that separate suit or engaged in any conduct relating to Allied.  Nor does Plaintiff allege that the Foreign LPs orchestrated or initiated the alleged transfers at issue in this lawsuit.

Plaintiff has not made any allegations that would support specific jurisdiction over the Foreign LPs.  The only references to the Foreign LPs in the Complaint that relate to Plaintiff's

claims are allegations that the Foreign LPs received Distributions from the Partnerships.[46]   The Distributions were made to the Foreign LPs in their capacity as passive, limited partner investors in the Partnerships.  Plaintiff does not allege any conduct or action whatsoever by the Foreign LPs other than that the transfers happened.

In the Foreign LP Declarations, the Foreign LPs establish that:

- The Foreign LPs are passive, limited partner investors in the Partnerships.  Coller Decl. ¶¶ 7–8; ISS Decl. ¶¶ 10–11; Sanba II Decl. ¶¶ 6, 11; Clouse Decl. ¶¶ 7–8.

- The Foreign LPs have no control over the Partnerships' management, operations, or investment decisions.  Coller Decl. ¶ 8; ISS Decl. ¶ 11; Sanba II Decl. ¶ 11; Clouse Decl. ¶ 8.

- The Foreign LPs have no say in decisions of whether and when to make distributions, including with respect to the Distributions at issue in this case.  Coller Decl. ¶ 8; ISS Decl. ¶ 11; Sanba II Decl. ¶ 11, 12; Clouse Decl. ¶ 8.

- The Distributions to the Foreign LPs were all made to bank accounts located outside of the United States.  Coller Decl. ¶ 10; ISS Decl. ¶ 13; Sanba II Decl. ¶ 13; Clouse Decl. ¶ 10.

- No person associated with the Foreign LPs travelled to the United States in connection with the Distributions.  Coller Decl. ¶ 11; ISS Decl. ¶ 14; Sanba II Decl. ¶ 14; Clouse Decl. ¶ 11.

- The Foreign LPs had no business dealings with ASHINC Corp., Allied, or any of their affiliated entities.   Coller Decl. ¶ 12; ISS Decl. ¶ 15; Sanba II Decl. ¶ 15; Clouse Decl. ¶ 12.

It is well established that passive investments like the ones involved here are not the type of "purposeful" activity necessary for the exercise of specific jurisdiction.  See, e.g., Shaffer v. Heitner, 433 U.S. 186, 216 (1977) (holding that ownership of shares in a corporation located in a particular forum is not purposeful availment of that forum); In re Am. Int'l Refinery, 2009 WL

---

[46]   The Complaint alleges that during the period from October 2017 through May 2019, Coller, ISS, and Sanba II each received four transfers while Clouse received three transfers.  See Compl. ¶¶ 132, 134, 136, 138 (Coller); ¶¶ 132, 134, 136, 138 (ISS); ¶¶ 132, 134, 136, 138 (Sanba II); ¶¶133, 135, 137 (Clouse).

8602809, at *8 (Bankr. W.D. La. Dec. 22, 2009) ("A defendant's investment in a company that is based in the forum is generally not a sufficient basis for personal jurisdiction."). The Fisker court found it did not have specific jurisdiction over a non-resident minority shareholder— notwithstanding that shareholder's "substantial investment" in a Delaware company—because the shareholder did not control the conduct of the company that was in dispute. In re Fisker, 2018 WL 4036412, at *13. Similarly here, the Foreign LPs were merely passive investors in the Partnerships and did not control whether, when, or why the General Partner made the disputed Distributions to its limited partners.

Further, the Foreign LPs' mere receipt of the allegedly fraudulent transfers, with nothing more, is insufficient to establish specific jurisdiction. See Astropower, 2006 WL 2850110, at *6– 7 (refusing to exercise jurisdiction over non-U.S. defendants who allegedly received fraudulent transfers after finding that they "did not purposely avail themselves of any business dealings in the United States or specifically direct any action to the Debtor in the United States"); Deutsche Bank AG v. Devon Park Bioventures, LP, C.A. No. 2017-0822-SG, 2021 WL 2711472, at *1 (Del. Ch. June 30, 2021) (unpublished) (dismissing claims relating to allegedly fraudulent transfers for lack of personal jurisdiction after finding that "[h]olding or transacting in ownership interests in Delaware entities does not, without more, create jurisdiction" and neither does "receiving distributions from a Delaware entity[.]"); see also In re Hellas Telecomms. (Luxembourg) II SCA, 524 B.R. 488, 512 (Bankr. S.D.N.Y. 2015) (refusing to exercise jurisdiction over non-U.S. defendants who received fraudulent transfers); In re Commodore Int'l, Ltd., 242 B.R. 243, 254– 55 (Bankr. S.D.N.Y. 1999) (receipt of allegedly fraudulent transfer insufficient to support jurisdiction); In re Flores, 426 B.R. 350, 356–57 (Bankr. D. Kan. 2010) (same).

Having failed to establish the required purposeful conduct and minimum contacts giving rise to Plaintiff's causes of action, Plaintiff's claims against the Foreign LPs must be dismissed for lack of specific personal jurisdiction.

       *iii.*    *This Court's exercise of jurisdiction over the Foreign LPs would not comport with due process.*

Even if Plaintiff could establish that the Foreign LPs purposefully engaged in the required minimum contacts with the United States (which it cannot), it still would be unreasonable under the circumstances—and inconsistent with the requirements of due process—to exercise personal jurisdiction over them.  To satisfy the requirements of due process, a court must also consider whether, under the facts of the particular case, exercising such jurisdiction "squares with notions of 'fair play and substantial justice.'"  See Grand Entm't Grp., Ltd. v. Star Media Sales, Inc., 988 F.2d 476, 483 (3d Cir. 1993) (quoting Int'l Shoe, 326 U.S. at 316).

As such, "even if a defendant has the required minimum contacts with the forum state, other factors may militate against exercising jurisdiction."  Pennzoil Prods. Co. v. Colelli & Assocs., Inc., 149 F.3d 197, 201 (3d Cir. 1998).  The factors courts consider include:  (1) the burden on the defendant; (2) plaintiff's interest in obtaining relief; (3) the forum's interest in adjudicating the dispute; and (4) the procedural and substantive interests of the foreign nation.  See O'Connor v. Sandy Lane Hotel Co., 496 F.3d 312, 324 (3d Cir. 2007).  The Foreign LPs submit that the analysis of these factors is academic given the complete absence of any relevant contacts here, but discuss them for the sake of completeness.

While courts may consider these and other various factors as part of their due process inquiry, the "primary concern" is the burden on the defendant.  Id. (citing World-Wide, 444 U.S. at 292).  The Supreme Court has recognized that the "unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight[.]"  Asahi Metal Indust.

Co. v. Superior Court of Cal., Solano Cty., 480 U.S. 102, 114 (1987).  With regard to this first factor, requiring the Foreign LPs to litigate in the United States, where they have no offices, branches or employees would be burdensome and prejudicial.  Coller Decl. ¶ 6; ISS Decl. ¶ 9; Sanba II Decl. ¶ 7, 9; Clouse Decl. ¶ 6.  They would suffer a substantial burden in terms of cost, time, inconvenience, and disruption to operations if required to participate in litigation halfway across the globe and under a foreign legal system.  See Ne. Power Co. v. Balcke-Durr, Inc., 49 F. Supp. 2d 783, 789 (E.D. Pa. 1999) ("It is clear that forcing [Balcke-Durr AG], a German holding company with its only business location in Germany, to defend itself in this suit in the Eastern District of Pennsylvania would be a substantial burden to the company."); see also Asahi, 480 U.S. at 114 ("Certainly the burden on the defendant in this case is severe . . . not only to traverse the distance between Asahi's headquarters in Japan and the Superior Court of California . . . but also to submit its dispute . . . to a foreign nation's judicial system."); In re Nazi Era Cases Against German Defendants Litig., 153 F. App'x 819, 825 (3d Cir. 2005) (unpublished) ("Forcing a wholly foreign company with no day-to-day operations to litigate in New York is no small burden.").

With respect to the second and third factors, neither Plaintiff nor this forum have a sufficient interest in the case against the Foreign LPs to justify this Court's exercise of jurisdiction.[47]  Plaintiff sued roughly thirty limited partner Defendants, including the Foreign LPs, in an effort to optimize her chances of recovery on a judgment in an entirely separate proceeding against an entirely different party relating to conduct more than ten years ago that had nothing to do with the Foreign LPs.  The Foreign LPs have engaged in no misconduct against any resident of the forum (or any misconduct at all).  Further, by failing to plead any actions or conduct whatsoever

---

[47]   For similar reasons and those expressed therein, the Foreign LPs join in and adopt the jurisdictional and abstention-related arguments set forth in the motions filed by the Board of Fire and Police Pension Commissioners and the Board of Administration of the Los Angeles City Employees' Retirement System [D.I. 74] and Yucaipa American Alliance Fund I, LLC and Yucaipa American Management, LLC [D.I. 76].

by the four Foreign LPs, Plaintiff has demonstrated that her interest in obtaining relief against them is minimal, especially when compared to the burden on the Foreign LPs of litigating abroad.

For the same reasons, the United States has no interest in adjudicating a dispute against foreign defendants who have no relationship with the United States and who have not been accused of any wrongdoing.  It would be neither fair nor just for Plaintiff's claims against the Foreign LPs to proceed under these circumstances.  See Asahi, 480 U.S. at 116 ("Considering the international context, the heavy burden on the [foreign-corporation] defendant, and the slight interests of the plaintiff and the forum . . . , the exercise of personal jurisdiction . . . in this instance would be unreasonable and unfair.").

Finally, when evaluating personal jurisdiction over foreign defendants, courts must pay special attention to "the risks to international comity."  Daimler, 134 S. Ct. at 762–63.  Here, international comity would be threatened if a foreign defendant could be brought before a U.S. court by an unknown party with whom it has never transacted business or interacted, based merely on the foreign defendant's receipt of distributions from a passive investment in a U.S. limited partnership.  The foreign nations involved here would certainly disfavor this outcome and the burden on their citizens, as would the United States if these foreign nations chose to respond in kind.  As such, the fourth factor also weighs against exercising jurisdiction.  See Gen. Elec. Co. v. Deutz AG, 270 F.3d 144, 160 (3d Cir. 2001) ("Failure to accord such deference invites similar disrespect for our judicial proceedings.  Reciprocity and cooperation are worthy goals of comity."); see also In re Maxwell Commc'n Corp., 93 F.3d 1036, 1047, 1051–53 (2d Cir. 1996) (finding that comity principles prevented U.S. Bankruptcy Code from reaching English parties).

Beyond the complete absence of the necessary contacts with the United States for personal jurisdiction to attach, the fair play and substantial justice requirements of constitutional due

process also mandate against the exercise of jurisdiction over the Foreign LPs.  See Merck & Co, v. Ban Labs, Inc., 179 F. Supp. 2d 368, 375–76 (D. Del. 2002) (declining to exercise jurisdiction because "the requirements of due process are not satisfied").  As such, Plaintiff's claims against the Foreign LPs must be dismissed.

### B.      The Complaint must be dismissed with respect to the State Defendants because they are immune from suit under the Eleventh Amendment.

"In our constitutional scheme, a federal court generally may not hear a suit brought by any person against a nonconsenting State." Allen v. Cooper, 140 S. Ct. 994, 1000 (2020).  The Third Circuit has held that the "Eleventh Amendment immunizes from suit in federal court both non-consenting states and those entities that are so intertwined with them as to render them 'arms of the state.'" Karns v. Shanahan, 879 F.3d 504, 512-13 (3d Cir. 2018).  A "suit may be barred by the Eleventh Amendment even though a state is not named a party to the action, so long as the state is deemed to be the real party in interest." Benn v. First Judicial District of Pa., 426 F.3d 233, 239 (3d Cir. 2005); Lang v. Pa. Higher Edu. Assistance Agency, 610 Fed.Appx. 158, 160 (3d Cir. 2015) ("A suit brought against an entity that is in essence 'an arm of the state' is similarly barred by the Eleventh Amendment").  As the Third Circuit has recognized, the Supreme Court has "made clear that the purpose of sovereign immunity is not merely to protect intrusion into the state's treasury, but to protect against the indignity of any kind of suit whatsoever." Hampe v. Butler, 263 F.3d 90, 97 (3d Cir. 2004) (citing Fed. Mar. Comm'n v. S.C. State Ports Auth., 535 U.S. 743, 765-66 (2002)).

Courts in this Circuit have considered sovereign immunity arguments as both a challenge to a court's subject matter jurisdiction and an affirmative defense to a plaintiff's claim.  See, e.g., Bradley v. W. Chester Univ. of Pa. State Sys. of Higher Educ., 880 F.3d 643, 649 (3d Cir. 2018) (affirming dismissal for lack of subject matter jurisdiction); Lang v. Pa. Higher Educ. Assistance

Agency, 610 F. App'x 158, 160 (3d Cir. 2015) ("[w]e treat Eleventh Amendment immunity as an affirmative defense"); In re La Paloma Generating Co., 588 B.R. 695, 717 (Bankr. D. Del. 2018) (Sontchi, J.) ("An Eleventh Amendment sovereign immunity defense differs from a defense on the merits in the key respect that a defendant may raise the defense of sovereign immunity at any time in the absence of an explicit waiver.") (internal quotations omitted).

In determining whether an entity is entitled to immunity, courts must consider "the provisions of state law that define the agency's character," even though the ultimate question of "whether a particular state agency [is] . . . an arm of the State, and therefore 'one of the United States' within the meaning of the Eleventh Amendment, is a question of federal law." Karns, 879 F.3d at 513 (quoting Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 430 n.5 (1997)). There is no exception to Eleventh Amendment immunity for plaintiffs who bring state law claims against a state or an arm of a state. See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 106 (recognizing that Eleventh Amendment immunity applies not only to claims arising under state law, but also to claims arising under federal law).

Courts in the Third Circuit "employ a fact-intensive, three-step balancing test to ascertain whether a state-affiliated entity is an 'arm of the State' that falls within the ambit of the Eleventh Amendment." Maliandi v. Montclair State Univ., 845 F.3d 77 (3d Cir. 2016); Fitchik v. N.J. Transit Rail Operations, Inc., 873 F.2d 655, 659 (3d Cir. 1989). The three factors established by Fitchik are:

> (1) the funding factor: whether the state treasury is legally responsible for an adverse judgment entered against the alleged arm of the State;
>
> (2) the status under state law factor; whether the entity is treated as an arm of the State under state case law and statutes; and

(3) the autonomy factor: whether, based largely on the structure of its internal governance, the entity retains significant autonomy from state control.

Maliandi, 845 F.3d at 83 (citing Fitchik, 873 F.2d at 659).  "After identifying the direction in which each factor points, we balance them to determine whether an entity amounts to an arm of the State." Maliandi, 845 F.3d at 84.  The court treats "all three Fitchik factors as co-equals, with the funding factor breaking the tie in a close case." Id.; see also Febres v. Camden Bd. of Educ., 445 F.3d 227, 230 (3d Cir. 2006).

Each of the State Defendants satisfies all three Fitchik factors.  Indeed, courts within the State Defendants' respective home jurisdictions have recognized each State Defendant as being an arm of its respective State.  Such holdings are consistent with courts within the Third Circuit that have ruled both the Board of Trustees of the Public Employees' Retirement System of New Jersey; and the Commonwealth of Pennsylvania Public School Employees' Retirement Systems are each an "arm of the state" that are entitled to Eleventh Amendment immunity.  See Jones v. Pub. Emp. Ret. Pensions Div., No. CIV. 09-5894 SDW, 2011 WL 6003122, at *3 (D.N.J. Nov. 29, 2011); Commonwealth of Pennsylvania Pub. Schl. Emps.' Ret. Sys. v. Citigroup, No. CIV. 11-2583, 2011 WL 19937737, at *4 (E.D. Pa. May 20, 2011).

These rulings are consistent with the "overwhelming authority establishing that state pension programs and retirement systems have been found to be 'arms of the state' by virtually every court considering that question."  Public Emps.' Ret. Ass'n of N.M. v. Clearlend Sec., 798 F.Supp.2d 1265, 1269-1270 n.1 (D.N.M. 2011) (citing Burrell v. Teacher's Ret. Sys. of Ala., 353 Fed. Appx. 182, 183 (11th Cir. 2009) (Teacher's Retirement System of Alabama)); Ernst v. Rising, 427 F.3d 351, 359-61 (6th Cir. 2005); McGinty v. New York, 251 F.3d 84, 96 (2d Cir. 2001) (New York State and Local Employees Retirement System); Fitzpatrick v. Bitzer, 519 F.2d 559, 561 (2d

Cir. 1975, aff'd in part, rev'd in part on other grounds, 427 U.S. 445 (1976) (Connecticut's State Employees' Retirement System); W.Va. Inv. Mgmt. Bd. v. Residential Accredited Loans, Inc., No. 2:10–CV–00461, 2010 WL 3418314, at *5 (S.D.W.Va. Aug. 26, 2010) (West Virginia Investment Management Board); Missouri State Emps.' Ret. Sys. v. Credit Suisse, N.Y. Branch, No. 09–4224–CV–C–NKL, 2010 WL 318652, at *6 (W.D. Mo. Jan. 21, 2010) (Missouri State Employees' Retirement System); JMB Grp. Trust IV v. Penn. Mun. Ret. Sys., 986 F.Supp. 534, 538 (N.D.Ill.1997) (Pennsylvania Municipal Retirement System); KPERS v. Boatmen's First Nat. Bank of Kansas City, 982 F.Supp. 806, 809 (D. Kan.1997) (Kansas Public Employees Retirement System); Kestler v. N. Carolina Loc. Govt'l Emps. Ret. Sys., 808 F.Supp. 1220 (W.D.N.C. 1992), overruled on other grounds, 48 F.3d 800 (4th Cir. 1995) (North Carolina Local Governmental Employees' Retirement System); Grossman v. Suffolk Cnty. Dist. Att'y's. Office, 777 F. Supp. 1101 (E.D.N.Y.1991) (citing Second Circuit opinions determining the New York State retirement system is immune under the Eleventh Amendment).

While courts within the Third Circuit have not had an opportunity to consider whether CalPERS and the New Mexico Funds are "arms of the state" for Eleventh Amendment purposes, various courts outside the Third Circuit have specifically addressed the question. As discussed below, every court that has considered whether CalPERS or the New Mexico State Investment Council is entitled to invoke sovereign immunity has answered the question in the affirmative.

i.    Funding Factor

The determinative question in analyzing the funding factor is "[w]hether the money that would pay the judgment would come from the state." Fitchik, 873 F.2d at 659. Courts in the Third Circuit consider three factors in answering this question: (1) a state's legal obligation to pay a money judgment entered against the entity; (2) whether the agency has money to satisfy the judgment; and (3) whether there are specific statutory provisions that immunize the state from

liability for money judgments.  Id.; see also Maliandi, 845 F.3d at 86.

### CalPERS

Various federal courts have expressly found that the State of California "has a statutorily created contractual obligation to contribute to CalPERS' fund in order to provide employees' vested rights to pension benefits."  California Pub. Emps. Ret. Sys. v. Moody's Corp., No. C 0903628 SI, 2009 WL 3809816, at *3 (N.D. Cal. Nov. 10, 2009); Westly v. California Pub. Emps Ret. Sys. Bd. of Admin., 105 Cal.App.4th 1095, 1116 (Cal.Ct.App. 2003) ("[R]etirement benefits are contractual obligations of the state and if the CalPERS fund is insufficient to pay the benefits owed to state employees, the state is obligated to pay the money to pensioners from other sources."); Davis v. California Pub. Emps Ret. Sys. Bd. of Admin., Case No. 2:20-cv-01543-JAM-JDP (PS), 2021 WL 4192661, at *2 (E.D. Cal. Sept. 15, 2021) ("As to the first and most salient factor, the State of California has a contractual obligation to provide for state employees' vested pension benefits, and it must cover any shortfall in defendant's funding").

### The New Mexico Funds

The New Mexico Funds belong to the State of New Mexico and are managed by the NMSIC, a state agency.   As explained by the New Mexico Court of Appeals:

> NMSIC is a state agency that serves as trustee of, and is responsible for investing, among other funds, the Land Grant Permanent Fund and the Severance Tax Permanent Fund, which are established under the New Mexico Constitution for the benefit of citizens of New Mexico. N.M. Const. art VIII, § 10, art. XII, §§ 2, 7; NMSA 1978, §§ 6-8-2 to -7 (1957, as amended through 2015); NMSA 1978, § 7-27-3.1 (1983).

N.M. State Inv. Council v. Weinstein, 382 P.3d 923, 928 (describing the parties to a qui tam action brought by private citizens on behalf of the NMSIC).  Under these circumstances, there can be no doubt that any judgments against the New Mexico funds would be paid by the State of New Mexico.  As the state or its permanent funds would be responsible for any judgment, the first

<u>Fitchik</u> factor is satisfied.  <u>See</u> <u>id.</u>

    ii.   <u>Status Under State Law Factor</u>

The second <u>Fitchik</u> factor requires that the Court determine the status of the entity under state law, which in turn requires consideration of four sub-factors: (1) how the law treats the agency generally; (2) whether the agency is separately incorporated; (3) whether the agency can sue and be sued in its own right; (4) and whether it is immune from state taxation.  <u>See</u> <u>Fitchik</u>, 873 F.2d at 659; <u>Maliandi</u>, 845 F.3d at 91.

***CalPERS***

CalPERS easily satisfies this factor.  <u>See</u> Cal. Gov't Code § 20002 (2022) (CalPERS "is a unit of the [California] State and Consumer Services Agency"); <u>Barroga v. California Pub. Emps Ret. Sys. Bd. of Admin.</u>, No. 2:12-cv-01179 MCE KJN, 2012 WL 5337326, at *5 (E.D. Cal. Oct. 26, 2012) ("California considers CalPERS as part of one of its state agencies"); <u>Moody's</u>, 2009 WL 3809816, at *6 ("Although CalPERS may sue and be sued in its own name, and take property in its own name, the State has a financial interest in CalPERS' affairs, and it performs a central governmental function"); <u>Davis</u>, 2021 WL 4192661, at *2 (CalPERS "was created by, and is governed according to, the California State Constitution and California Government Code").

***New Mexico Funds***

The New Mexico Funds are created by statute and the New Mexico Constitution and are controlled by state officials, and therefore satisfy this factor.  <u>See</u> N.M.S.A. §§ 6-8-1, 6-8-2; <u>New Mexico ex rel. Nat'l Educ. Ass'n of N.M., Inc. v. Austin Capital Mgmt.</u>, 671 F. Supp. 2d 1248, 1252 (D.N.M. 2009) (finding there is "no question" that the State Investment Council was an arm of the state and emphasizing the importance of the governmental officials' participation in the funds, and the control over the state of the investment of the funds).

    iii.   <u>Autonomy Factor</u>

The third factor courts in this Circuit examine is the entity's degree of autonomy from the state, "focusing on the entity's governing structure and the oversight and control exerted by a State's governor and legislature."  Maliandi, 845 F.3d at 96 (citing Febres, 445 F.3d at 231–32; accord Fitchik, 873 F.2d at 663–64).  The State Defendants satisfy this factor as well.

**CalPERS**

CalPERS indisputably satisfies this factor.  As the Davis court found, CalPERS "serves a central governmental function", 2021 WL 4192661, at *2, citing Cal. Gov't Code § 20001 (CalPERS' purpose "is to effect economy and efficiency in the public service by providing a means whereby employees who become superannuated or otherwise incapacitate may, without hardship or prejudice, be replaced by more capable employees, and to that end provide a retirement system consisting of retirement compensation and death benefits").

**New Mexico Funds**

The New Mexico Funds are controlled and governed by State officials and are bound by state investment guidelines.  See Nat'l Educ. Ass'n, 671 F. Supp. 2d at 1252 (finding the State Investment Council "in no way functions independently of the State").

Accordingly, the State Defendants satisfy all three of the applicable Fitchik factors and each constitutes an "arm of the state" for the purposes of Eleventh Amendment sovereign immunity.  Because the State Defendants have not waived sovereign immunity, they are immune from Plaintiff's claims against them, this Court lacks subject matter jurisdiction over such claims, and thus the Complaint must be dismissed with respect to the State Defendants.

> **C.   The Court lacks subject-matter jurisdiction over the claims against the NYC Funds because Plaintiff failed to serve statutorily mandated notices of claim.**

The NYC Funds are the public pension funds for hundreds of thousands of active and retired New York City teachers, firefighters, police officers, and municipal employees.  As such,

the State and City of New York have enacted legislative protections to safeguard these public funds and to afford the NYC Funds an adequate opportunity to explore the merits of any purported claims against them prior to incurring the costs of litigation.  One such protection is the requirement to serve notices of claim upon the New York City Comptroller prior to commencing an action seeking money damages.  Plaintiff failed to satisfy this requirement.  Accordingly, this Court lacks subject-matter jurisdiction over such claims and the Complaint must be dismissed with prejudice with respect to the NYC Funds.

Service of a notice of claim upon the New York City Comptroller is a "condition precedent" to commencing an action for damages against a New York City municipal entity.  Zito v. N.Y.C. Office of Payroll Admin., 130 A.D.3d 1326, 1327, 15 N.Y.S.3d 245, 247 (App. Div. 2015).  Failure to serve a notice of claim negates "subject matter jurisdiction because the municipality or governmental authority 'waived immunity and consented to be sued only in the event that certain jurisdictional conditions precedent are complied with.'"  Pritchard v. Curtis, 101 A.D.3d 1502, 1504, 957 N.Y.S.2d 440, 444 (App. Div. 2012) (quoting Lumbermans Mut. Cas. Co. v. Port Auth. of N.Y. & N.J., 137 A.D.2d 796, 797, 525 N.Y.S.2d 343, 344 (App. Div. 1988)).  This is true regardless of whether the claims against the NYC Funds sound in tort or contract.

New York General Municipal Law ("GML") § 50-i(1) provides that no tort action may be maintained against "a city, county, town, village, fire district or school district" unless a notice of claim has been served in accordance with GML § 50-e and the plaintiff pleads that at least thirty days have elapsed since service of the same and that adjustment or payment thereof has been refused.  A notice of claim required as a condition precedent to commencement of an action against a public entity must be served within ninety days of the claim arising.  GML § 50-e.

New York City Administrative Code § 7-201(a) also requires a notice of claim as a pre-condition for claims against the NYC Funds, and specifically includes contract claims:

> In every action or special proceeding prosecuted or maintained against the city, the complaint or necessary moving papers shall contain an allegation that at least thirty days have elapsed since the demand, claim or claims, upon which such action or special proceeding is founded, were presented to the comptroller for adjustment, and that the comptroller has neglected or refused to make an adjustment or payment thereof for thirty days after such presentment . . . .

The purpose of notice-of-claim requirements "is to protect the municipality against unfounded claims and to assure it 'an adequate opportunity . . . to explore the merits of the claim while information is still readily available.'" Camacho v. New York, 187 A.D.2d 262, 263 (1st Dep't 1992) (quoting Teresta v. City of New York, 304 N.Y. 440, 443 (1952)) (modification in original).

These notice-of-claim requirements apply to the NYC Funds as municipal entities. The creation and maintenance of pension reserves are deemed obligations of New York City and are statutorily guaranteed by it. N.Y.C. Admin. Code §§ 13-133 (NYCERS); 13-533 (TRS); 13-231 (Police); 13-334 (Fire). Accordingly, by threatening to deplete the assets of the NYC Funds, Plaintiff's claims against the NYC Funds directly implicate the City's fisc.

Multiple statutory provisions confirm that the NYC Funds are entities and agents of the City of New York. A majority of the board of each of the NYC Funds are high-level New York City officials. N.Y.C. Admin. Code § 13-103 (NYCERS board includes public advocate, comptroller, the president of each New York City borough, and a mayoral appointee); § 13-507 (TRS board includes comptroller, chancellor of school system, and two appointees of the mayor); § 13-216 (Police Department Fund board includes New York City police commissioner, comptroller, commissioner of finance, and a mayoral appointee); § 13-316 (Fire Department Fund board includes New York City fire commissioner, comptroller, commissioner of finance, and a

mayoral appointee).  The New York City Comptroller is the custodian of and investment advisor to each of the NYC Funds.  N.Y.C. Admin. Code § 13-136 (NYCERS); § 13-536 (TRS); § 13-235 (Police Department Fund); § 13-338 (Fire Department Fund); N.Y.C. Charter § 93(*l*).  Only the New York City Comptroller is authorized to make payments from the assets of the NYC Funds. N.Y.C. Admin. Code § 13-137 (NYCERS); § 13-537 (TRS); § 13-236 (Police Department Fund); § 13-339 (Fire Department Fund).

The NYC Funds also satisfy the definition of "agency" under the New York City Charter. The New York City Charter defines an "agency" as "a city, county, borough, or other office, position, administration, department, division, bureau, board or commission, or a corporation, institution or agency of government, the expenses of which are paid in whole or in part from the city treasury."  § 1150(2).  As provided in the New York City Administrative Code, New York City contributes to each of the NYC Funds for various uses, including pension funds, reserve funds, and expenses.  N.Y.C. Admin. Code §§ 13-127 to -129 (NYCERS); 13-526 to -527 (TRS); 13-228 to -229 (Police Department Fund); 13-331 to -332 (Fire Department Fund).

Courts have routinely found that the NYC Funds are agencies of the City of New York. See, e.g., Morris v. N.Y.C. Emps.' Ret. Sys., 129 F. Supp. 2d 599, 601 (S.D.N.Y. 2001) ("NYCERS is a City administrative agency that manages retirement and disability benefits for City employees."); Doctors Council v. N.Y.C. Emps.' Ret. Sys., 71 N.Y.2d 669, 676 (1988) (characterizing NYCERS as an "agency" of New York City); New York Teachers Pension Ass'n, Inc. v. Teachers' Ret. Sys. of the City of New York, 71 A.D.2d 250, 422 N.Y.S. 2d 389 (1st Dep't 1979) (TRS is subject to the New York Freedom of Information Law, New York Public Officers Law § 87, governing "[a]ccess to *agency* records") (emphasis added).

Given these multiple provisions of law, courts do not question that the notice-of-claim mandate applies to claims asserted against the NYC Funds.  See Greene v. Teachers' Ret. Sys., 107 Misc. 2d 508 (Sup. Ct., N.Y. Cty. 1980) (in challenge by TRS that, *inter alia*, plaintiff failed to comply with 90-day notice requirement of GML § 50-e, finding that plaintiff had timely filed notice of claim within 90 days pursuant to a tolling provision); Cannavo v. N.Y.C. Dep't of Hous. Pres. & Dev., No. SCR 783/16-1, 2017 WL 4202816, at *4 (Civ. Ct., Richmond Cty. Sept. 8, 2017) (finding that claimant filed a notice of claim on NYCERS pursuant to GML § 50-e); see also Weingarten v. Bd. of Trustees of N.Y.C. Teachers' Ret. Sys., 98 N.Y.2d 575, 579 (2002) (finding that teachers and their union filed notices of claim with TRS before challenging benefits calculations).

The strictly mandated remedy for failure to serve a notice of claim is dismissal of the complaint, "even if the claim is meritorious."  PBS Bldg. Sys. v. City of New York, No. 94 Civ. 3488 (JGK), 1996 WL 583380, at *3 (S.D.N.Y. Oct. 10, 1996) (collecting cases addressing both GML § 50-e and N.Y.C. Admin. Code § 7-201).  "The Legislature has said that a particular form of notice, conveyed with particular details to particular public officers, shall be a prerequisite to the right to sue.  The courts are without power to substitute something else."  Thomann v. City of Rochester, 256 N.Y. 165, 172 (1931) (Cardozo, C.J.).  "Nor may a claimant be relieved of a positive statutory mandate simply because no prejudice has resulted, even to avoid a harsh result."  Parochial Bus Sys., Inc. v. Bd. of Educ., 60 N.Y.2d 539, 548 (1983) (citations and internal quotation marks omitted).

Here, Plaintiff failed to serve any notices of claim *at all* with respect to any of the claims asserted against the NYC Funds in the Complaint.  Because Plaintiff failed to comply with the notice-of-claim requirements, Plaintiff also fails to allege in the Complaint (because she cannot)

that the Comptroller has either failed to make payment on the claims asserted against the NYC Funds or offered to adjust those claims within thirty days.  Plaintiff's failure to comply with these requirements has deprived the NYC Funds, which are the retirement funds for thousands of dedicated public servants, of the opportunity to explore an early resolution of this case and to meaningfully evaluate and adjust the claims without the expense of litigation.[48]  As a result, this Court does not have jurisdiction over Plaintiff's claims against the NYC Funds and the Complaint must be dismissed with respect to them.

### D. Counts One and Two of the Complaint must be dismissed as to the ERISA Defendants because ERISA provides absolute protection for plan benefits.

Employer-sponsored, ERISA-qualified plans cover more than eighty million Americans. ERISA entitles participants in ERISA-qualified plans to remain secure in the belief that they have an inalienable right to their benefits.  To that end, ERISA bars Plaintiff's attempt to usurp plan assets, and thereby imperil plan participants' benefits, for the benefit of her (predominantly institutional lender) creditor constituents.

The twelve ERISA Defendants are pension and other benefits plans that are subject to, and enjoy the expansive protections of, the federal ERISA regulatory framework.  The ERISA Defendants represent an aggregate of approximately $119.6 million (over 30%) of the Distributions that Plaintiff seeks to avoid and recover.

ERISA establishes uniform standards "concerning reporting, disclosure, and fiduciary responsibility" for ERISA plans, and creates a robust "integrated system of procedures for enforcement." Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 90 (1983); Aetna Health v. Davila, 542 U.S. 200, 208 (2004).  One of Congress's stated goals in creating ERISA "was to minimize the

---

[48]   Whether such a resolution or adjustment would have occurred had Plaintiff complied with this statutory requirement is not relevant.

administrative and financial burden of complying with conflicting directives among States . . . requiring the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction." <u>N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.</u>, 514 U.S. 645, 656–57 (1995) (citing <u>Ingersoll–Rand v. McClendon</u>, 498 U.S. 133, 142 (1990)).

ERISA's anti-alienation provision is a fundamental protection for plan benefits under ERISA and provides an absolute protection for plan benefits that preempts and bars the state law claims Plaintiff has asserted against the ERISA Defendants here.  ERISA provides the exclusive means for recovering funds from ERISA-governed plans – options that are not available here – and forecloses Plaintiff's claims both here and in any state court.  With respect to the ERISA Defendants, Counts I and II of the Complaint are an impermissible attempt to pursue recovery from ERISA-protected parties and, accordingly, must be dismissed as a matter of law.

       i.       *ERISA's anti-alienation provision provides absolute protection for plan benefits under ERISA-qualified plans.*

ERISA's anti-alienation provision ensures that a participant's plan benefits are absolutely and unconditionally protected for that participant's retirement:  "Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated."  29 U.S.C. §1056(d)(1);[49] see also Treas. Reg. 1.401(a)-13(b), 26 C.F.R. § 1.401(a)-13(b) ("benefits provided under the plan may not be anticipated, assigned (either at law or in equity), alienated or subject to attachment, garnishment, levy, execution or other legal or equitable process").  Legislative history explains that the anti-alienation provision's purpose is to protect plan benefits "against the claims of general creditors," and to "further ensure that the employee's accrued benefits are actually available for retirement purposes."  P.L.R. 9109051 (citing H.R. Rep. 1280, 93rd Cong., 2d Sess. 280 (1974);

---

[49]    There are a few limited statutory exemptions to this requirement of anti-alienation, none of which apply to the claims at issue in the Complaint.

H.R. Rep. 807, 93rd Cong., 2d Sess. 68 (1974)).   The anti-alienation provision "reflects a considered congressional policy choice, a decision to safeguard a stream of income for pensioners (and their dependents, who may be, and perhaps usually are, blameless) . . . ."   Patterson v. Shumate, 504 U.S. 753, 765 (quoting Guidry v. Sheet Metal Workers Nat'l Pension Fund, 493 U.S. 365, 376 (1990)).

The Supreme Court has held that anti-alienation is an absolute protection for participant benefits, even where competing laws challenge the scope or protections afforded by the provision. For example, in Patterson, the Supreme Court broadly interpreted the protections of the anti-alienation provision and determined that a debtor's bankruptcy estate does not include plan benefits, notwithstanding the Bankruptcy Code's policy of maximizing the property included in a debtor's estate.  504 U.S. 753, 757–66 (1992); see also Forbes v. Lucas (In re Lucas), 924 F.2d 597 (6th Cir. 1991) (same); Shearer v. Oberdick (In re Oberdick), 490 B.R. 687, 717–18 (Bankr. W.D. Pa. 2013).  The Supreme Court was clear in Patterson that there are no exceptions to ERISA's anti-alienation provisions.  504 U.S. at 764.

Similarly, in Guidry, the Supreme Court held that ERISA's anti-alienation provision was not subject to equitable exceptions, even where criminal misconduct had occurred.  493 U.S. at 376 (noting that Section 206(d) reflects "a considered congressional policy choice" and that "[i]f exceptions to this policy are to be made, it is for Congress to undertake the task").  The Guidry Court refused to acknowledge any "equitable" exceptions to the clear statutory language and intent, even where application of ERISA's anti-alienation provision "prevents others from securing relief for the wrongs done them."  Id. at 376–77; see also Shah v. Baloch, 418 P.3d 902, 905 (Ariz. Ct. App. 2017) ("The superior court order that we are affirming leaves [the plaintiff] unable to

satisfy his judgment from funds [the defendant] allegedly fraudulently transferred to his pension plan to avoid the judgment.").

Courts in the Third Circuit have followed the Supreme Court's guidance in protecting ERISA plans from alienation of plan assets and benefits.  See, e.g., In re Meinen, 228 B.R. 368, 377 (Bankr. W.D. Pa. 1998) (excluding assets in an "ERISA-qualified plan" from the debtor's estate); Shinehouse v. Guerin, No. 95-7070 1996 U.S. Dist. LEXIS 6680, at * 8–14 (E.D. Pa. May 14, 1996) (holding that funds owed but not yet paid to defendant under ERISA-protected retirement plans were protected by ERISA's anti-alienation provisions and not reachable by defendant's creditors).

   *ii.*   *ERISA preempts Plaintiff's claims against the ERISA Defendants.*

ERISA preemption of state law may be express or implied.  Shaw, 463 U.S. at 95.  Express preemption occurs when a state law references an ERISA plan such that it acts "immediately and exclusively upon ERISA Plans or where the existence of ERISA plans is essential to the law's operation."  Gobeille v. Liberty Mut. Ins. Co., 577 U.S. 312, 320 (2016); Travelers Ins. Co., 514 U.S. at 656.  Implied preemption occurs when a state law has an "impermissible connection with ERISA plans" such that it "governs . . . a central matter of plan administration" or "interferes with nationally uniform plan administration." Rutledge v. Pharm. Care Mgmt. Ass'n, 141 S. Ct. 474, 480 (2020); Gobeille, 577 U.S. 312, 320 (2016); Egelhoff v. Egelhoff, 532 U.S. 141, 148 (2001); Travelers Ins. Co., 514 U.S. at 656.

ERISA's anti-alienation provision preempts the entirety of Plaintiff's claims against the ERISA Defendants.  ERISA explicitly provides that it "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan."  29 U.S.C. §1144(a). For example, in Boggs v. Boggs, the Supreme Court held that ERISA's anti-alienation provision conflicts with, and thus preempts, state community property laws.  520 U.S. 833, 844 (1997).  In

Boggs, the Supreme Court refused to expand the exceptions to ERISA's anti-alienation provisions beyond the exceptions contained within the statute itself, in light of the importance of protecting both plan benefits *as well as the funds that are the source of those benefits*:

> Statutory anti-alienation provisions are potent mechanisms to prevent the dissipation of <u>funds</u>. . . . ERISA's pension plan anti-alienation provision is mandatory and contains only two explicit exceptions, see §§ 1056(d)(2), (d)(3)(A), which are not subject to judicial expansion. The anti-alienation provision can "be seen to bespeak a pension law protective policy of special intensity: Retirement <u>funds</u> shall remain inviolate until retirement."

520 U.S. at 851 (citing <u>Guidry</u>, 493 U.S. at 376) (quoting J. Langbein & B. Wolk, PENSION AND EMPLOYEE BENEFIT LAW 547 (2d ed.1995)) (emphasis added).

Even where there is no direct conflict, neutral state laws of general application, such as fraudulent transfer laws, are still preempted where the state laws significantly affect ERISA plan operation and administration. <u>See Travelers Ins. Co.</u>, 514 U.S. at 668 (acknowledging that "a state law [producing] acute, albeit indirect, economic effects, by intent or otherwise," on ERISA-qualified plan administration are preempted). Indeed, courts have held that state law fraudulent transfer claims against ERISA plans are preempted where a successful claim would result in the alienation of plan assets and a reduction in benefits. <u>See, e.g.</u>, <u>Majteles v. AVL Corp.</u>, 182 Misc. 2d 140, 143–45 (N.Y. Sup. Ct. 1999) (holding that funds transferred by an insolvent corporation into ERISA pension plans are protected, even if fraudulently transferred, because ERISA's anti-alienation provision preempts New York's fraudulent transfer statute); <u>see also</u> <u>United Food & Commercial Workers Int'l Union-Indus. Pension Fund v. EC Mgmt. Servs. Of Ga., Inc.</u>, No. 3:19cv247, 2021 WL 1234511, *22–28 (E.D. Va. Mar. 31, 2021) (dismissing state law fraudulent transfer claims as preempted by ERISA and noting ERISA's "expansive preemption provisions . . . which are intended to ensure that employee benefit plan regulation would be 'exclusively a

federal concern'" and holding that state law fraudulent transfer cause of action was preempted by ERISA) (quoting Aetna Health Inc. v. Davila, 542 U.S. 200, 208 (2004)).[50]

Further, Plaintiff's Delaware state law fraudulent transfer claims are preempted as applied against the ERISA Defendants because they interfere with nationally uniform plan administration. Rutledge, 141 S. Ct. 474, 480 (2020); Gobeille, 577 U.S. 312, 320 (2016); Egelhoff, 532 U.S. 141, 148 (2001); Travelers Ins. Co., 514 U.S. at 656.  Subjecting the ERISA Defendants to various state law claims, such as the Delaware fraudulent transfer claims asserted by Plaintiff, creates a significant administrative burden on ERISA plans that must master the laws of different states and defend litigation in multiple states.  In addition to the Delaware state law claims asserted in the Complaint, Plaintiff has filed complaints in seven[51] different state courts alleging claims under seven different state laws.  See, e.g., Youngman v. Western Conference of Teamsters Pension Plan, et al., Case No. 21-2-13349-1 (Sup. Ct. of the State of Washington in and for the County of King) (asserting Washington state law claims).  This attempt to alienate ERISA plan assets and benefits under multiple state laws is exactly the kind of piecemeal multifaceted state court litigation ERISA was intended to preempt.

In addition, the administrative burden of subjecting ERISA plans to multiple state laws undercuts ERISA's stated purpose.  See Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co., 967 F.3d

---

[50]   Decisions from other circuits allowing state law fraudulent conveyance claims brought by ERISA-qualified plans against plan fiduciaries or employers to preserve plan assets are not applicable here, where Plaintiff seeks to recover and therefore alienate plan assets.  Each of the cases in which state law fraudulent conveyance claims were permitted involved claims against employers who failed to make required plan contributions or fiduciaries who diverted assets that were required plan contributions.  See, e.g., Cent. States S.E. & S.W. Areas Pension Fund v. LaCasse, 254 F. Supp. 2d 1069 (N.D. Ill. 2003) (permitting ERISA-qualified plan's fraudulent conveyance claim against employer for the recovery of assets fraudulently transferred from employer that prevented employer from fulfilling obligations to plan); Or. Laborers-Emp'rs Health & Welfare Tr. Fund v. All State Indus. & Marine Cleaning, 850 F. Supp. 905 (D. Or. 1994) (same); see also Cal. Serv. Emps. Health & Welfare Trust Fund v. Advance Bldg. Maint., No. C 06-34078, 2007 WL 3232444, at * 12 (N.D. Cal. Nov. 1, 2007); Klemme v. Shaw, No. 2:05-CV-01263, 2007 WL 838958 (D. Nev. Mar. 16, 2007) (allowing ERISA-qualified plan's fraudulent conveyance claim to proceed against plan fiduciary who diverted assets that were required plan contributions).

[51]   In addition to the seven different state court filings, Plaintiff also filed a complaint in the Superior Court of the District of Columbia.

218, 235 (3d Cir. 2020) (noting that the analysis should focus on whether claims, *inter alia*, undercut ERISA's stated purpose).

Accordingly, all claims Plaintiff has asserted against the ERISA Defendants are preempted and barred by ERISA. ERISA's mandate to protect plan assets is paramount, and any claims that attempt to end-run ERISA's anti-alienation provision must be dismissed with prejudice. Accordingly, the Complaint should be dismissed with respect to the ERISA Defendants.

### E.   State Street is not a transferee from which Plaintiff can recover.

The Complaint must be dismissed with respect to State Street because State Street was a mere conduit for Distributions made for the ultimate benefit of the American Airlines Trust.[52] The Complaint names both the American Airlines Trust and State Street as "Outside Transferee Defendants." Compl. at 4. But there are no allegations that the American Airlines Trust and State Street received separate Distributions or that State Street benefited from the Distributions. Instead, State Street is only alleged to have "received transfers at issue in this Complaint" in its capacity "as Trustee on behalf of the [American Airlines Trust]." Compl. ¶ 44. State Street cannot be sued in its individual capacity because it is not a "transferee" from whom Plaintiff can recover fraudulent transfers.

Under basic principles of fraudulent transfer law, an entity that does not exercise dominion or control over funds transferred to it is a "mere conduit" and therefore not a "'transferee' for the purposes of . . . avoidance actions."  Mervyn's LLC v. Lubert-Adler Group IV LLC (In re Mervyn's Holdings LLC), 426 B.R. 96, 103–04 (Bankr. D. Del. 2010); see also Halperin v. Careers USA, Inc. (In re FBI Wind Down, Inc.), 614 B.R. 460, 500 (Bankr. D. Del. 2020) ("Courts have held that a defense is available for parties who act as a mere conduit in receiving a transfer solely

---

[52]   Plaintiff's claims against American Airlines Trust are also precluded by the ERISA anti-alienation provisions, as set forth in Section II.G above.

for another and not for their own benefit."); Peachtree Special Risk Brokers, LLC v. Kartman (In re Rocco Co., Inc.), 2014 WL 7404566, at *9 (D.N.J. Dec. 29, 2014) (holding "courts in the Third Circuit, like other jurisdictions, have adopted the 'dominion and control' or 'conduit' test announced by the Seventh Circuit in Bonded Fin. Serv., Inc. v. European Am. Bank, 838 F.2d 890 (7th Cir. 1988)"). Mere possession of funds is not sufficient to render a party a transferee. Here, Plaintiff fails to any allege facts showing State Street controlled any funds it received on behalf of the American Airlines Trust through the Distributions. To the contrary, Plaintiff sues State Street solely in its capacity "as [t]rustee on behalf of American Airlines Master Fixed Benefit Pension Plan." Compl. ¶ 44.

Mervyn's Holdings is particularly instructive. There, the plaintiff sought to recover from Bank of America in its capacity as trustee of a trust. 426 B.R. at 98–99. The court granted Bank of America's motion to dismiss on the theory it could not be liable as a transferee because it only acted as a conduit for funds being transferred to a third party. Id. at 103. The court emphasized that Bank of America was "bound by the terms of the Trust" and was thus "no different from a courier or an intermediary on a wire transfer." Id. The same reasoning applies here. State Street never received any transfers from the Partnerships for itself, but rather "it held the [] funds only for the purpose of fulfilling an instruction to make the funds available to [another] party," i.e., the American Airlines Trust. Id. Just as in Mervyn's Holdings, State Street at most "received" mere physical custody of the Distributions for the purpose of holding the funds in trust for the beneficiaries of the American Airlines Trust. See 426 B.R. at 103.

Courts routinely reject similar attempts to assert fraudulent transfer claims against innocent intermediary financial institutions where there are no allegations the intermediary benefitted from the transfers or did anything other than process transactions in the ordinary course of business.

-63-

See, e.g., id. at 104; Christy v. Alexander & Alexander of N.Y., Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey), 130 F.3d 52, 57 (2d Cir.1997) ("[A] commercial entity that, in the ordinary course of its business, acts as a mere conduit for funds and performs that role consistent with its contractual undertaking in respect of the challenged transaction, is not an initial transferee[.]"); Nordberg v. Societe Generale (In re Chase & Sanborn Corp.), 848 F.2d 1196, 1200 (11th Cir. 1988) (affirming bankruptcy court's dismissal of fraudulent transfer claim where bank was not alleged to have had actual control over the allegedly transferred funds).  Accordingly, State Street is not a proper defendant in this adversary proceeding and the Complaint should be dismissed with prejudice as to State Street.

## **CONCLUSION**

For the foregoing reasons, the LP Defendants respectfully submit that the Complaint should be dismissed with prejudice.

**WHEREFORE**, the LP Defendants respectfully request that the Court enter an order dismissing each cause of action set forth in the Complaint with prejudice.

**LOWENSTEIN SANDLER LLP**
Michael Etkin
Andrew Behlmann
Nicole Fulfree
Scott Cargill
Colleen Restel
One Lowenstein Drive
Roseland, NJ  07068
Telephone: (973) 597-2500
metkin@lowenstein.com
abehlmann@lowenstein.com
nfulfree@lowenstein.com
scargill@lowenstein.com
crestel@lowenstein.com

**BAYARD P.A.**
*/s/ Erin R. Fay*
Erin R. Fay (No. 5268)
Gregory J. Flasser (No. 6154)
600 N. King Street, Suite 400
Wilmington, Delaware 19801
Telephone: (302) 655-5000
efay@bayardlaw.com
gflasser@bayardlaw.com

*Counsel to the LP Defendants*

-65-

**Schedule 1**

LP Defendant Subgroups with Particularized Defenses

| FOREIGN LPs |
| --- |
| Coller Partners 702 LP Incorporated |
| Clouse S.A., acting in respect of its Compartment 11 |
| International SIF SICAV SA |
| Sanba II Investment Company |
| **STATE DEFENDANTS** |
| California Public Employees' Retirement System |
| New Mexico State Investment Council |
| New Mexico State Investment Council Land Grant Permanent Fund |
| New Mexico State Investment Council Severance Tax Permanent Fund |
| **NYC FUNDS** |
| New York City Employees' Retirement System |
| New York City Fire Department Pension Fund |
| New York City Police Pension Fund |
| Teachers' Retirement System of The City Of New York |
| **ERISA DEFENDANTS** |
| American Airlines Master Fixed Benefit Pension Plan Trust |
| Carpenters Pension Trust Fund For Northern California |
| Consolidated Retirement Fund |
| IAM Private Equity, LLC |
| ILGWU Death Benefit Fund 4 |
| Locals 302 & 612 Of The International Union Of Operating Engineers – Employers Construction Industry Retirement Trust |
| National Retirement Fund; Northeast Carpenters Pension Fund |
| Pacific Coast Roofers Pension Plan |
| American Airlines Master Fixed Benefit Pension Plan Trust |
| Steamship Trade Association Of Baltimore, Inc. – International Longshoremen's Association (AFL-CIO) Pension Fund |
| United Food And Commercial Workers International Union Pension Plan For Employees |
| Western Conference Of Teamsters Pension Trust |
| **MERE CONDUIT** |
| State Street Bank And Trust Company (As Trustee On Behalf Of American Airlines Master Fixed Benefit Pension Plan Trust) |