# EXHIBIT B

**EXECUTION COPY**

YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND I, LP

AMENDED AND RESTATED
LIMITED PARTNERSHIP AGREEMENT

LIMITED PARTNER INTERESTS IN YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND I, LP, A DELAWARE LIMITED PARTNERSHIP, HAVE NOT BEEN REGISTERED WITH OR QUALIFIED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE.  THE INTERESTS ARE BEING SOLD IN RELIANCE UPON EXEMPTIONS FROM SUCH REGISTRATION OR QUALIFICATION REQUIREMENTS.  THE INTERESTS CANNOT BE SOLD, TRANSFERRED, ASSIGNED OR OTHERWISE DISPOSED OF EXCEPT IN COMPLIANCE WITH THE RESTRICTIONS ON TRANSFERABILITY CONTAINED IN THIS AGREEMENT AND APPLICABLE FEDERAL AND STATE SECURITIES LAWS.

## TABLE OF CONTENTS

Section                                                                    Page

ARTICLE I        ORGANIZATION

    1.1    Amendment and Restatement of the Original Agreement ................................... 1

    1.2    Name and Offices ................................................................................................ 1

    1.3    Purposes; Investment Objective; Investment Policies and Procedures ................. 1

    1.4    Term .................................................................................................................... 2

    1.5    Fiscal Year .......................................................................................................... 2

    1.6    Partnership Powers .............................................................................................. 2

ARTICLE II        THE GENERAL PARTNER

    2.1    Management ......................................................................................................... 4

    2.2    Limitations on the General Partner ..................................................................... 5

    2.3    Reliance by Third Parties .................................................................................... 5

    2.4    Certain Restrictions on Activities of the General Partner and its Affiliates ......... 5

    2.5    Liability of the General Partner and Other Covered Persons ............................. 10

    2.6    Removal of the General Partner ......................................................................... 11

    2.7    Relief of Responsibility ..................................................................................... 11

ARTICLE III        THE LIMITED PARTNERS

    3.1    No Participation in Management, etc .................................................................. 12

    3.2    Limitation of Liability ....................................................................................... 12

    3.3    No Priority, etc .................................................................................................. 12

ARTICLE IV        INVESTMENTS

    4.1    Investments During Commitment Period; Follow-On Investments .................... 12

    4.2    Investment and Other Restrictions ..................................................................... 13

    4.3    Venture Capital Operating Company .................................................................. 14

## TABLE OF CONTENTS

Section                                                                                                           Page

4.4     Unrelated Business Taxable Income..........................................................................15

4.5     Temporary Investments .........................................................................................15

4.6     Suspension and Runoff Activities..........................................................................15

4.7     Co-Investment .......................................................................................................16

4.8     Alternative Investment Structures.........................................................................17

4.9     Council of Advisors ..............................................................................................18

4.10    Media Investments ................................................................................................19

ARTICLE V        CAPITAL CONTRIBUTIONS; CAPITAL COMMITMENTS

5.1     Capital Contributions and Capital Commitments of the Partners.......................20

5.2     Capital Commitment of the General Partner and its Affiliates............................22

5.3     Return of Capital Contributions...........................................................................22

5.4     Excused Investments.............................................................................................22

5.5     Defaulting Limited Partner ..................................................................................24

ARTICLE VI       CAPITAL ACCOUNTS; DISTRIBUTIONS; ALLOCATIONS;
                 WITHHOLDING

6.1     Capital Accounts...................................................................................................26

6.2     Adjustments to Capital Accounts.........................................................................26

6.3     Distributions of Distributable Cash Attributable to Portfolio Investments ........26

6.4     Distributions of Distributable Cash Not Attributable to Portfolio
        Investments ...........................................................................................................27

6.5     Tax Distributions ..................................................................................................27

6.6     Overriding Provisions; Apportionment of Expenses ...........................................28

6.7     Distributions of Securities....................................................................................29

## TABLE OF CONTENTS

Section                                                                                                          Page

6.8      Negative Capital Accounts ................................................................... 29

6.9      No Withdrawal of Capital...................................................................... 29

6.10     Allocations of Profits and Losses ........................................................ 29

6.11     Tax Matters ........................................................................................... 31

6.12     Withholding Taxes................................................................................ 32

ARTICLE VII      THE MANAGER

7.1      Appointment of Manager ...................................................................... 33

7.2      Management Fee .................................................................................... 33

7.3      Expenses ............................................................................................... 34

ARTICLE VIII      BANKING; ACCOUNTING; BOOKS AND RECORDS

8.1      Banking.................................................................................................. 35

8.2      Maintenance of Books and Records; Accounts and Accounting Method ........... 35

8.3      Partnership Tax Returns........................................................................ 35

8.4      Value ..................................................................................................... 35

ARTICLE IX      REPORTS TO PARTNERS; ADVISORY BOARD; MEETINGS

9.1      Independent Auditors............................................................................ 37

9.2      Reports to Current Partners................................................................... 37

9.3      Tax Information ..................................................................................... 39

9.4      Advisory Board...................................................................................... 39

9.5      Meetings of the Partners ....................................................................... 42

9.6      Limited Partner Information ................................................................. 42

ARTICLE X      INDEMNIFICATION

10.1     Indemnification of General Partner, etc............................................... 42

## TABLE OF CONTENTS

Section                                                                                                                    Page

    10.2    Expenses, etc ................................................................................................ 44

    10.3    Notices of Claims, etc ................................................................................. 45

    10.4    No Waiver ................................................................................................... 45

    10.5    Independent Counsel Investigations ........................................................... 46

ARTICLE XI      TRANSFER OF LIMITED PARTNER INTERESTS;
                     WITHDRAWAL OF LIMITED PARTNERS

    11.1    Admission, Substitution and Withdrawal of Limited Partners; Assignment ....... 46

    11.2    Additional Limited Partners ........................................................................ 49

    11.3    ERISA and Public Limited Partners ........................................................... 52

ARTICLE XII      BANKRUPTCY, DISSOLUTION, ETC. OF PARTNERS

    12.1    Bankruptcy or Dissolution of the General Partner ...................................... 56

    12.2    Bankruptcy, Dissolution or Withdrawal of a Limited Partner .................... 56

ARTICLE XIII      DISSOLUTION AND TERMINATION OF PARTNERSHIP

    13.1    Dissolution Events ...................................................................................... 57

    13.2    Distribution Upon Dissolution ................................................................... 58

    13.3    Distributions in Cash or in Kind ................................................................ 60

    13.4    Time for Liquidation, etc ............................................................................ 60

    13.5    Termination ................................................................................................. 60

    13.6    General Partner Not Liable for Return of Capital Contributions ................ 60

ARTICLE XIV      DEFINITIONS

    14.1    Definitions .................................................................................................. 61

    14.2    Interpretation .............................................................................................. 75

ARTICLE XV      AMENDMENTS; POWER OF ATTORNEY

## TABLE OF CONTENTS

Section                                                                                     Page

15.1   Amendments ...................................................................................... 76

15.2   Power of Attorney............................................................................... 77

15.3   Further Actions of the Limited Partners ........................................... 79

ARTICLE XVI   MISCELLANEOUS

16.1   Notices .............................................................................................. 79

16.2   Counterparts...................................................................................... 79

16.3   Table of Contents and Headings ....................................................... 80

16.4   Successors and Assigns..................................................................... 80

16.5   Severability ....................................................................................... 80

16.6   Non-Waiver........................................................................................ 80

16.7   Governing Law .................................................................................. 80

16.8   Confidentiality .................................................................................. 80

16.9   Survival of Certain Provisions ......................................................... 80

16.10  Waiver of Partition............................................................................ 80

16.11  Entire Agreement .............................................................................. 81

16.12  Partnership Advisors......................................................................... 81

This Amended and Restated Limited Partnership Agreement (as from time to time amended, supplemented or restated, this "Agreement") of Yucaipa American Alliance (Parallel) Fund I, LP, a Delaware limited partnership (the "Partnership"), is made and entered into as of March 4, 2005, for the purpose of amending and restating the Limited Partnership Agreement of the Partnership, dated as of January 7, 2005 (the "Original Agreement"). Certain capitalized terms used herein without definition have the meanings specified in Section 14.1.

## ARTICLE I

## ORGANIZATION

1.1    Amendment and Restatement of the Original Agreement.  The General Partner, the Initial Limited Partner and the Persons listed on Schedule A hereto, which by this reference is incorporated in and made part of this Agreement (as such schedule is from time to time amended, supplemented or restated), as limited partners of the Partnership (in their capacities as limited partners of the Partnership, the "Limited Partners"), hereby amend and restate the Original Agreement and enter into this Agreement.  Immediately following the admission of the first Limited Partner on the date hereof, the Initial Limited Partner shall cease to be a partner of the Partnership and shall have his original capital contribution returned to him and shall have no further rights or claims against, or obligations as a partner of, the Partnership.  A Person shall be admitted at the Initial Closing as a limited partner of the Partnership at the time that (a) this Agreement and a Subscription Agreement or counterparts thereof are executed by or on behalf of such Person and (b) such Person is listed by the General Partner as a limited partner of the Partnership on Schedule A hereto.

1.2    Name and Offices.  The name of the Partnership is "Yucaipa American Alliance (Parallel) Fund I, LP".  The Partnership shall have its principal place of business at 9130 West Sunset Boulevard, Los Angeles, California 90069 or at such other location within the United States of America as the General Partner may from time to time determine in its sole discretion.  The General Partner shall provide prompt notice to the Limited Partners of any relocation of the Partnership's principal place of business.  The Partnership may maintain such other office or offices at such location or locations within or without the State of Delaware as the General Partner may from time to time select.  The registered office of the Partnership in the State of Delaware is located at Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801, and the registered agent for service of process on the Partnership at such address is The Corporation Trust Company.

1.3    Purposes; Investment Objective; Investment Policies and Procedures.

(a)    Purposes.  The purposes of the Partnership are to acquire, hold and dispose of Securities, in accordance with the investment objective and investment policies and procedures described in Sections 1.3(b) and 1.3(c) , including by co-investing on a parallel basis with YAAF, and to engage in such activities as the General Partner, in its sole discretion, deems necessary, advisable, convenient or incidental to the foregoing.

(b)  <u>Investment Objective</u>.  The investment objective of the Partnership is to realize substantial capital gains primarily from private equity investments, equity-related investments, and investments in debt or other Securities providing equity-type returns, such as through corporate acquisitions, leveraged buyouts, and financial restructurings, in organizations, businesses and concepts that are worker friendly, in transactions primarily in the two hundred fifty million dollar ($250,000,000) to one billion dollar ($1,000,000,000) range that would typically require twenty-five million dollars ($25,000,000) to two hundred fifty million dollars ($250,000,000) of equity from the Partnership and Parallel Funds.

(c)  <u>Investment Policies and Procedures</u>.  The General Partner is responsible for the investment decisions of the Partnership, based on the advice of the Manager.  The Partnership's day-to-day and other routine activities will be managed by the Manager.  Among the Manager's management responsibilities for the Partnership will be the following: (<u>i</u>) to search for, analyze and develop investment opportunities; (<u>ii</u>) to screen and evaluate promising investment proposals; (<u>iii</u>) to structure and arrange the consummation of Portfolio Investments; (<u>iv</u>) to monitor the operations of Portfolio Companies; and (<u>v</u>) to develop and arrange the implementation of strategies for the realization of gain from investments.

1.4  <u>Term</u>.  The term of the Partnership commenced on the date the Certificate of Limited Partnership of the Partnership (the "<u>Certificate</u>") was filed in the Office of the Secretary of State of the State of Delaware (the "<u>Secretary of State</u>") and shall continue, unless the Partnership is sooner dissolved, until the tenth anniversary of the Final Closing Date, <u>provided</u> that, unless the Partnership is sooner dissolved, the term of the Partnership may be extended by the General Partner (which shall send to the Limited Partners a written notice of its determination to so extend such term at least sixty (60) days prior to the intended effective date of such extension, which effective date shall be specified in such notice), (<u>a</u>) with the approval of the Advisory Board, for up to two successive periods not to exceed one year each, and (<u>b</u>) thereafter, with the approval of 66⅔% in Interest, for successive periods not to exceed one year each (such term, as so extended if extended, being referred to as the "<u>Term</u>").  In the event the Term is extended past the tenth anniversary of the Final Closing Date, the General Partner shall use its reasonable best efforts to dispose of all Portfolio Investments then held by the Partnership as soon as reasonably practicable after such tenth anniversary, taking into account, such factors as the General Partner deems appropriate in its sole discretion, including whether appropriate disposition opportunities are readily available, the likelihood that such Portfolio Investments would increase or decrease in value if the Partnership were to continue to hold such Portfolio Investments, transfer restrictions applicable to such Portfolio Investments, general market conditions, and the costs to the Partnership if the Partnership were to continue to hold such Portfolio Investments.  Notwithstanding the expiration of the Term, the Partnership shall continue as a separate legal entity until cancellation of the Certificate in accordance with Section 13.5.

1.5  <u>Fiscal Year</u>.  The Fiscal Year of the Partnership shall end on the 31st day of December in each year.  The Partnership shall have the same Fiscal Year for income tax and for financial and partnership accounting purposes.

1.6  <u>Partnership Powers</u>.  In furtherance of the purposes specified in Section 1.3 and without limiting the generality of Section 2.1, but subject to the other terms and

2

provisions of this Agreement, the Partnership and the General Partner, acting on behalf of the Partnership or on its own behalf and in its own name, as appropriate, shall be empowered to do or cause to be done any and all acts deemed by the General Partner, in its sole judgment, to be necessary or advisable in furtherance of the purposes of the Partnership, including the power and authority:

(a)     to acquire, hold, manage, own and Transfer the Partnership's interests in Securities or any other investments made or other assets held by the Partnership;

(b)     to make all elections, investigations, evaluations and decisions, binding the Partnership thereby, that may, in the sole judgment of the General Partner, be necessary or appropriate for the acquisition, holding or disposition of Securities for the Partnership;

(c)     to establish, maintain or close one or more offices within or without the State of California and in connection therewith to rent office space and to engage personnel;

(d)     to open, maintain and close bank and brokerage (including margin) accounts, to draw checks or other orders for the payment of moneys, to exchange U.S. dollars held by the Partnership into non-U.S. currencies and vice versa and to invest such funds as are temporarily not otherwise required for Partnership purposes in Temporary Investments;

(e)     to enter into hedging transactions designed to reduce the Partnership's exposure to currency fluctuations and/or declines in the public market price of Portfolio Investments or other related risks (but not for speculative purposes);

(f)     to bring, defend, settle and dispose of Proceedings;

(g)     to retain consultants, custodians, attorneys, placement agents, accountants and other agents and employees, and to authorize each such agent and employee to act for and on behalf of the Partnership;

(h)     to retain the Manager, as contemplated by Section 7.1, to render investment advisory and managerial services to the Partnership, provided that such retention shall not relieve the General Partner of any of its obligations hereunder;

(i)     to execute, deliver and perform its obligations under the Subscription Agreements and any agreements to induce any Person to purchase limited partner interests in the Partnership, without any further act, approval or vote of any Partner;

(j)     to execute, deliver and perform its obligations under contracts and agreements of every kind necessary or incidental to the offer and sale of limited partner interests in the Partnership, to the acquisition, holding and Transfer of Securities, or otherwise to the accomplishment of the Partnership's purposes, and to take or omit to take such other action in connection with such offer and sale, with such acquisition, holding or Transfer, or with the business of the Partnership, as may be necessary or desirable to further the purposes of the Partnership;

(k)      to borrow in the following circumstances:  (i) pending receipt of Capital Contributions for which a Drawdown Notice has been issued, or will be issued within ten (10) Business Days of such borrowing, pursuant to Section 5.1, in an aggregate amount not in excess of the lesser of (A) the amount of uncalled Capital Commitments and (B) twenty-five percent (25%) of aggregate Capital Commitments, provided that the General Partner shall use its reasonable best efforts to avoid employing such debt in a manner reasonably expected to result in the realization of unrelated debt-financed income under Section 514 of the Code; (ii) in connection with Portfolio Investments that are financed by an obligation owed to the seller in an aggregate amount, together with interest, not in excess of uncalled Capital Commitments, provided that the General Partner shall use its reasonable best efforts to avoid employing such debt in a manner reasonably expected to result in the realization of unrelated debt-financed income under Section 514 of the Code; or (iii) in any other circumstance in which the General Partner has consulted in advance with the Advisory Board regarding such borrowing and the Advisory Board has not disapproved of such borrowing during such consultation, provided that the General Partner shall use its reasonable best efforts to avoid employing such debt in a manner reasonably expected to result in the realization of unrelated debt-financed income under Section 514 of the Code; provided further that, for the avoidance of doubt, the restrictions set forth in clauses (i), (ii) and (iii) of this Section 1.6(k) do not apply to borrowing by Portfolio Companies or debt at the Portfolio Company level;

(l)      subject to Section 4.2(a)(i), to issue guarantees in connection with acquiring, holding or disposing of Portfolio Investments;

(m)      to set aside funds for reasonable reserves, anticipated contingencies and working capital, including to fund the Partnership's obligations under Section 10.1; and

(n)      to carry on any other activities necessary to, in connection with, or incidental to any of the foregoing or the Partnership's business.

The Partnership, and the General Partner on behalf of the Partnership, may enter into and perform the Subscription Agreements, any side letters contemplated by Section 16.11, any management agreement contemplated by Section 7.1 and any documents contemplated thereby or related thereto, without any further act, vote or approval of any Person, including any Partner, notwithstanding any other provision of this Agreement.  The General Partner is hereby authorized to enter into the documents described in the preceding sentence on behalf of the Partnership, but such authorization shall not be deemed a restriction on the power of the General Partner to enter into other documents on behalf of the Partnership.

## ARTICLE II

## THE GENERAL PARTNER

2.1      Management.  The management, control and operation of and the determination of policy with respect to the Partnership and its affairs shall be vested exclusively in the General Partner (acting directly or through its duly appointed agents), which is hereby authorized and empowered on behalf and in the name of the Partnership, subject to the terms of

4

this Agreement, to carry out any and all of the purposes of the Partnership and to perform all acts and enter into and perform all contracts and other undertakings that it may in its sole discretion deem necessary, advisable, convenient or incidental thereto.  The General Partner may exercise on behalf of the Partnership, and may delegate to the Manager, all of the powers set forth in Section 1.6, <u>provided</u> that the management and the conduct of the activities of the Partnership shall remain the sole responsibility of the General Partner and all decisions relating to the selection and disposition of the Partnership's investments shall be made exclusively by the General Partner in accordance with this Agreement.

2.2     <u>Limitations on the General Partner</u>.  The General Partner and, where applicable, the Manager shall not:

(a)     do any act in contravention of any applicable law or any provision of this Agreement;

(b)     possess Partnership property for other than a Partnership purpose;

(c)     admit any Person as a general partner of the Partnership except as permitted in this Agreement and the Act;

(d)     admit any Person as a Limited Partner except as permitted in this Agreement and the Act; or

(e)     Transfer its interest in the Partnership other than as permitted in this Agreement and the Act.

2.3     <u>Reliance by Third Parties</u>.  In dealing with the General Partner and its duly appointed agents (including the Manager), no Person shall be required to inquire as to the General Partner's or any such agent's authority to bind the Partnership.

2.4     <u>Certain Restrictions on Activities of the General Partner and its Affiliates</u>.

(a)     <u>Sponsorship</u>.  During the period from the date hereof through the earlier of (<u>i</u>) the date on which seventy-five percent (75%) of the aggregate Capital Commitments of Limited Partners who are not Defaulting Limited Partners (the "<u>Non-Defaulting Limited Partners</u>") have been invested in Portfolio Investments, committed for investment pursuant to a binding letter of intent or other binding written commitment, reserved for Follow-On Investments, or reasonably reserved for Partnership Expenses, and (<u>ii</u>) the last day of the Commitment Period, none of the General Partner or its Affiliates will form or organize any pooled investment vehicle with substantially similar investment objectives as those of the Partnership as set forth in Section 1.3(b) (other than the Partnership, any Parallel Fund, any entity formed in connection with a Portfolio Investment, Permitted Funds, and any entity formed in connection with co-investment by Yucaipa Co-Investors pursuant to Section 4.7(b)) (any such pooled investment vehicle being a "<u>Competing Fund</u>"), without the consent of 66⅔% in Interest; <u>provided</u> that, for the avoidance of doubt, a Competing Fund shall not be deemed to have been formed or organized until the initial closing for the subscription of interests in such Competing Fund (other than subscriptions by Affiliates of the General Partner); <u>provided further</u> that the General Partner and its Affiliates shall not engage in "road shows" (as such term is commonly

5

understood in the investment community) or similar multi-participant marketing presentations with respect to a Competing Fund prior to the earlier of the circumstances set forth in clauses (i) or (ii) of this Section 2.4(a), and any other activity undertaken by the General Partner and its Affiliates in connection with the anticipated formation or organization of a Competing Fund shall be conducted in a manner that will not materially interfere with the operations of the Partnership.  Notwithstanding the foregoing, prior to the Outside Admission Date, the General Partner and its Affiliates may form one or more pooled investment vehicles (including YAAF) to accommodate the needs of particular investors, having terms substantially similar to those of the Partnership, to co-invest with the Partnership on substantially the same terms as the Partnership ("Parallel Funds"), including the timing, terms and conditions of any investment acquisition or disposition in Portfolio Investments made by the Partnership.  The participation of the Partnership and any Parallel Funds in any Portfolio Investment and related obligations shall be in proportion to their respective total capital commitments at the time and each Parallel Fund must pay its proportionate share of all Partnership Expenses and Organizational Expenses and will be credited with its proportionate share of Fee Income and Directors' Fees, in each case, except to the extent otherwise required for legal, tax or regulatory reasons.  Without limiting the foregoing, on each date on which any Limited Partner is admitted to the Partnership or increases its Capital Commitment, and on each date on which any Parallel Fund Investor is admitted to any Parallel Fund or increases its Parallel Fund Commitment, the General Partner shall use its reasonable best efforts to reallocate investments and expenses between the Partnership and the Parallel Funds, to the extent reasonably practicable, in proportion to the aggregate capital commitments of each of the Partnership and the Parallel Funds (but taking into account Limited Partners and Parallel Fund Investors who have been excused from participating in any particular portfolio investment pursuant to the terms of this Agreement and the Parallel Fund Agreements), including by transferring portions of portfolio investments between the Partnership and the Parallel Funds at a price (paid by the transferee entity to the transferor entity) equal to the cost of such portion plus interest thereon at the Prime Rate plus 2% per annum.

    (b) <u>Deal Flow</u>.  During the Commitment Period, any investment opportunity that is presented to the General Partner or any of its Affiliates and that the General Partner believes in good faith to be suitable and appropriate for the Partnership, taking into account, among other things, the investment objectives of the Partnership as set forth in Section 1.3(b) and the nature and scope of the potential investment, will be offered by the General Partner to the Partnership (and to the Parallel Funds, unless the General Partner elects otherwise for legal, tax or regulatory reasons), and the General Partner shall cause its Affiliates to offer such investment opportunities to the Partnership, unless the Advisory Board agrees that it or they need not be so offered, to the extent that (<u>i</u>) the Partnership has unfunded Capital Commitments net of reserves for (<u>A</u>) payment of Partnership Expenses throughout the Term, (<u>B</u>) funding of Follow-On Investments and (<u>C</u>) funding of any investment with respect to which the Partnership has entered, prior to the termination of the Commitment Period, into a binding letter of intent or other binding written commitment to make such an investment, and (<u>ii</u>) the minimum investment expected to be made by the Partnership and Parallel Funds in such investment opportunity would be at least fifteen million dollars ($15,000,000).  The foregoing shall not apply to (<u>x</u>) investment opportunities related or complementary to existing investments of the General Partner or any of its Affiliates made prior to the Initial YAAF Closing Date or prior to the date that any such Affiliate became an Affiliate of the General Partner, (<u>y</u>) passive personal investments of any Affiliate of the General Partner or Manager or (<u>z</u>) any individual investment under fifteen million

1057503.4

dollars ($15,000,000) (as of the date of the investment).  Notwithstanding anything in this Agreement to the contrary, in the event that the General Partner determines in good faith that an investment opportunity is required pursuant to this Section 2.4(b) to be offered to the Partnership and that such investment opportunity also is required to be offered by the general partner of any of the Permitted Funds to such Permitted Fund pursuant to the terms of the limited partnership agreement (or equivalent governing agreement or document) of such Permitted Fund, then the General Partner shall allocate such investment opportunity to the Partnership (and the Parallel Funds) and such Permitted Fund in such manner and in such proportions (including entirely to either the Partnership (and the Parallel Funds) or such Permitted Fund) as it deems reasonable, taking into account the size of the Partnership (and the Parallel Funds) and such Permitted Fund, the amount of their respective unfunded capital commitments, their respective investment focus and such other factors as the General Partner deems appropriate in its reasonable discretion; provided that if any such allocation is not made pro rata based on the respective amount of uncommitted capital of the Partnership (and the Parallel Funds) and such Permitted Fund, then the General Partner shall inform the Advisory Board of the reasons why such allocation was not made on such a pro rata basis.  In the event such investment opportunity is allocated to both the Partnership and a Permitted Fund, (x) the General Partner shall cause such Partnership's and such Permitted Fund's respective investments in such investment opportunity to be made at substantially the same time and on substantially similar terms in all material respects (except as otherwise necessary or appropriate due to legal, tax or regulatory differences between the Partnership and such Permitted Fund), and (y) the General Partner shall use its reasonable best efforts to cause the Partnership and such Permitted Fund to dispose of their respective investments in such investment opportunity at substantially the same time and on substantially similar terms in all material respects (except as otherwise necessary or appropriate due to legal, tax or regulatory differences between the Partnership and such Permitted Fund), unless, in the case of clause (y), the General Partner determines in good faith, after taking into account relevant differences in the needs of, and circumstances surrounding, the Partnership and such Permitted Fund, including the respective term, investment horizon, liquidity requirements, and liabilities and other obligations of the Partnership and such Permitted Fund, that it would not be in the best interests of the Partnership or such Permitted Fund, as the case may be, for the Partnership or such Permitted Fund, as the case may be, to dispose of the Partnership's or such Permitted Fund's investment in such investment opportunity at substantially the same time or on substantially similar economic terms in all material respects.  If the General Partner would have been required to offer an investment opportunity to the Partnership pursuant to the first sentence of this Section 2.4(b) but for the fact that the minimum investment expected to be made by the Partnership and Parallel Funds in such investment opportunity was less than fifteen million dollars ($15,000,000), then the Principal may not invest, in the aggregate, more than ten million dollars ($10,000,000) in such investment opportunity (measured as of the time of the Principal's initial investment in such investment opportunity and as of the time of each subsequent investment (if any) by the Principal in such investment opportunity), unless the Principal promptly discloses such investment to the Advisory Board promptly after the Principal makes such investment.  If the General Partner would have been required to offer an investment opportunity to the Partnership pursuant to the first sentence of this Section 2.4(b) but for the fact that the minimum investment expected to be made by the Partnership and Parallel Funds in such investment opportunity was less than fifteen million dollars ($15,000,000), then no Dedicated Investment Professional may invest in such investment opportunity unless (1) the investment by

7

such Dedicated Investment Professional in such investment opportunity is less than one million dollars ($1,000,000) or (2) the General Partner has consulted in advance with the Advisory Board regarding such investment and the Advisory Board has not disapproved of such investment during such consultation (such disapproval to be exercised subject to the Advisory Board's reasonable discretion).

(c)     Other Activities.  Subject to Section 2.4(b), the General Partner, the Principal, the Manager and their respective Affiliates, partners, members, directors, officers, stockholders and employees may engage in, or hold any interest in, any business ventures of any kind, independently or with others, and such Persons will each have the right to take for their own account or to recommend to others such investment opportunities.  No Limited Partner will, by reason of being a Limited Partner in the Partnership, have any right to participate in any manner in any profits or income earned or derived by or accruing to the General Partner, the Principal, Manager or their respective Affiliates, partners, members, directors, officers, stockholders or employees from the conduct of any business other than the business of the Partnership or from any transaction in securities effected by the General Partner, the Principal, the Manager or their respective Affiliates, partners, members, directors, officers, stockholders or employees for any account other than that of the Partnership.  Notwithstanding the foregoing, the General Partner and the Manager (i) shall devote substantially all of their time to the affairs of the Partnership and the Parallel Funds, (ii) shall cause the Principal to devote a substantial majority of his business time to the affairs of the Partnership and the Parallel Funds and other Permitted Activities, provided that, in the case of clause (ii), such portion of his business time devoted to the affairs of the Partnership and the Parallel Funds shall not be less than as may be reasonably required to conduct the affairs of the Partnership and the Parallel Funds, and (iii) shall cause at least two (2) Dedicated Investment Professionals to devote a substantial majority of their business time to the affairs of the Partnership, the Parallel Funds and YASSF, provided that, in the case of clause (iii), such portion of such substantial majority of their business time devoted to the affairs of the Partnership and the Parallel Funds shall not be less than as may be reasonably required to conduct the affairs of the Partnership and the Parallel Funds.

(d)     Conflicts of Interest.

(i)     While the Manager and the General Partner intend to avoid situations involving conflicts of interest, each Limited Partner acknowledges that there may be situations in which the interests of the Partnership, in a Portfolio Company or otherwise, may conflict with the interests of the General Partner, the Principal, the Manager and their respective Affiliates (including Permitted Funds).  Each Limited Partner agrees that the activities of the General Partner, the Principal, the Manager and their respective Affiliates (including Permitted Funds), in each case, that are expressly authorized by this Agreement may be engaged in by the General Partner, the Principal, the Manager or any such Affiliate, as the case may be, and will not, in any case or in the aggregate, be deemed to be a breach of this Agreement or any duty owed by any such Person to the Partnership or to any Partner.

(ii)     On any issue involving material conflicts of interest not provided for in paragraph (iii) below of which either the General Partner or the Manager is

8

actually aware, each of the Manager and the General Partner (A) shall be guided by its good faith judgment as to the best interests of the Partnership and the Partners, (B) shall consult with, and propose an appropriate course of action to, the Advisory Board with respect to such conflict of interest, and (C) unless such proposed course of action has been disapproved by the Advisory Board during such consultation, shall take such actions as are consistent in all material respects with such proposed course of action to ameliorate such conflict of interest.

(iii)     The General Partner may cause the Partnership to (A) enter into contracts and transactions with the Manager, the General Partner or their respective Affiliates, or (B) invest in any publicly traded entity in which the General Partner, the Manager, the Principal, the Dedicated Investment Professionals and their respective Affiliates, in the aggregate, hold a financial interest greater than the greater of ten million dollars ($10,000,000) (as of the date of the investment) or two percent (2%) of the outstanding economic interests in the entity, or (C) invest in any non-publicly traded entity in which the General Partner, the Manager, the Principal, the Dedicated Investment Professionals and their respective Affiliates, in the aggregate, hold a financial interest greater than one million dollars ($1,000,000) (as of the date of the investment); provided that, in the case of each such contract, transaction or investment (other than the contracts, transactions and investments expressly permitted by Article VII and other than Subscription Agreements with Affiliated Limited Partners), (1) the General Partner shall have determined in good faith that the terms of such contract, transaction or investment are fair and reasonable to the Partnership, shall have consulted in advance with the Advisory Board regarding the relevant terms and conditions of such contract, transaction or investment and shall have informed the Advisory Board that it has the right to object to such contract, transaction or investment and (2) the Advisory Board shall not have disapproved of such contract, transaction or investment during such consultation (such disapproval to be exercised subject to the Advisory Board's reasonable discretion); provided further that the Limited Partners recognize and consent to the receipt by the General Partner, the Manager or their respective Affiliates of Fee Income from Portfolio Companies or from other Persons in connection with actual or potential investments, and neither the Partnership nor any Partner, except as set forth in Section 7.2(a), shall have any interest therein by virtue of this Agreement or the partnership relation created hereby.  If such disapproval occurs, then the Partnership shall not enter into such contract, transaction or investment. Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement shall prevent (X) the Principal, the General Partner, the Manager, the Dedicated Investment Professionals or any of their respective Affiliates, partners, members, directors, officers, stockholders or employees from investing in securities of a publicly traded company, (Y) the Partnership from investing in an entity in which any of the Principal, the Manager, the General Partner, the Dedicated Investment Professionals or their respective Affiliates holds a financial interest less than or equal to the applicable thresholds set forth in the first sentence of this Section 2.4(d)(iii), or (Z) the Partnership from entering into contracts or transactions with any Portfolio Company or making Follow-On Investments in a

Portfolio Company, and in each such case of the investments described in any of clauses (X) through (Z) above, no such investment shall be considered to be a conflict of interest subject to the procedures of this Section 2.4(d).

2.5     Liability of the General Partner and Other Covered Persons.

(a)     General.  Except as provided in the Act and in this Agreement, the General Partner has the powers, duties, responsibilities and liabilities of a partner in a partnership without limited partners to Persons other than the Partnership and the other Partners.  Except as provided in the Act and in this Agreement, the General Partner has the powers, duties (including fiduciary duties), responsibilities and liabilities of a partner in a partnership without limited partners to the Partnership and the other Partners.  Notwithstanding the foregoing, no Covered Person shall be liable to the Partnership or any Partner for any act or omission taken or suffered by such Covered Person in good faith and in the belief that such act or omission is in or is not contrary to the best interests of the Partnership and is within the scope of authority granted to such Covered Person by this Agreement; provided that, (i) if such Covered Person is not an Advisory Board Representative, then such act or omission shall not have been adjudicated by a court of competent jurisdiction to be Disabling Conduct, and (ii) if such Covered Person is an Advisory Board Representative, then such act or omission shall not have been adjudicated by a court of competent jurisdiction to be fraud or willful malfeasance.  To the fullest extent permitted by law, no Partner shall be liable to the Partnership or any Partner for any action taken by any other Partner.

(b)     Reliance.  The General Partner, the Manager or any of their respective Affiliates or their respective shareholders, officers, directors, employees, partners or members shall not incur any liability in acting upon any signature or writing reasonably believed by it to be genuine, may rely on a certificate signed by an executive officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge, and may rely on an opinion of counsel selected and retained by such Person with reasonable care with respect to legal matters.  The General Partner, the Manager or any of their respective Affiliates or their respective shareholders, officers, directors, employees, partners or members may consult with counsel, appraisers, engineers, accountants and other skilled Persons of its choosing (each, an "Agent"), and shall not be liable to the Partnership or any Partner for (i) anything done, suffered or omitted in good faith in reasonable reliance upon the advice of any of such Agents, or (ii) any action of any Agent, provided that in each case such Agent was selected and retained with reasonable care.  Neither the General Partner nor the Manager shall be liable to the Partnership or any Partner for any error of judgment made in good faith by a responsible officer or officers of the General Partner or the Manager, provided that such error does not constitute Disabling Conduct on the part of the General Partner or the Manager.  Except as otherwise provided in this Section 2.5, no Covered Person shall be liable to the Partnership or any Partner for any mistake of fact or judgment by the Covered Person in conducting the affairs of the Partnership or otherwise acting in respect of and within the scope of this Agreement.

(c)     Discretion.  Whenever in this Agreement the General Partner or the Manager is permitted or required to make a decision (i) in its "sole discretion" or "discretion" or under a grant of similar authority or latitude, the General Partner or the Manager, as the case may be, shall be entitled to consider only such interests and factors as it deems appropriate, including

its interests and the interests of the other Partners, and shall exercise such discretion in good faith, or (ii) in its "good faith" or under another expressed standard, the General Partner or the Manager, as the case may be, shall act under such express standard and shall not be subject to any other or different standard imposed by any other agreement or by relevant provisions of law or in equity or otherwise.

2.6     Removal of the General Partner.  Within one hundred eighty (180) days after the General Partner, the Manager or the Principal has been adjudicated by a court of competent jurisdiction, and if an appeal is taken, then after one such appeal, to have engaged in Disabling Conduct, the General Partner may be removed as the general partner of the Partnership by the written election of 66⅔% in Interest, at which time a replacement general partner shall be designated by the written election of a Majority in Interest; provided that such removal of the General Partner and designation of such replacement general partner shall in any event be in accordance with the FCC Insulation Policies.  Upon such election, (a) the removed General Partner shall thereupon become, without any further action being required of any Person, a Limited Partner and shall cease being the general partner of the Partnership; (b) the replacement general partner of the Partnership shall promptly prepare and file or cause to be filed, with the assistance of the removed General Partner if and to the extent reasonably requested, an amendment to the Certificate, and shall prepare and execute an amendment to this Agreement, reflecting its admission as a general partner of the Partnership and changing the name of the Partnership so that it does not include the word "Yucaipa"; (c) the removed General Partner shall thereafter be entitled to receive 65% of the GP Carry that otherwise would have been distributable to it pursuant to Section 6.3 if it had not been removed as the general partner of the Partnership with respect to Portfolio Investments owned by the Partnership on or before the effective date of the election to remove the removed General Partner and without regard to Portfolio Investments made, or fees and expenses incurred, thereafter (with the remaining 35% of such GP Carry being distributed instead to the replacement general partner); (d) the removed General Partner and its Affiliates shall continue to be Covered Persons and to be entitled to indemnification hereunder, to the extent provided in Section 10.1; (e) the obligation of the removed General Partner under Sections 13.2(b) and 13.2(c) shall be unaffected (i) except that Sections 13.2(b) and 13.2(c) shall be applied to the removed General Partner (and all calculations thereunder shall be made) as though the only Portfolio Investments, Organizational Expenses and Partnership Expenses of the Partnership were those made and incurred prior to the removal of the removed General Partner and (ii) except that, for the avoidance of doubt, the obligation of the removed General Partner under Sections 13.2(b) and 13.2(c) shall not extend to any portion of the GP Carry that is distributed to the replacement general partner; (f) for all other purposes under this Agreement, the replacement general partner shall be deemed to be the "General Partner" hereunder and shall be deemed to be admitted as the general partner of the Partnership effective immediately prior to the removal of the removed General Partner, such replacement general partner shall continue the business of the Partnership and the Partnership shall not be dissolved except in accordance with Section 13.1; (g) the interests in the Partnership held by the removed General Partner as a Limited Partner shall become non-voting; and (h) each power of attorney that has been granted to the removed General Partner pursuant to Section 15.2 shall immediately and automatically be revoked and terminated.

2.7     Relief of Responsibility.  If a Dedicated Investment Professional has been adjudicated by a court of competent jurisdiction to have engaged in Disabling Conduct, the

General Partner shall promptly cause such Dedicated Investment Professional to be relieved of all responsibilities related to the Partnership, in each case, unless otherwise approved by 66⅔% in Interest.

## ARTICLE III

## THE LIMITED PARTNERS

3.1    <u>No Participation in Management, etc</u>.  No Limited Partner shall take part in the management or control of the Partnership's affairs, transact any business in the Partnership's name or have the power to sign documents for or otherwise bind the Partnership. Except as expressly provided herein, no Limited Partner shall have the right to vote for the election, removal or replacement of the General Partner.  No provision of this Agreement shall obligate any Limited Partner to refer investments to the Partnership or restrict any investments that a Limited Partner may make.

3.2    <u>Limitation of Liability</u>.  Except as may otherwise be provided by the Act or as expressly provided for in Section 6.12, 10.1, 11.1(b), 11.2(a) or 11.3(a) or the definition of "Remaining Capital Commitment", the liability of each Limited Partner for the debts, liabilities and obligations of the Partnership shall not exceed such Limited Partner's Capital Commitment. Notwithstanding the foregoing, the limitation on liability set forth in this Section 3.2 shall not apply with respect to any breach by a Limited Partner of its obligations under this Agreement or of its representations, warranties or covenants to the Partnership or General Partner in such Limited Partner's Subscription Agreement or otherwise in connection with becoming a Limited Partner.  No Limited Partner, to the fullest extent permitted by applicable law, shall have any fiduciary duties to the Partnership or any other Partner, other than to act in accordance with the contractual covenant of good faith and fair dealing.

3.3    <u>No Priority, etc</u>.  No Limited Partner shall have priority over any other Limited Partner either as to the return of the amount of its Capital Contribution or, other than as provided in Article VI, as to any allocation of Profits and Losses or any item of income, gain, loss, deduction or credit.

## ARTICLE IV

## INVESTMENTS

4.1    <u>Investments During Commitment Period; Follow-On Investments</u>.  No investments in Portfolio Companies will be made by the Partnership, and no Capital Commitments shall be called to fund Portfolio Investments, following the termination of the Commitment Period, <u>provided</u> that Remaining Capital Commitments may be called from time to time following the termination of the Commitment Period to (<u>a</u>) pay for Partnership Expenses and Organizational Expenses, (<u>b</u>) fund Follow-On Investments, during the two-year period immediately following termination of the Commitment Period, in an aggregate amount not to exceed twenty percent (20%) of aggregate Capital Commitments, and (<u>c</u>) fund any investment with respect to which the Partnership has entered, prior to the termination of the Commitment

Period, into a binding letter of intent or other binding written commitment to make such an investment.

4.2   <u>Investment and Other Restrictions</u>.

(a)   <u>General</u>.  The Partnership shall not:

(i)   invest in any Person that (when taken together with all other investments by the Partnership in, and the amount at that time of guarantees (if any) made by the Partnership with respect to, such Person and any other Person who is an Affiliate of the first Person other than by reason of the Partnership's investment in such other Person) would result in an investment by the Partnership at that time of an aggregate amount in such Person and any such Affiliate of such Person in excess of twenty-five percent (25%) of aggregate Capital Commitments;

(ii)   invest in Securities that, at the time of the funding of such investment, are publicly traded, unless such investment is (<u>A</u>) with the intent (whether alone or together with other Persons) to take the issuer of such Securities "private", as such term is commonly understood in the investment community, (<u>B</u>) with the intent (whether alone or together with other Persons) to acquire control of the issuer of such Securities, (<u>C</u>) with the intent (whether alone or together with other Persons) to elect a member onto the board of directors of, substantially influence the management or operations of, or otherwise pursue a strategic objective (other than a strategic objective set forth in Clause (B) above) with respect to, the issuer of such Securities, or (<u>D</u>) a private placement of Securities, <u>provided</u> that the aggregate amount of investments of the Partnership under clauses (C) and (D) shall not exceed twenty percent (20%) of aggregate Capital Commitments;

(iii)   invest in any other pooled investment vehicles unless such vehicle is organized with reference to a particular acquisition of a Portfolio Company and does not require the payment of any carried interest or management fees with respect to the Partnership's investment; or

(iv)   invest in entities whose primary business is the exploration of oil or gas;

in each case, unless the General Partner has consulted in advance with the Advisory Board regarding such investment and the Advisory Board has not disapproved of such investment during such consultation.

In addition, the Partnership shall not (<u>x</u>) invest in any real property or in any entity whose primary business activity is the passive ownership of real estate, <u>provided</u> that, for the avoidance of doubt, such restriction shall not apply to any investment in a Portfolio Company that conducts business as an operating company even if ownership of real estate is a material asset of such Portfolio Company, and <u>provided further</u> that in connection with an investment in such an operating company, such investment may be structured to include, for tax reasons, an

13

investment by the Partnership in a separate entity whose primary purpose is ownership of real estate, or (y) invest in excess of twenty percent (20%) of aggregate Capital Commitments in entities that are organized and operate principally outside of the United States and Canada.

(b)     No Hostile Deals.  The General Partner may cause the Partnership to make a Portfolio Investment only if (i) the offer to acquire the Portfolio Investment has the approval or acquiescence, whether by invitation to participate in an auction process or otherwise, of the board of directors or shareholders of the prospective Portfolio Company or an appropriate representative of the prospective Portfolio Company, or the General Partner has no actual knowledge that such offer lacks such approval or acquiescence, and (ii) the General Partner determines in good faith that the acquisition is not "hostile", as such term is then commonly understood in the investment community.

(c)     Bridge Financing.  The Partnership may enter into Bridge Financings for any prospective or existing Portfolio Company, but the maximum amount of any such Bridge Financing, when added to the total of all other investments (valued at cost) in the Portfolio Company, may not exceed twenty-five percent (25%) of the aggregate Capital Commitments.  In addition, the total of all outstanding Bridge Financings at any point in time may not exceed twenty-five percent (25%) of the aggregate Capital Commitments.

(d)     Foreign Investments and Offices.  The Partnership shall not (x) make an initial investment in any prospective Portfolio Company organized under the laws of any jurisdiction outside of the United States, Canada and their respective territories and possessions or (y) open an office in any jurisdiction outside of the United States, Canada and their respective territories and possessions, unless, in each case, the Partnership has:

(i)     obtained an opinion of counsel qualified to practice in such jurisdiction that, under the laws of such jurisdiction, the limited liability of the Limited Partners will be recognized to the same extent in all material respects as under the Act;

(ii)     obtained reasonable assurances, based on the advice of counsel qualified to practice in such jurisdiction or an independent firm of internationally recognized public accountants, that such investment shall not cause the Limited Partners, solely as a result of being a Limited Partner, to be required to (i) file income tax returns in such jurisdiction or (ii) pay tax in such jurisdiction with respect to the Limited Partner's income, except in the case of either the foregoing clause (i) or (ii) to the extent limited to income attributable to the Partnership.

4.3     Venture Capital Operating Company.

(a)     The General Partner shall use its reasonable best efforts to operate the Partnership as a "venture capital operating company" (a "VCOC") within the meaning of the regulations of the DOL included within 29 C.F.R. § 2510.3-101 (the "DOL Regulations") from the date of the Partnership's first Portfolio Investment and shall structure the Partnership's first Portfolio Investment so that the Partnership shall, on the date that such Portfolio Investment is made, qualify as a VCOC within the meaning of the DOL Regulations, unless each ERISA

14

Limited Partner and Public Limited Partner agrees to the contrary.  The General Partner may, upon the advice of counsel, provide for the escrow (which escrow shall be established and maintained in accordance with all applicable requirements under ERISA) of all or a portion of any Capital Contributions of ERISA Limited Partners and Public Limited Partners made pursuant to Section 5.1, to the extent such contributions are made prior to the funding of the Partnership's first Portfolio Investment.

(b)     For so long as there is any Limited Partner which is an ERISA Limited Partner or a Public Limited Partner, or whose assets are subject to Title I of ERISA or Section 4975 of the Code, no later than the 60th day of each "annual valuation period" (as defined in Section 2510.3-101(d)(5)(ii) of the DOL Regulations) of the Partnership, the General Partner shall provide a written certificate to each such Limited Partner stating (i) that the General Partner has consulted with counsel (which may be counsel to the General Partner) and is delivering such certificate on the basis of advice received from such counsel and (ii) whether or not the Partnership qualifies as a VCOC.  The certificate shall include a reasonable level of detail regarding the basis for the conclusion set forth therein.  The General Partner's obligation to deliver such certificate shall not apply during the "distribution period" as provided in Section 2510.3-101(d)(2)(ii) of the DOL Regulations.

(c)     In the event that the assets of the Partnership are at any time deemed to be "plan assets" for purposes of ERISA, the General Partner shall use its reasonable best efforts to avoid any prohibited transactions under ERISA or Section 4975 of the Code.

4.4     Unrelated Business Taxable Income.  The General Partner shall use its reasonable best efforts to operate the Partnership and to structure Portfolio Investments in a manner that will not result in the realization of unrelated business taxable income under Section 512 of the Code or unrelated debt-financed income under Section 514 of the Code, consistent with the Partnership's objective of maximizing returns for all Partners; provided that the foregoing covenant shall not apply to the operation of Sections 1.6(k) or 7.2; provided further that the incurrence of unrelated business taxable income by the Partnership shall in no way indicate that the General Partner has failed to comply with this covenant.

4.5     Temporary Investments.  The General Partner shall cause the Partnership to invest funds held by the Partnership in Temporary Investments pending investment in Portfolio Investments or pending distribution.

4.6     Suspension and Runoff Activities.

(a)     Subject to Section 4.6(b), the Commitment Period will be suspended upon, and the Partnership will engage only in Runoff Activities after (each event described in the following clauses (i) through (iv) being a "Suspension Event"):

(i)     the Principal has ceased to be actively involved (including by reason of death or disability) with the Partnership to the extent required under clause (ii) of the last sentence of Section 2.4(c);

(ii)     any sale or transfer of any equity interests in the General Partner or the Manager, as the case may be, that results in the Principal beneficially owning

15

less than 50% of the equity interests of the General Partner or the Manager, as the case may be;

(iii)     the General Partner, the Manager, the Principal or any Dedicated Investment Professional (<u>A</u>) has been determined, by independent counsel selected pursuant to Section 10.5, in a written opinion addressed to the Partnership, to have more likely than not engaged in Disabling Conduct, or (<u>B</u>) has been adjudicated by a court of competent jurisdiction to have engaged in Disabling Conduct, unless, in each case, such Person is relieved of all responsibilities related to the Partnership within five (5) Business Days of such determination or adjudication; or

(iv)     the number of Dedicated Investment Professionals who devote a substantial majority of their business time to the affairs of the Partnership to the extent required under clause (iii) of the last sentence of Section 2.4(c) has fallen to below two (2), unless otherwise cured within ninety (90) days thereof.

The General Partner shall provide the Limited Partners with prompt notice of the occurrence of any event for which the Commitment Period is suspended pursuant to clause (i) through (iv) above (the effective date of such suspension being the "<u>Suspension Date</u>").

(b)     The General Partner shall have ninety (90) days from the Suspension Date to prepare and present a plan regarding future management of the Partnership (which management plan shall designate a successor to the Principal if the suspension of the Commitment Period occurs pursuant to Section 4.6(a)(i)) to the Limited Partners and obtain the approval of 66⅔% in Interest (such approval not to be unreasonably withheld, <u>provided</u> that if the suspension of the Commitment Period arises pursuant to Section 4.6(a)(i), then such approval shall be at the Limited Partners' sole discretion).  The restrictions set forth in Section 4.6(a) shall terminate effective upon such approval of the Limited Partners.  In the event that the General Partner is unable to obtain such approval of the Limited Partners within such period, then effective upon the expiration of such period, the Commitment Period shall end and the restrictions set forth in Section 4.6 shall become permanent restrictions.

(c)     Except as expressly provided in this Section 4.6, from and after the date that the Commitment Period ends as contemplated by this Section 4.6, the General Partner shall continue to act on behalf of the Partnership and to perform the functions of the General Partner and shall have all the rights and privileges of the General Partner hereunder.

(d)     For the avoidance of doubt, neither the approval of 66⅔% in Interest of any management plan pursuant to Section 4.6(b), nor the termination of the restrictions set forth in Section 4.6(a) as a result of such approval, shall be deemed to waive any subsequent suspension of the Commitment Period arising from the occurrence of a Suspension Event after such approval and termination.

4.7     <u>Co-Investment</u>.

(a)     <u>Co-Investment by Unaffiliated Limited Partners</u>.  The General Partner may, in its sole discretion, provide one or more Limited Partners (other than Affiliated Limited

16

Partners) with the opportunity to co-invest with the Partnership in the Securities of, or provide Bridge Financing to, Portfolio Companies.

(b)     <u>Co-Investment by Yucaipa Co-Investors</u>.  The General Partner may provide Yucaipa Co-Investors with the opportunity to co-invest with the Partnership in the Securities of, or provide Bridge Financing to, Portfolio Companies; <u>provided</u> that any co-investment by the Yucaipa Co-Investors during any particular calendar year shall be equal to the Co-Investment Percentage for such calendar year multiplied by the total amount invested by the Partnership and Parallel Funds in such Securities or Bridge Financing.  Such co-investment by the Yucaipa Co-Investors shall be on substantially the same material terms and conditions as the investment in such Securities or Bridge Financing made by the Partnership, and the General Partner shall not permit the Yucaipa Co-Investors to dispose of any such co-investment before the Partnership disposes of the Partnership's corresponding investment in such Portfolio Company.  If any such co-investment in a Portfolio Company and the Partnership's investment in such Portfolio Company are disposed of at substantially the same time, the disposition by the Yucaipa Co-Investors shall be on a <u>pro rata</u> basis and on terms no more favorable to the Yucaipa Co-Investors than those received by the Partnership.  The General Partner shall cause the Yucaipa Co-Investors to dispose of any such co-investment in a Portfolio Company on a <u>pro rata</u> basis and at substantially the same time that the Partnership disposes of its investment in such Portfolio Company, unless the Yucaipa Co-Investors wish to hold some or all of any such co-investment until a later date and the General Partner has determined that it would not be contrary to the best interests of the Partnership for such Yucaipa Co-Investors to hold such co-investment until a later date.

4.8     <u>Alternative Investment Structures</u>.  If the General Partner determines in good faith that, for legal, tax or regulatory reasons, it is in the best interests of some or all of the Partners that a Portfolio Investment be made through an alternative investment structure, the General Partner shall be permitted to structure the making of all or any portion of such Portfolio Investment outside of the Partnership, by requiring any Partner or Partners to make such Portfolio Investment either directly (which shall not include a general partner interest or other similar interest) or indirectly through a partnership or other vehicle (other than the Partnership) that will invest on a parallel basis with or in lieu of the Partnership, as the case may be (any such structure or vehicle being referred to as an "<u>Alternative Vehicle</u>"), <u>provided</u> that no Limited Partner shall be obligated to make a Portfolio Investment directly (but shall instead make such Portfolio Investment through the Partnership or another Alternative Vehicle) if such Limited Partner objects in writing within ten (10) days after receiving notice that it will be required to make such direct investment.  The Partners shall be required to make capital contributions directly to each such Alternative Vehicle to the same extent, for the same purposes and on the same terms and conditions as Partners are required to make Capital Contributions to the Partnership, and such capital contributions shall reduce the Remaining Capital Commitments of the Limited Partners to the same extent as if Capital Contributions were made to the Partnership with respect thereto.  Each Partner shall have the same economic interest in all material respects in Portfolio Investments made pursuant to this Section 4.8 as such Partner would have if such Portfolio Investment had been made solely by the Partnership, and the other terms of such Alternative Vehicle shall be substantially identical in all material respects to those of the Partnership, to the maximum extent applicable; <u>provided</u> that such Alternative Vehicle (or the entity in which such Alternative Vehicle invests) shall provide for the limited liability of the

17

Limited Partners as a matter of the organizational documents thereof and as a matter of local law; provided further that the General Partner or an Affiliate thereof will serve as the general partner or in some other similar fiduciary capacity with respect to such Alternative Vehicle. The General Partner shall provide the Limited Partners with copies of the governing documents of such Alternative Vehicle at least ten (10) Business Days prior to the closing of such proposed Portfolio Investment and shall obtain such opinions of counsel with respect to such Alternative Vehicle as may be customarily reasonably requested by the Advisory Board. The General Partner shall use its reasonable best efforts to operate such Alternative Vehicle as a VCOC within the meaning of the regulations of the DOL Regulations from the date of such Alternative Vehicle's first portfolio investment and shall structure such Alternative Vehicle's first portfolio investment so that such Alternative Vehicle shall, on the date that such first portfolio investment is made, qualify as a VCOC within the meaning of the DOL Regulations, unless each ERISA Limited Partner and Public Limited Partner agrees to the contrary. The General Partner may, upon the advice of counsel, provide for the escrow of all or a portion of any capital contributions of ERISA Limited Partners and Public Limited Partners made to such Alternative Vehicle to the extent such contributions are made prior to the funding of such Alternative Vehicle's first portfolio investment. In the event that any Alternative Vehicle fails to qualify as a VCOC, then no ERISA Limited Partner or Public Limited Partner shall be required to make any investment through such Alternative Vehicle.

4.9     Council of Advisors. The General Partner may appoint a council of strategic advisors (the "Council of Advisors") comprised of qualified executives and professionals who are not Affiliates or employees of the General Partner or the Manager to assist the General Partner and the Manager with sourcing investments, conducting due diligence and managing Portfolio Investments and to generally consult with respect to industry trends and investment strategies. The General Partner, in its sole discretion, may cause any Portfolio Company to grant an interest in, or allocate portions of any investment opportunity relating to, the Securities of any Portfolio Company to individual members of the Council of Advisors or any other Person designated by the General Partner (provided that such Person is not an Affiliate or employee of the General Partner or the Manager) who are or is responsible for finding, or participating in the due diligence relating to, a Portfolio Investment, or enhancing the value of such Portfolio Investment (including the management of such Portfolio Company); provided that the General Partner shall notify the Advisory Board of any such grant or allocation promptly after such grant or allocation has been made; provided further that no such grant or allocation to the members of the Council of Advisors shall exceed, in the aggregate, five percent (5%) of the total amount invested (or to be invested if such investment has not yet been made) by the Partnership and Parallel Funds in such Securities at the time of such grant or allocation, unless otherwise approved by the Advisory Board. If, at the Partnership's request, any such Person serves as an officer or director of a Portfolio Company, he or she will be entitled to keep any monetary or other compensation provided by such Portfolio Company for such services, and the amounts so received will not be treated as Fee Income or Directors' Fees or used to offset Management Fees pursuant to Section 7.2(a)(iii); provided that the General Partner shall disclose to the Advisory Board, at least once every Fiscal Year, the amounts of such monetary or other compensation provided by Portfolio Companies to members of the Council of Advisors for such services. Members of the Council of Advisors also may be reimbursed by the Partnership for reasonable out-of-pocket expenses incurred in connection with the performance of their duties. The General Partner shall inform the Limited Partners of the identity of the members of the

18

Council of Advisors and, from time to time, of any change to the composition of such Council of Advisors.

4.10    Media Investments.

(a)    Special Restrictions. In addition to any other restrictions applicable to Limited Partners set forth in this Agreement and notwithstanding anything in this Agreement to the contrary, no Limited Partner (other than Affiliated Limited Partners) and no officer, director, partner or equivalent official of a Limited Partner (other than Affiliated Limited Partners) shall:

(i)    act as an employee of the Partnership or Parallel Fund if its, his or her function, directly or indirectly, relates to the media or wireless communications services business of any Media Company or to any Media Company business of the Partnership or a Parallel Fund;

(ii)    in its capacity as a Limited Partner, serve, in any material capacity, as an independent contractor or agent of any Media Company or of any Media Company business of the Partnership or a Parallel Fund;

(iii)    in its capacity as a Limited Partner, communicate on matters pertaining to the day-to-day operations of any Media Company business of the Partnership or a Parallel Fund, or the day-to-day operations of a Media Company, with (A) an officer, director, partner, agent, representative or employee of such Media Company or (B) the General Partner or the Manager;

(iv)    in its capacity as a Limited Partner, perform any services for any Media Company or relating to any Media Company business of the Partnership or a Parallel Fund, with the exception of making loans to, or acting as surety for, such Media Company; or

(v)    become actively involved in the management or operation of any Media Company business of the Partnership or of any Media Company.

(b)    FCC Compliance. To ensure that the Partnership and Parallel Funds have the ability to invest in media and wireless communications services companies consistent with the requirements of the Communications Act and the rules, regulations and policies of the FCC, each Limited Partner shall provide the General Partner, promptly upon request, the following information:

(i)    information regarding the percentage of its capital stock owned, controlled or voted by Aliens, and the number and percentage of its partners that are Aliens;

(ii)    all other non-confidential information that the General Partner requires to make necessary filings with, or other submissions to, the FCC; and

(iii)    all other non-confidential information that the General Partner reasonably deems necessary or advisable in order to enable the Partnership and

19

Parallel Funds to make, manage and dispose of actual or potential Portfolio Investments.

In addition, no Limited Partner shall take any action that such Limited Partner knows would cause a violation by the Partnership or a Parallel Fund of the Communications Act or the rules, regulations, or policies of the FCC.

ARTICLE V

CAPITAL CONTRIBUTIONS; CAPITAL COMMITMENTS

5.1    Capital Contributions and Capital Commitments of the Partners.

(a)    Capital Contributions.  Subject to Sections 4.1, 4.6 and 5.4, each Partner shall make Capital Contributions to the Partnership, in cash or other immediately available funds, in the aggregate amount not to exceed the amount of the Capital Commitment set forth opposite its name in Schedule A hereto, provided that, for the avoidance of doubt, for purposes of this sentence, amounts subject to recall pursuant to the last sentence of the definition of "Remaining Capital Commitments," shall be excluded from any determination of the aggregate Capital Contributions made by such Partner.

(b)    Drawdowns.  Subject to Sections 4.1, 4.6 and 5.4, the Capital Contributions of the General Partner and each Limited Partner, the amount of which is determined pursuant to the terms of Section 5.1(b)(iii), shall be paid in separate Drawdowns, subject to the following terms and conditions:

(i)    The General Partner shall provide each Partner with a notice (the "Drawdown Notice") at least ten (10) Business Days prior to the date of the Drawdown.  Each Drawdown shall be in connection with a proposed Portfolio Investment (including any Follow-On Investment) by the Partnership or shall be applied to provide for Partnership Expenses or Organizational Expenses.  The first Drawdown Notice that does not request payment solely of the Management Fee or Organizational Expenses shall be issued in connection with the Partnership's proposed first Portfolio Investment.  For the avoidance of doubt, the General Partner may issue a Drawdown Notice to each Partner at the time of the Closing in which such Partner is admitted to the Partnership for the first installment of such Partner's pro rata share of Management Fees and Organizational Expenses.

(ii)    Each Drawdown Notice shall include, to the knowledge of the General Partner as of the date thereof:

(A)    the amount of Capital Contributions (determined in accordance with paragraph (iii) below) to be made in respect of the applicable Portfolio Investment, Partnership Expenses or Organizational Expenses, as the case may be, required to be paid by the Partner to which such Drawdown Notice is given;

20

(B)      in the case of a Drawdown (or any portion thereof) to fund a Portfolio Investment, (1) a description of the Portfolio Investment as the General Partner shall deem appropriate, (2) the purchase price expected to be paid in the transaction, (3) the nature and estimated amounts of any transaction expenses expected to be paid by the Partnership in connection with the Partnership's making of such Portfolio Investment, and (4) the aggregate amount expected to be invested by each of the Partnership, Parallel Funds and the Yucaipa Co-Investors;

(C)      in the case of a Drawdown  (or any portion thereof) to fund Partnership Expenses (other than Management Fees), a detailed breakdown of such Partnership Expenses, including information on the categories of expenses which constitute such Partnership Expenses; and

(D)      in the case of a Drawdown  (or any portion thereof) to fund Management Fees, a reasonably detailed description of the General Partner's calculation of the amount of such Management Fees, including offsets of the Management Fee from Fee Income and Directors' Fees.

If the actual Capital Contribution to be paid by a Partner changes prior to the making of such Portfolio Investment, or payment of Partnership Expenses or Organizational Expenses (including, for example, due to a default by, or the operation of Section 5.4 in respect of, another Partner or, in the case of a Portfolio Investment, due to a change in the Securities to be acquired), the General Partner will give prompt notice to such Partner, who shall pay any additional Capital Contribution thereby required by the date specified in such notice, provided that such payment date shall be at least five (5) Business Days after the date of such notice, and such payment, together with the amount originally required to be paid pursuant to the preceding sentence, shall not exceed 150% of the amount originally required to be paid pursuant to the preceding sentence.

(iii)      Each Partner shall pay to the Partnership the Capital Contribution of such Partner determined in accordance with the provisions of the following sentence and specified in the Drawdown Notice (as the same may be revised), by wire transfer in immediately available funds by the date of Drawdown specified in the Drawdown Notice.  Subject to Sections 4.1, 4.6 and 5.4, the required Capital Contribution of each Partner shall be equal to the lesser of (A) such Partner's Remaining Capital Commitment and (B) if such Capital Contribution is (1) in respect of a Portfolio Investment or a Partnership Expense which the General Partner determines to be attributable to a particular Portfolio Investment, such Partner's pro rata share (based on the Capital Commitments of all the Partners other than Limited Partners excused from such Portfolio Investment pursuant to Section 5.4) of the aggregate amount required for the Partnership to make such Portfolio Investment or pay such attributable Partnership Expense, (2) in respect of a Partnership Expense (other than the Management Fee and other than a Partnership Expense described in clause (1) above) or Organizational Expenses, such Partner's pro rata share (based on the Capital Commitments of all the

Partners) of the aggregate amount required for the Partnership to pay such Partnership Expenses or Organizational Expenses, as the case may be, and (3) in respect of the Management Fee, such Partner's share of the Management Fee then payable by the Partnership calculated as provided in Section 7.2.

(c)     Creditors.  The provisions of this Section 5.1 are intended solely to benefit the Partners and, to the fullest extent permitted by applicable law, shall not be construed as conferring any benefit upon any creditor of the Partnership (and no such creditor shall be a third party beneficiary of this Agreement), and no Partner shall have any duty or obligation to any creditor of the Partnership or a Parallel Fund to make any contributions to the Partnership or a Parallel Fund or to cause the General Partner to deliver to any Partner a Drawdown Notice.

5.2     Capital Commitment of the General Partner and its Affiliates.  Notwithstanding anything in this Agreement to the contrary, the aggregate capital commitments of the General Partner and its Affiliates to the Partnership and Parallel Funds shall equal at least five percent (5%) of aggregate capital commitments with respect to the Partnership and Parallel Funds; provided that in no event shall such aggregate capital commitments of the General Partner and its Affiliates be required to exceed forty-five million dollars ($45,000,000).

5.3     Return of Capital Contributions.  If any proposed Portfolio Investment with respect to which funds have been drawn down is not consummated within seventy-five (75) days following a Drawdown or if the amount of funds drawn down for any particular Portfolio Investment exceeds the amount necessary to consummate such Portfolio Investment, as the case may be, the General Partner shall promptly return such funds or such excess amount of funds together, in each case, with any interest or gains thereon (net of any Partnership Expenses in respect thereof), to the Partners in the same proportions that such funds were contributed by the Partners, provided that, subject to Section 5.4, such funds or such excess amount of funds (and any interest or gains thereon) may be retained by the Partnership and not so returned if the General Partner determines in good faith that the Partnership is likely to consummate an alternative proposed Portfolio Investment within such seventy-five (75) day period, and instead may be used to fund such alternative proposed Portfolio Investment (and the General Partner shall notify the Partners if it relies on this proviso and shall promptly provide the information required to be provided in a Drawdown Notice pursuant to Section 5.1(b)(ii)).  The Remaining Capital Commitments of each Partner shall be increased by any such funds or excess amount of such funds so returned (but not by any interest or gains returned therewith), and such funds or excess shall not be reflected in such Partner's Capital Account or treated as a Capital Contribution.

5.4     Excused Investments.

(a)     Conditions to Excuse.  A Partner will be excused from making its Capital Contribution otherwise required to be made to the Partnership in respect of a particular Portfolio Investment (an "Excused Investment"), if the following conditions are met:

(i)     such Partner reasonably determines that the making of such investment as set forth in the Drawdown Notice (and such Partner's making a Capital Contribution in respect of such investment) is reasonably likely to cause a

22

Materially Adverse Legal Impact on such Partner, or the General Partner reasonably determines that the making of such investment (and such Partner's making a Capital Contribution in respect of such investment) is reasonably likely to cause a Materially Adverse Legal Impact or that the participation of such Partner in such investment would prevent the Partnership from being able to consummate such investment;

(ii)    (A) in the case of a determination by a Partner pursuant to this Section 5.4(a), such Partner shall notify the General Partner in writing, at least five (5) Business Days prior to the due date of payment of the Capital Contribution, of its intention to avail itself of the provisions of this Section 5.4(a), and shall deliver to the General Partner an opinion of counsel, which opinion and counsel shall be reasonably satisfactory to the General Partner, to the effect of paragraph (i) above (other than as to materiality or adverse effect), or (B) in the case of a determination by the General Partner pursuant to this Section 5.4(a), the General Partner shall advise such Partner in writing, at least five (5) Business Days prior to the due date of payment of the Capital Contribution, of its intention to invoke the provisions of this Section 5.4 and shall deliver to such Partner an opinion of counsel, which opinion and counsel shall be reasonably satisfactory to the Partner, to the effect of paragraph (i) above (other than as to materiality or adverse effect).

In addition, the General Partner and the affected Partner shall use their respective reasonable best efforts to alleviate the circumstances that are likely to give rise to a Materially Adverse Legal Impact, and, if as a result of such efforts, such circumstances are alleviated, the provisions of this Section 5.4 shall not apply. The provisions of this Section 5.4 are not intended to create, and will not be used as, a means of permitting a Partner to exercise its rights under this Section 5.4 based on a judgment as to prospective investment results or for the purpose of improving the investment results of such Partner relative to other Partners. Each Partner agrees that its rights under this Section 5.4 will be exercised on an investment-by-investment basis and in good faith. A Partner that is excused from a Portfolio Investment under this Section 5.4(a) shall have no right to receive any distributions in respect of such Excused Investment. The General Partner may, in its sole discretion, waive all or any portion of the conditions applicable to Partners set forth in this Section 5.4(a) (other than any condition requiring any such Partner to act in good faith).

(b)    Sale of Interest upon General Partner Determination. If at any time the General Partner determines, after consultation with the affected Partner and after receipt of an opinion of counsel to the General Partner, which opinion and counsel shall be reasonably satisfactory to such affected Partner, that there is a reasonable likelihood that the continuing participation in the Partnership by any Partner would have a Materially Adverse Legal Impact (other than an ERISA Event, which ERISA Event shall be handled instead pursuant to Section 11.3) on the General Partner, the Partnership, any Portfolio Company or any of their respective Affiliates, such Partner will, upon the written request and with the reasonable cooperation of the General Partner, use commercially reasonable efforts to dispose of such Partner's entire interest in the Partnership (or such portion of its interest that, in the sole discretion of the General Partner, is sufficient to prevent or remedy such Materially Adverse Legal Impact) to one or more

23

of the other Partners or any other Person at a price reasonably acceptable to such Partner, in a transaction that complies with Section 11.1.  If a determination is made by the General Partner under this Section 5.4(b) that would affect more than one Partner in substantially the same manner, the General Partner shall request that all of the affected Partners take the actions set forth in the preceding sentence in proportion to their respective Capital Commitments.  The General Partner shall make such revisions to Schedule A hereto as may be necessary or appropriate to reflect the changes in Capital Commitments contemplated by this Section 5.4(b).

(c)     Sale of Interest upon Limited Partner Determination.  If at any time a Limited Partner determines, after consultation with the General Partner and after providing the General Partner with an opinion of counsel, which opinion and counsel shall be reasonably satisfactory to the General Partner, and with such other corroborative evidence as may be reasonably requested by the General Partner, that the continuing participation in the Partnership by such Limited Partner is reasonably likely to constitute a material violation of a statute, rule, regulation or governmental administrative policy applicable to such Limited Partner of a federal, state or non-U.S. governmental authority (other than an ERISA Event, which ERISA Event shall be handled instead pursuant to Section 11.3), then the General Partner and such Limited Partner shall reasonably cooperate to prevent or remedy such violation, including by requiring such Limited Partner to use commercially reasonable efforts to dispose of its entire interest in the Partnership (or such portion of its interest that, in the reasonable discretion of the General Partner, is sufficient to prevent or remedy such material violation) to one or more of the other Partners or any other Person at a price reasonably acceptable to such Partner, in a transaction that complies with Section 11.1; provided that such prevention or remedy shall not include the withdrawal by such Limited Partner from the Partnership, unless the General Partner and such Limited Partner have mutually concluded, in good faith and in their respective reasonable judgment, that the prevention or remedy of such material violation would not be reasonably practicable without such withdrawal.  The General Partner shall make such revisions to Schedule A hereto as may be necessary or appropriate to reflect the changes in Capital Commitments contemplated by this Section 5.4(c).

5.5     Defaulting Limited Partner.

(a)     Default Generally.  If any Limited Partner fails to contribute, in a timely manner, any portion of the Capital Commitment required to be contributed by such Limited Partner hereunder or pursuant to such Limited Partner's Subscription Agreement, and any such failure continues for five (5) Business Days after receipt of written notice thereof from the General Partner (a "Default"), then such Limited Partner may be designated by the General Partner as in default (a "Defaulting Limited Partner") and shall thereafter be subject to the provisions of this Section 5.5.  The General Partner may choose not to designate any Limited Partner as a Defaulting Limited Partner and may agree to waive or permit the cure of any default by a Limited Partner, subject to such conditions as the General Partner and the Defaulting Limited Partner may agree upon; provided that the General Partner shall not unreasonably refuse to permit such Limited Partner to cure such default, and shall not unreasonably designate such Limited Partner as a Defaulting Limited Partner, if (x) such default arose from a good faith administrative error on the part of such Limited Partner, (y) such Limited Partner promptly cures such default upon becoming aware of such error, and (z) such Limited Partner compensates the Partnership in full for all losses, costs and expenses incurred by the Partnership in connection

24

with such default, including any interest payable on, and any borrowing costs relating to, any temporary financing of the defaulted amount by the Partnership. In the event that a Limited Partner becomes a Defaulting Limited Partner, (i) such Defaulting Limited Partner's Remaining Capital Commitment (the "Defaulted Capital Commitments") shall be deemed to be zero (except that the General Partner and other non-Defaulting Limited Partners shall have an option, exercisable within thirty (30) days following the date of the notice referred to in the first sentence of this Section 5.5(a), to assume the Defaulted Capital Commitments of the Defaulting Limited Partner, such Defaulted Capital Commitments to be assumed in proportion to the Capital Commitments of the Partners exercising such option), (ii) such Limited Partner shall be entitled to receive only one-half of the distributions that it would have been entitled to receive had it not become a Defaulting Limited Partner (the "Retained Distribution"), with such Retained Distribution to be paid to such Defaulting Limited Partner only after the liquidation and dissolution of the Partnership (notwithstanding anything in this Agreement to the contrary) and only to the extent that a positive balance remains on such Retained Distribution after all unpaid obligations of such Limited Partner to the Partnership (including for its pro rata share of the Management Fee, Partnership Expenses and Organizational Expenses) are deducted therefrom, and the other one-half of such distributions (the "Forfeited Distributions") shall be treated in accordance with Section 5.5(b), and (iii) such Limited Partner shall not have a right to receive any distributions with respect to any Portfolio Investment for which such Limited Partner failed to contribute when due any portion of such Limited Partner's Capital Commitment or any Portfolio Investment made on or after such date. Notwithstanding any other provision of this Section 5.5(a), the obligations of any Defaulting Limited Partner to the Partnership hereunder, including such Defaulting Limited Partner's liability for its pro rata share of the Management Fee, shall not be extinguished as a result of the operation of this Section 5.5(a). In addition to the foregoing, the General Partner shall have the right, in its sole discretion, to pursue all remedies at law or in equity available to it with respect to the Default of a Defaulting Limited Partner.

(b)    Application of Forfeited Distributions, etc. The Forfeited Distribution of a Defaulting Limited Partner pursuant to Section 5.5(a) shall be applied as follows when and as amounts become distributable:  first, to the Manager in an amount equal to the Management Fee and to the Partnership in an amount equal to the Organizational Expenses and Partnership Expenses, in each case as estimated in good faith by the Manager (in accordance with the formula set forth in Section 7.2(a)), attributable to such Defaulting Limited Partner's Capital Commitment for the period from the date of Default through the end of the Term, and second, to the Partners other than any Defaulting Limited Partner in accordance with their respective Capital Commitments, provided that no Partner shall receive a distribution in respect of a Portfolio Investment that is an Excused Investment with respect to such Partner and provided further that in the event that the Manager has received in excess of the amount to which the Manager would have been entitled had there been no Default pursuant to this Section 5.5, such excess shall be returned to the Partnership and distributed among the Partners (other than the Defaulting Limited Partner) in proportion to their Capital Commitments. Notwithstanding anything in this Agreement to the contrary, if the Management Fee, other Partnership Expenses and Organizational Expenses attributable to such Defaulting Limited Partner for the period from the date of Default through the end of the Term exceeds the Forfeited Distribution of such Defaulting Limited Partner, such Defaulting Limited Partner shall be liable to the Partnership for the deficiency, and such deficiency may be deducted from the Retained Distribution of such Defaulting Limited Partner. The General Partner shall make such adjustments, including

25

adjustments to the Capital Accounts of the Partners (including the Defaulting Limited Partner), as it determines to be appropriate to give effect to the provisions of this Section 5.5.

(c)     Consents.  Whenever the vote, consent or decision of a Limited Partner or of the Limited Partners is required or permitted pursuant to this Agreement or under the Act, a Defaulting Limited Partner shall not be entitled to participate in such vote or consent, or to make such decision, and such vote, consent or decision shall be tabulated or made as if such Defaulting Limited Partner were not a Partner.

ARTICLE VI

CAPITAL ACCOUNTS; DISTRIBUTIONS; ALLOCATIONS; WITHHOLDING

6.1     Capital Accounts.  There shall be established on the books and records of the Partnership a capital account (a "Capital Account") for each Partner.

6.2     Adjustments to Capital Accounts.  As of the last day of each Period, the balance in each Partner's Capital Account shall be adjusted by (a) increasing such balance by such Partner's (i) allocable share of Profits and each item of the Partnership's income and gain for such Period (allocated in accordance with Section 6.10) and (ii) Capital Contributions, if any, made during such Period and (b) decreasing such balance by (i) the amount of cash or the Value of Securities or other property distributed to such Partner pursuant to Article VI or XIII and (ii) such Partner's allocable share of Losses and each item of the Partnership's deduction or loss for such Period (allocated in accordance with Section 6.10).  Each Partner's Capital Account shall be further adjusted with respect to any special allocations or adjustments pursuant to this Agreement.  To the extent not otherwise provided for in this Agreement, the Capital Accounts of the Partners shall be adjusted and maintained in accordance with the rules of Treasury Regulations § 1.704-1(b)(2)(iv).

6.3     Distributions of Distributable Cash Attributable to Portfolio Investments.  Distributable Cash attributable to any Portfolio Investment shall initially be apportioned among the Partners in proportion to their Sharing Percentages with respect to such Portfolio Investment. Subject to Sections 5.5, 6.5, 6.6, 6.12 and 11.2, within ninety (90) days after receipt of such Distributable Cash by the Partnership (or, if distribution within such ninety (90) day period is not practicable, as soon as practicable thereafter), the amounts so apportioned to the General Partner shall be distributed to the General Partner, and the amounts so apportioned to each Limited Partner shall be distributed to such Limited Partner and to the General Partner, as follows:

(a)     First, one hundred percent (100%) to such Limited Partner until the cumulative amount distributed to such Limited Partner pursuant to this Section 6.3(a) is equal to the sum of:

(i)     the aggregate Capital Contributions of such Limited Partner used to fund the cost of such Portfolio Investment and each Portfolio Investment previously disposed of, or used to fund the portion of the cost of each Portfolio Investment then held by the Partnership that represents an Unrealized Loss as of the date of such distribution;

(ii)     the aggregate Capital Contributions of such Limited Partner used to fund the portion of the Partnership Expenses and Organizational Expenses that is apportioned, pursuant to Section 6.6(c), to such Portfolio Investment or to any Portfolio Investment that has been previously disposed of or represents an Unrealized Loss; and

(iii)     an amount sufficient to provide such Limited Partner with an internal rate of return equal to eight percent (8%) per annum, compounded annually, on (x) the Capital Contributions then described in clause (a)(i) above (computed from the later of (A) the due date specified in the applicable Drawdown Notice or (B) the date on which the Partnership actually received such Capital Contributions) and (y) the Capital Contributions then described in clause (a)(ii) above (computed from the due date specified in the Drawdown Notice);

(b)     Second, one hundred percent (100%) to the General Partner until the cumulative amount distributed to the General Partner with respect to such Limited Partner pursuant to this Section 6.3(b) is equal to twenty-five percent (25%) of the cumulative amount distributed to such Limited Partner pursuant to Section 6.3(a)(iii); and

(c)     Third, eighty percent (80%) to such Limited Partner and twenty percent (20%) to the General Partner.

The General Partner shall make such determinations as may be required by the definition of "Unrealized Loss" as of the date of each distribution under this Section 6.3, provided that the General Partner shall not be required to notify the Partners of which Portfolio Investment gave rise to the distributions under Section 6.3(a) in respect of any Unrealized Loss if the General Partner determines in its sole discretion that such notifications may not be in the best interests of the Partnership.  Any Unrealized Loss attributable to a Portfolio Investment shall be apportioned among the Partners in proportion to their Sharing Percentages with respect to such Portfolio Investment.

6.4     Distributions of Distributable Cash Not Attributable to Portfolio Investments.  Subject to Sections 5.3, 5.5, 6.5, 6.6, 6.12 and 11.2, Distributable Cash not attributable to a Portfolio Investment shall be distributed to the Partners in proportion to their Capital Commitments, at such times and in such amounts as the General Partner deems appropriate in its sole discretion.

6.5     Tax Distributions.  Notwithstanding Section 6.3, the Partnership may, at the General Partner's election exercisable in its sole discretion, make distributions to all Partners (other than any Defaulting Limited Partners), with respect to a Fiscal Year in an amount equal to the taxable income and gain (net of any deductions and losses) allocable to such Partner with respect to such Fiscal Year, taking into account the carry forward of losses from prior Fiscal Years not previously taken into account, multiplied by a tax rate determined by the General Partner by reference to the Applicable Tax Rate.  The amount distributable to any Partner pursuant to Section 6.3 shall be reduced by the amount distributed to such Partner pursuant to this Section 6.5, and the amount so distributed under this Section 6.5 shall be deemed to have

been distributed to the extent of such reduction pursuant to Section 6.3 for purposes of making the calculations required by Sections 6.3, 13.2(b) and 13.2(c).

6.6     <u>Overriding Provisions; Apportionment of Expenses</u>.

(a)     <u>Available Assets</u>. Notwithstanding anything in this Agreement to the contrary, distributions shall be made only to the extent of Available Assets and in compliance with the Act and other applicable law.

(b)     <u>Disposition of Portion of Portfolio Investment</u>. If less than all of the Portfolio Investment in a Portfolio Company are disposed of by the Partnership, the portion disposed of and the portion retained shall for purposes of Articles VI and X (including for purposes of applying the definitions used therein) be deemed to be two separate Portfolio Investments. The aggregate Capital Contributions used to fund the Portfolio Investment in such Portfolio Company shall be allocated between the portion disposed of and the portion retained in any manner reasonably determined by the General Partner.

(c)     <u>Apportionment of Expenses</u>. For the purposes of Section 6.3, any Capital Contributions of a Partner used to fund Partnership Expenses (other than Partnership Expenses described in the last sentence of this Section 6.6(c)) or Organizational Expenses shall be apportioned among the Portfolio Investments as the Partnership disposes of the Portfolio Investments or determines that all or a portion of a Portfolio Investment represents an Unrealized Loss. The amount of such Capital Contributions apportioned to a particular Portfolio Investment (or the portion that represents an Unrealized Loss) in respect of any Partner shall equal the excess of ($\underline{i}$) the product of ($\underline{A}$) the aggregate Capital Contributions of such Partner used to fund such Partnership Expenses or Organizational Expenses and ($\underline{B}$) a fraction ($\underline{1}$) the numerator of which is the aggregate Capital Contributions of such Partner used to fund such Portfolio Investment (or the portion that represents an Unrealized Loss) and any other Portfolio Investments that have been disposed of (or the portion of any other Portfolio Investment that represents an Unrealized Loss) and ($\underline{2}$) the denominator of which is the aggregate Capital Contributions of such Partner used to fund all Portfolio Investments (whether or not disposed of) over ($\underline{ii}$) the amount of such Capital Contributions previously allocated to other Portfolio Investments (or the portion of any other Portfolio Investment that represents an Unrealized Loss). Notwithstanding the preceding sentence, in the event that a Portfolio Investment is disposed of by the Partnership at a time when the Partnership does not hold any other Portfolio Investments, the amount of such Capital Contributions apportioned to such Portfolio Investment shall be equal to the excess of ($\underline{x}$) the aggregate Capital Contributions of such Partner used to fund such Partnership Expenses or Organizational Expenses over ($\underline{y}$) the amount of such Capital Contributions previously allocated to other Portfolio Investments (or the portion of any Portfolio Investment that represents an Unrealized Loss). Any Capital Contributions of a Partner that were used to fund Partnership Expenses and that were contributed to the Partnership pursuant to Section 5.1(b)(iii)(B)(1) in respect of a particular Portfolio Investment shall be apportioned to such Portfolio Investment.

(d)     <u>Distributions from Bridge Financings</u>. Notwithstanding anything in this Agreement to the contrary, distributions relating to a Bridge Financing that is repaid, refinanced or sold to a third party within one year of such financing will be on a <u>pro rata</u> basis to all Partners

28

in proportion to their respective Capital Contributions in respect of such Bridge Financing, and shall not be included in making the determinations provided for in Section 6.3, but distributions relating to a Bridge Financing that is not repaid, refinance or sold to a third party within one year of such financing shall be distributed pursuant to Section 6.3.

6.7     Distributions of Securities.  Except as otherwise provided in Section 11.3(b), 11.3(c) or Section 13.3, the General Partner shall distribute only Marketable Securities as distributions in kind.  Notwithstanding the foregoing, the General Partner shall not distribute Securities of Media Companies to the Limited Partners if the General Partner determines that any such distribution might cause the Limited Partners to be considered non-insulated limited partners under the policies of the FCC ("FCC Insulation Policies").  In the event that a distribution of Securities is made, such Securities shall be deemed to have been sold at their Value and the proceeds of such sale shall be deemed to have been distributed in the form of Distributable Cash to the Partners for all purposes of this Agreement.  Subject to Sections 11.3, 13.2(b) and 13.2(c), Securities distributed in kind shall be distributed in proportion to the aggregate amounts that would be distributed to each Partner pursuant to Section 6.3, such aggregate amounts to be estimated in the good faith judgment of the General Partner.  The General Partner may cause certificates evidencing any Securities to be distributed to be imprinted with legends as to such restrictions on Transfer that it may deem necessary or appropriate, including legends as to applicable United States federal or state or non-U.S. securities laws or other legal or contractual restrictions, and may require any Partner to which Securities are to be distributed to agree in writing (i) that such Securities will not be Transferred except in compliance with such restrictions and (ii) to such other matters as the General Partner may deem in good faith to be necessary or appropriate.  The General Partner shall use its reasonable best efforts to give each Limited Partner at least ten (10) Business Days prior written notice of any distribution in kind.

6.8     Negative Capital Accounts.  No Limited Partner shall, and except as otherwise required by law or as otherwise provided in this Agreement, the General Partner shall not, be required to make up a negative balance in its Capital Account.

6.9     No Withdrawal of Capital.  Except as otherwise expressly provided herein, no Partner shall have the right to withdraw capital from the Partnership or to receive any distribution of or return on such Partner's Capital Contributions.

6.10     Allocations of Profits and Losses.

(a)     General.  After giving effect to the special allocations set forth in Section 6.10(b), Profits, Losses and, to the extent necessary, individual items of income, gain, loss or deduction, of the Partnership for any Fiscal Year shall be allocated among the Partners in a manner such that, as of the end of such Fiscal Year, the sum of (i) the Capital Account of each Partner, whether positive or negative, and (ii) such Partner's share of Partnership Minimum Gain and Partner Nonrecourse Debt Minimum Gain, shall be equal to the respective net amounts, whether positive or negative, which would be distributed to them or for which they would be liable to the Partnership under the Act or this Agreement (including under Sections 13.2(b) and 13.2(c)), determined as if the Partnership were to (x) liquidate its assets for an amount equal to their Gross Asset Values, (y) satisfy all of its debts and liabilities, and (z) distribute the proceeds

29

in liquidation pursuant to this Article VI.  The General Partner shall make such adjustments to the allocations provided for by this Section 6.10 as it determines to be reasonably necessary in order to reflect the intended economic effect of any increase or decrease in the Gross Asset Value of Partnership assets.

(b)     Special Allocation Provisions.  Notwithstanding any other provision in this Section 6.10, the following special allocations shall be made in the following order:

(i)     Minimum Gain Chargeback.  If there is a net decrease in Partnership Minimum Gain or Partner Nonrecourse Debt Minimum Gain (determined in accordance with the principles of Treasury Regulations §§ 1.704-2(d) and 1.704-2(i)) during any Partnership taxable year, the Partners shall be specially allocated items of Partnership income and gain for such year (and, if necessary, subsequent years) in an amount equal to their respective shares of such net decrease during such year, determined pursuant to Treasury Regulations §§ 1.704-2(g) and 1.704-2(i)(5).  The items to be so allocated shall be determined in accordance with Treasury Regulations § 1.704-2(f).  This Section 6.10(b)(i) is intended to comply with the minimum gain chargeback requirements in such Treasury Regulations and shall be interpreted consistently therewith.

(ii)     Qualified Income Offset.  In the event any Limited Partner unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulation § 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Partnership income and gain shall be specially allocated to such Limited Partner in an amount and manner sufficient to eliminate the deficit balance in its Capital Account created by such adjustments, allocations or distributions as promptly as possible.

(iii)     Gross Income Allocation.  In the event any Limited Partner has a deficit Capital Account at the end of any Fiscal Year which is in excess of the sum of (A) the amount such Partner is obligated to restore, if any, pursuant to any provision of this Agreement, and (B) the amount such Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations §§ 1.704-2(g)(1) and 1.704-2(i)(5), each such Limited Partner shall be specially allocated items of Partnership income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 6.10(b)(iii) shall be made only if and to the extent that a Limited Partner would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Section 6.10 have been tentatively made as if Section 6.10(b)(ii) and this Section 6.10(b)(iii) were not in this Agreement.

(iv)     Nonrecourse Deductions.  Nonrecourse Deductions shall be allocated twenty percent (20%) to the General Partner and eighty percent (80%) to the Partners, pro rata in accordance with their Sharing Percentages with respect to the applicable Portfolio Investment.

(v)     Partner Nonrecourse Deductions.  Partner Nonrecourse Deductions for any taxable period shall be allocated to the Partner who bears the economic

risk of loss with respect to the liability to which such Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations § 1.704-2(j).

(vi)    Partnership Expenses, Management Fee and Organizational Expenses.  Partnership Expenses, Management Fee and Organizational Expenses shall be allocated to the Partners in accordance with their contributions in respect thereof.

(c)    Tax Allocations.  For income tax purposes only, each item of income, gain, loss and deduction of the Partnership shall be allocated among the Partners in the same manner as the corresponding items of Profits and Losses and specially allocated items are allocated for Capital Account purposes; provided that in the case of any Partnership asset the Gross Asset Value of which differs from its adjusted tax basis for federal income tax purposes, income, gain, loss and deduction with respect to such asset shall be allocated solely for income tax purposes in accordance with the principles of Section 704(c) of the Code (in any manner determined by the General Partner) so as to take account of the difference between the Gross Asset Value and adjusted basis of such asset.  Any tax credits of the Partnership shall be allocated among the Partners in such manner as the General Partner determines is consistent with the allocation of items giving rise thereto or such other manner as required by applicable law.

(d)    Other Allocation Provisions.

(i)    "Excess nonrecourse liabilities" of the Partnership (within the meaning of Treasury Regulations § 1.752-3(a)(3)) shall be allocated among the Partners in accordance with the manner in which it is reasonably expected that the deductions attributable to those nonrecourse liabilities will be allocated.

(ii)    The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations § 1.704-1(b) and shall be interpreted and applied in a manner consistent with such regulations.  Section 6.10 may be amended at any time by the General Partner if necessary, in the opinion of tax counsel to the Partnership, to comply with such regulations, so long as any such amendment does not materially change the relative economic interests of the Partners.

6.11    Tax Matters.  All matters concerning allocations for United States federal, state and local and non-U.S. income tax purposes, including accounting procedures, not expressly provided for by the terms of this Agreement shall be determined in good faith by the General Partner.  The General Partner may, in its sole discretion, cause the Partnership to make the election under Section 754 of the Code.  The General Partner is hereby designated as the tax matters partner of the Partnership, as provided in the Treasury Regulations pursuant to Section 6231 of the Code (and any similar provisions under any other state or local or non-U.S. tax laws).  Each Partner hereby consents to such designation and agrees that upon the request of the General Partner it will execute, certify, acknowledge, deliver, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to evidence such consent.

31

6.12    Withholding Taxes.

(a)    General.  Each Partner shall, to the fullest extent permitted by applicable law, indemnify and hold harmless each Person who is or is deemed to be the responsible withholding agent for United States federal, state or local or foreign income tax purposes against all claims, liabilities and expenses of whatever nature relating to such Person's obligation to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by the Partnership or as a result of such Partner's participation in the Partnership, except to the extent such Person has been adjudicated by a court of competent jurisdiction to have engaged in Disabling Conduct with respect to such obligation.

(b)    Authority to Withhold; Treatment of Withheld Tax.  Notwithstanding anything in this Agreement to the contrary, each Partner hereby authorizes the Partnership to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by the Partnership or any of its Affiliates (pursuant to the Code or any provision of United States federal, state, or local or foreign tax law) with respect to such Partner or as a result of such Partner's participation in the Partnership.  The Partnership shall provide notice to such Partner of any such payment required to be made as soon as reasonably practicable prior to making such payment.  If and to the extent that the Partnership shall be required to withhold or pay any such withholding or other taxes, such Partner shall be deemed for all purposes of this Agreement to have received a payment from the Partnership as of the time such withholding or other tax is required to be paid, which payment shall be deemed to be a distribution of Distributable Cash with respect to such Partner's interest in the Partnership to the extent that such Partner (or any successor to such Partner's interest in the Partnership) would have received a distribution but for such withholding.  To the extent that the aggregate of such payments to a Partner for any Period exceeds the distributions that such Partner would have received for such Period but for such withholding, the General Partner shall notify such Partner as to the amount of such excess and such Partner shall make a prompt payment to the Partnership of such amount by wire transfer.  Upon request by a Limited Partner, the General Partner shall use its reasonable best efforts, at the expense of such Limited Partner, to assist such Limited Partner in (i) reclaiming any taxes withheld by the Partnership or any of its Portfolio Companies with respect to such Limited Partner or (ii) claiming any available tax exemptions with respect to allocations of income of the Partnership to such Limited Partner, in each case, from applicable tax authorities to the extent permitted by applicable law; provided that nothing in the foregoing shall require the General Partner to take any action that the General Partner believes in good faith would be adverse in any respect to the Partnership, any Partner or any Portfolio Company.

(c)    Distributions in Kind.  If the Partnership makes (or will make) a distribution-in-kind and such distribution is subject to withholding or other taxes payable by the Partnership on behalf of any Partner, the General Partner shall notify such Partner as to the extent (if any) of the taxes withheld (or to be withheld) and such Partner shall make a prompt payment to the Partnership of the amount of such taxes by wire transfer.

(d)    Withholding Tax Rate.  Any withholdings referred to in this Section 6.12 shall be made at the maximum applicable statutory rate under the applicable tax law unless the General Partner shall have received an opinion of counsel or other evidence, satisfactory to the General Partner, to the effect that a lower rate is applicable, or that no withholding is applicable.

(e)     <u>Withholding from Distributions to the Partnership</u>.  In the event that the Partnership receives a distribution from or in respect of which tax has been withheld, the Partnership shall be treated as having received cash in an amount equal to the amount of such withheld tax, and each Partner shall be treated as having received as a distribution of Distributable Cash the portion of such amount that is attributable to such Partner's interest in the Partnership as equitably determined by the General Partner.

ARTICLE VII

THE MANAGER

7.1     <u>Appointment of Manager</u>.  The Partnership hereby appoints the Manager to act as the manager of the Partnership.  The Manager shall manage the operations of the Partnership, including (<u>a</u>) originating, recommending, structuring and identifying sources of capital for investment opportunities for the Partnership, (<u>b</u>) monitoring, evaluating and making investment recommendations regarding the timing and manner of disposition of Portfolio Investments, and (<u>c</u>) providing such other services related thereto as the Partnership may reasonably request.  Appointment of the Manager by the Partnership shall not relieve the General Partner from its obligations to the Partnership hereunder or under the Act.  The engagement by the Partnership of the Manager contemplated hereby may (but need not) be set forth in a separate management agreement specifying in further detail the rights and duties of the Manager.  Such engagement, whether or not set forth in such a management agreement, shall terminate upon (<u>x</u>) the removal of the General Partner in accordance with Section 2.6, (<u>y</u>) the vote of 66⅔% in Interest within one hundred twenty (120) days after the bankruptcy or dissolution and commencement of winding-up of the General Partner or the filing of a certificate of cancellation of the Partnership as described in Section 13.5, or (<u>z</u>) a determination by the General Partner to terminate such engagement.

7.2     <u>Management Fee</u>.

(a)     <u>Payment and Calculation of the Management Fee</u>.  In consideration of the management services referred to in Section 7.1, the Manager shall be paid a management fee (the "<u>Management Fee</u>") by the Partnership as of October 1, 2003 for the period from October 1, 2003 through December 31, 2004 and thereafter semiannually in advance as of January 1, 2005 and as of each July 1 and January 1 thereafter during the Term or until dissolution if the Partnership is dissolved before the expiration of the Term (each, a "<u>Payment Date</u>"), in an amount for each semiannual period equal to the aggregate of the following amounts, calculated with respect to each Limited Partner (other than Affiliated Limited Partners):

(i)     (<u>A</u>) through the earlier of (<u>x</u>) the last day of the Commitment Period or (<u>y</u>) the date on which a Competing Fund has commenced payment to the Manager or any of its Affiliates of the management fee payable pursuant to the limited partnership agreement or other operating agreement of such Competing Fund, an amount equal to the Fee Percentage per annum multiplied by the Capital Commitment of such Limited Partner; and (<u>B</u>) thereafter, an amount equal to the Fee Percentage per annum multiplied by the aggregate Capital Contributions of

33

such Limited Partner used to fund Portfolio Investments (other than Portfolio Investments with a carrying value (as determined pursuant to the definition of "Unrealized Loss") of zero) that have not yet been disposed as of the applicable Payment Date;

(ii)    increased by the sum of any additional amounts received by the Partnership pursuant to Section 11.2(a)(iv) since the previous Payment Date with respect to such Limited Partner; and

(iii)    reduced, but not below zero, by an amount equal to the sum of (A) seventy percent (70%) of such Limited Partner's pro rata share (based on aggregate Capital Commitments and aggregate Parallel Fund Commitments) of all Fee Income received since the previous Payment Date and (B) all of such Limited Partner's pro rata share (based on aggregate Capital Commitments and aggregate Parallel Fund Commitments) of all Directors' Fees received since the previous Payment Date.

To the extent that the Management Fee with respect to any Limited Partner is not reduced as of any given Payment Date by the fees or amounts referred to in clause (iii) above (or any portion thereof determined with respect to a previous Payment Date and carried over to the current Payment Date pursuant to this sentence) because the Management Fee with respect to such Limited Partner has been reduced to zero, the excess shall be carried over to the next succeeding Payment Date (and, if necessary, to one or more subsequent Payment Dates) and applied as a reduction of the Management Fee with respect to such Limited Partner, but not below zero, for such succeeding Payment Date (or a subsequent Payment Date). Installments for any period other than a full semiannual period shall be adjusted on a pro rata basis according to the actual number of days elapsed. The General Partner, in its discretion, may at any time defer payment to the Manager of all or any part of any installment of the Management Fee.

(b)    Each Limited Partner's Share of the Management Fee. Each Limited Partner's share of the Partnership's obligation to pay the Management Fee shall be equal to the amount calculated with respect to such Limited Partner pursuant to Section 7.2(a) and shall be payable as provided in Section 5.1(b) and, in the case of an Additional Limited Partner, as provided for in Section 11.2(a). Notwithstanding anything in this Agreement to the contrary, if after a Limited Partner's payment of its share of the Management Fee, the Fee Percentage shall have been reduced due to an increase in aggregate Capital Commitments such that such Limited Partner shall have paid Management Fees in excess of the amount such Limited Partner would have paid had the lower Fee Percentage been in effect at the time of such payment, then such Limited Partner shall receive a credit for such excess, which credit shall be applied against future Management Fees until such credit is exhausted.

7.3    Expenses. All Partnership Expenses and Organizational Expenses shall be paid by the Partnership. All Excess Organizational Expenses and Manager Expenses shall be paid by the Manager. Notwithstanding anything in this Agreement to the contrary, the Partnership shall not be responsible for any Placement Fees.

34

ARTICLE VIII

BANKING; ACCOUNTING; BOOKS AND RECORDS

8.1     Banking.  All funds of the Partnership may be deposited in such bank, brokerage or money market accounts as shall be established by the General Partner. Withdrawals from and checks drawn on any such account shall be made upon such signature or signatures as the General Partner may designate.

8.2     Maintenance of Books and Records; Accounts and Accounting Method. The General Partner shall keep or cause to be kept at the address of the General Partner (or at such other place as the General Partner shall determine) full and accurate accounts of the transactions of the Partnership in proper books and records of account, during the Term and for a period of at least seven (7) years thereafter, which shall set forth all information required by the Act.  Such books and records shall be available, upon reasonable notice to the General Partner, for inspection and copying at reasonable times during business hours by a Limited Partner or its duly authorized agents or representatives for any purpose reasonably related to such Limited Partner's interest as a limited partner in the Partnership.

8.3     Partnership Tax Returns.  The General Partner shall cause the Partnership initially to elect the Fiscal Year as its taxable year and shall cause to be prepared and timely filed all tax returns required to be filed for the Partnership in the jurisdictions in which the Partnership conducts business or derives income for all applicable tax years.

8.4     Value.

(a)     In determining the Value on a given date of Marketable Securities for which market quotations are readily available and which are available for immediate sale, (i) Securities traded on a national securities exchange will be valued at the average closing price for the preceding five (5) trading days on such exchange where they are primarily traded and (ii) Securities traded on the Nasdaq National Market ("NASDAQ") will be valued at the average closing bid price on NASDAQ for the five trading days prior to the date of determination or, if the determination of Value is made in connection with a distribution of Securities pursuant to Section 6.7, the five (5) trading days prior to and the five (5) trading days following the date of determination.

(b)     Subject to the provisions of Section 8.4(c), the last sentence of Section 8.4(d), Section 8.4(e), the penultimate sentence of Section 11.3(b) and the penultimate sentence of Section 11.3(c), the Value of all other Securities or other assets of or interests in the Partnership will be determined by the General Partner in good faith considering all factors, information and data deemed to be pertinent, which factors, information and data may include any of the following: purchase cost, estimates of liquidation value, prices received in recent private placements of Securities of the same issuer, market quotations (if any), liquidity of the investment, existence of any control premiums and changes in the financial condition and prospects of the issuer.  Unless the General Partner determines that it would not be advisable to do so, the General Partner will generally select and consult with an independent appraiser in making a determination of Value referred to in the preceding sentence, the fees and costs of

35

which appraiser shall be borne by the Partnership.  If Securities owned by the Partnership have been appraised by an independent appraiser, the General Partner when making a determination of Value will give due consideration to such independently appraised value in determining the Value of such Securities, although such independently appraised value shall not be conclusive.

(c)     Notwithstanding anything in this Agreement to the contrary, upon dissolution of the Partnership pursuant to Article XIII, the Value of Securities, other than Marketable Securities, that are distributed in kind shall be determined by the General Partner in good faith, _provided_ that notice of such determination by the General Partner shall be provided to the Advisory Board, and if the Advisory Board shall give notice in writing that it disapproves such determination of Value within thirty (30) days of such determination, then the Value of such Securities shall be determined by an independent, nationally recognized investment banking, accounting or other appraisal firm selected by the General Partner, which firm has not been reasonably objected to, within fifteen (15) days after notice identifying such firm is given, by the Advisory Board, the fees and costs of which firm shall be borne by the Partnership.  Such determination by such firm in accordance with this Section 8.4(c) shall be binding and conclusive upon the Partners.

(d)     At least once each Fiscal Year, the General Partner shall convene an Advisory Board meeting (and which meeting shall be convened within the time frame specified in Section 13.2(c) in the case such Fiscal Year is the first, fourth or seventh full Fiscal Year after the termination of the Commitment Period), during which the General Partner shall (i) present to the Advisory Board information regarding the Value (as determined pursuant to this Section 8.4) of each Portfolio Investment then held by the Partnership and the grounds relied upon by the General Partner to determine such Value and (ii) use its reasonable best efforts to answer such questions as the members of the Advisory Board may have regarding such Value.  If the Advisory Board, by a vote of at least two-thirds of the members of the Advisory Board, disapproves of the Value of any such Portfolio Investment (other than a Portfolio Investment consisting of Marketable Securities) within thirty (30) days of such meeting, then such Value shall be determined by an independent, nationally recognized investment banking, accounting or other appraisal firm selected by the General Partner, which firm has not been reasonably objected to, within fifteen (15) days after notice identifying such firm is given, by the Advisory Board, the fees and costs of which firm shall be borne by the Partnership.  Such determination by such firm in accordance with this Section 8.4(d) shall be binding and conclusive upon the Partners.

(e)     The Value of options and warrants that constitute Directors' Fees shall be determined by the General Partner in its reasonable discretion as of the date of their grant or issuance; _provided_ that notice of such determination by the General Partner shall be provided to the Advisory Board, and if the Advisory Board shall give notice in writing that it disapproves such determination of Value within thirty (30) days of such determination, then the Value of such options and warrants shall be determined by an independent, nationally recognized investment banking, accounting or other appraisal firm selected by the General Partner, which firm has not been reasonably objected to, within fifteen (15) days after notice identifying such firm is given, by the Advisory Board, the fees and costs of which firm shall be borne by the Partnership.  Such determination by such firm in accordance with this Section 8.4(e) shall be binding and conclusive upon the Partners.

36

ARTICLE IX

REPORTS TO PARTNERS; ADVISORY BOARD; MEETINGS

9.1     <u>Independent Auditors</u>.  The financial statements of the Partnership shall be prepared in accordance with generally accepted accounting principles and shall be audited and an opinion rendered thereon as of the end of each Fiscal Year by a firm of nationally recognized independent certified public accountants selected by the General Partner.  The audit shall be performed in accordance with generally accepted auditing standards, which shall include test work on the balance sheet or statement of net assets, statement of operations, statement of investments, statement of cash flows and statement of changes in Partners' Capital Accounts (including detail of individual Partner Capital Accounts).  The audit opinion shall cover the statement of changes in Partners' Capital Accounts (including detail of individual Partner Capital Accounts) and indicate that allocations and distributions to the Partners were made in accordance with the provisions of this Agreement.  The General Partner shall promptly inform the Limited Partners of any change, from time to time, in the firm of nationally recognized independent certified public accountants selected to perform such audits.

9.2     <u>Reports to Current Partners</u>.

(a)     <u>Financial Reports</u>.  The General Partner shall prepare and mail a financial report to each Limited Partner within one hundred twenty (120) days after the end of each full Fiscal Year, and within sixty (60) days after the end of each of the first three full quarters of each Fiscal Year during the Term, subject in both cases to reasonable delays in the event of late receipt of any necessary financial information from a Portfolio Company.  In the case of a report sent as of the end of a Fiscal Year such financial report shall be audited.  In the case of a report sent as of the end of the first three quarters, prior to its delivery to the Limited Partners, (<u>x</u>) such interim financial information contained in the quarterly financial report shall be reviewed by an independent public accountant using professional standards and procedures for conducting such reviews, as established by generally accepted auditing standards, and (<u>y</u>) any material misstatements or other issues communicated to the General Partner as a result of the review procedures shall be communicated to the Advisory Board.  Each report shall set forth for such Fiscal Year or quarter:

(i)     the assets and liabilities of the Partnership as of the end of such Fiscal Year or quarter, including a valuation of the Partnership's Portfolio Investments in accordance with generally accepted accounting principles;

(ii)     profit or loss of the Partnership for such Fiscal Year or quarter;

(iii)     a summary of each Partner's capital account activity for such Fiscal Year or quarter, including (<u>A</u>) a beginning capital account balance, (<u>B</u>) cash contributions, (<u>C</u>) cash or securities distributions, (<u>D</u>) gain or loss from operations, (<u>E</u>) unrealized depreciation and appreciation on investment, and (<u>F</u>) the amount of Management Fees and details supporting the calculation of such amount including any offsets for Fee Income and Directors' Fees, and (<u>G</u>) a closing capital account balance;

37

(iv)    a description (to the extent applicable and reasonably available to the Partnership) of (A) portfolio valuation changes, (B) new Portfolio Investments (including Follow-On Investments), (C) investment dispositions or write-offs, and (D) cash or securities distributions, and (E) merger, reorganizations and initial public offerings by Portfolio Companies, in each case, with respect to such Fiscal Year or quarter;

(v)    (A) any litigation pending against the General Partner, the Manager of the Partnership, and (B) any litigation pending against the Principal that alleges fraud, misrepresentation or a violation of any federal, state or other applicable securities law, rule or regulation, on the part of the Principal, in connection with the investment activities of the Principal, and (C) any litigation that, to the actual knowledge of the General Partner, is pending against any Portfolio Company, in each case, to the extent that any such litigation described in the foregoing clauses (A) through (C) would be reasonably expected to have a Material Adverse Effect; provided that nothing in the foregoing shall require disclosure of any litigation pending against any Portfolio Company to the extent that (x) the General Partner in good faith believes that such disclosure is not in the best interest of the Partnership or could damage the Partnership or its business or (y) the Partnership is required by law or by agreement with a third Person to keep confidential; and

(vi)    if such report is the audited financial report sent as of the end of a Fiscal Year, (A) a summary of each Portfolio Investment held by the Partnership as of the end of such Fiscal Year, and (B) a statement showing the amount of GP Carry distributed to the General Partner during such Fiscal Year, and (C) a determination and supporting calculations of whether, based on the audited Partnership net asset value and the cumulative amount of GP Carry received by the General Partner as of the end of the Fiscal Year, the General Partner would be subject to a clawback obligation pursuant to the provisions of Section 13.2(b) as if the Partnership were dissolved as of the end of such Fiscal Year, (D) a summary of the source and amount of all Fee Income and Directors' Fees for such Fiscal Year, and (E) a description of any investigation of the General Partner or the Partnership of which the General Partner is actually aware by the Securities and Exchange Commission or any other regulatory or administrative body with authority over the General Partner or the Partnership, in each case, to the extent that such investigation, if adversely determined, would have a Material Adverse Effect;

in the case of each of clause (i) through (vi) above, to the extent not previously disclosed in Drawdown Notices or distribution notices.

(b)    Other Information.  The General Partner shall use reasonable best efforts to provide to a Limited Partner such other information as is reasonably requested by such Limited Partner for any purpose reasonably related to such Limited Partner's interest as a limited partner in the Partnership to the extent that any such efforts shall not impose any undue cost or burden on the General Partner or the Partnership.  Notwithstanding anything in this Agreement

to the contrary, the General Partner shall have the right to keep confidential from Limited Partners and the Advisory Board, for such a period of time as the General Partner deems reasonable, any information that the General Partner reasonably believes to be in the nature of trade secrets or that the Partnership is required by law or by agreement with a third Person to keep confidential.

(c)     Certification.  Within one hundred twenty (120) days of the end of each Fiscal Year, the General Partner shall provide to each Limited Partner a letter executed by the General Partner certifying that to its knowledge (i) the annual audited financial statements provided to each Limited Partner fairly present in all material respects the financial condition of the Partnership as of such date and (ii) the General Partner has no knowledge of the existence of any material breach of the Agreement.

9.3     Tax Information.  The General Partner shall use reasonable best efforts to prepare and mail within ninety (90) days after the end of each Fiscal Year (a) to each Limited Partner and (b) to each other Person who was a Limited Partner during such Fiscal Year (or its legal representatives), to the extent necessary in the sole judgment of the General Partner, a financial report setting forth in sufficient detail such transactions effected by the Partnership during such Fiscal Year as shall enable such Limited Partner or former Limited Partner (or its legal representatives) to prepare its U.S. federal income tax returns in accordance with the laws, rules and regulations then prevailing.

9.4     Advisory Board.

(a)     Appointment of Members.

(i)     The General Partner shall establish a single advisory board for the Partnership and Parallel Funds (the "Advisory Board") having at least three (3) and not more than nine (9) members appointed by the General Partner as of the Outside Admissions Date.  Each member of the Advisory Board shall be a representative of a Limited Partner or of a Parallel Fund Investor, provided that no member of the Advisory Board shall be a representative of the General Partner, the Manager or any of their respective Affiliates.  Each Person appointed to the Advisory Board who is a representative of a Limited Partner shall serve until the earlier of (A) the end of the Term or (B) such Person's death, resignation or removal pursuant to Section 9.4(b).  Each Person appointed to the Advisory Board who is a representative of a Parallel Fund Investor shall serve until the earlier of (A) the end of the term of the applicable Parallel Fund or (B) such Person's death, resignation or removal pursuant to provisions of the applicable Parallel Fund Agreement that are equivalent to Section 9.4(b).  Any Limited Partner with a Capital Commitment equal to or greater than one hundred million dollars ($100,000,000) may, if it so elects, require the General Partner to appoint an officer or employee of such Limited Partner as one of the members of the Advisory Board, provided that such right shall terminate if such member is removed pursuant to Section 9.4(b)(ii).  Any Parallel Fund Investor with a Parallel Fund Commitment equal to or greater than one hundred million dollars ($100,000,000) may, if it so elects, require the General Partner to appoint an

39

officer or employee of such Parallel Fund Investors as one of the members of the Advisory Board, provided that such right shall terminate if such member is removed pursuant to provisions of the applicable Parallel Fund Agreement that are equivalent to Section 9.4(b)(ii).

(ii)     Subject to the restrictions set forth in Section 9.4(a) and provisions of the Parallel Fund Agreements that are equivalent to Section 9.4(a), the General Partner may at any time, and from time to time, fill any vacancy on the Advisory Board, including any vacancy arising from the death, resignation or removal of any member of the Advisory Board.  For the avoidance of doubt, any successor member appointed by the General Partner to fill a vacancy arising from the death, resignation or removal of a member of the Advisory Board may, but need not, be a representative of the Limited Partner or Parallel Fund Investor represented by such deceased, resigned or removed member; provided that if such deceased, resigned or removed member had been appointed to the Advisory Board pursuant to the last sentence of Section 9.4(a)(i), and was not removed pursuant to Section 9.4(b)(ii), then such Limited Partner may, if it so elects, designate such successor member, and such successor member shall be appointed to the Advisory Board; provided further that if such deceased, resigned or removed member had been appointed to the Advisory Board pursuant to provisions of a Parallel Fund Agreement that equivalent to the last sentence of Section 9.4(a)(i), and was not removed pursuant to provisions of such Parallel Fund Agreement that are equivalent to Section 9.4(b)(ii), then such Limited Partner may, if it so elects, designate such successor member, and such successor member shall be appointed to the Advisory Board.

(b)     Removal of Members.

(i)     Any member of the Advisory Board may resign by giving the General Partner written notice of such resignation.  Such resignation shall be effective as of the date the General Partner receives such notice; provided that such member of the Advisory Board may specify in such notice that such resignation shall be effective as of a later date specified in such notice, in which case, such resignation shall instead be effective as of such specified later date.

(ii)     A member of the Advisory Board who is a representative of a Limited Partner shall be deemed to have been removed, effective as of the date on which any of the events specified in clauses (A), (B), (C) or (D) below occurs, and no additional action on the part of any Person shall be required to effectuate such removal, if the Limited Partner that such member represents (A) becomes a Defaulting Limited Partner, (B) assigns more than one-half of its limited partner interest in the Partnership to any unaffiliated Person, (C) is determined, pursuant to Section 5.4, to be a Limited Partner whose continued participation in the Partnership would have a Materially Adverse Legal Impact, or (D) withdraws from the Partnership pursuant to Section 5.4(c).  A member of the Advisory Board who is a representative of a Parallel Fund Investor shall be deemed to have

been removed pursuant to provisions of the applicable Parallel Fund Agreement that are equivalent to this Section 9.4(b)(ii).

(iii)     A member of the Advisory Board who is a representative of a Limited Partner shall be removed upon the request of the Limited Partner that such member represents.  Such removal shall be effective, and no additional action on the part of any Person shall be required to effectuate such removal, upon the later of (A) the General Partner's receipt from such Limited Partner of written notice specifying such request or (B) such later effective date as may be specified in such notice.  A member of the Advisory Board who is a representative of a Parallel Fund Investor shall be removed upon the request of the Parallel Fund Investor that such member represents.  Such removal shall be effective, and no additional action on the part of any Person shall be required to effectuate such removal, upon the later of (A) the General Partner's receipt from such Parallel Fund Investor of written notice specifying such request or (B) such later effective date as may be specified in such notice.

(c)     Scope of Authority.  The Advisory Board shall be responsible for (i) consenting to, approving, disapproving, reviewing or waiving any matter requiring the consent, approval, disapproval, review or waiver of the Advisory Board as set forth under this Agreement and the Parallel Fund Agreements and (ii) providing such advice and counsel as is requested by the General Partner or required pursuant to this Agreement and the Parallel Fund Agreements in connection with potential conflicts of interest and other matters relating to the Partnership and the Parallel Funds.  The Advisory Board shall take no part in the control or management of the Partnership or any Parallel Fund.  The Advisory Board shall not have any power or authority to act for or on behalf of the Partnership or any Parallel Fund, and all investment decisions, as well as all responsibility for the management of the Partnership and the Parallel Funds, shall rest with the General Partner.  Except for those matters for which the consent, approval, disapproval, review or waiver of the Advisory Board is required by this Agreement or any Parallel Fund Agreement, any actions taken by the Advisory Board shall be advisory only, and none of the General Partner, the Manager or any of their respective Affiliates shall be required or otherwise bound to act in accordance with any decision, action or comment of the Advisory Board or any of its members.

(d)     Meetings.  Meetings of the Advisory Board may be called by the General Partner at any time, and from time to time, to consider matters for which the consent, approval, disapproval, review or waiver of the Advisory Board is required by this Agreement or is requested by the General Partner, and shall be called promptly by the General Partner after its receipt of a written request for such a meeting signed by a majority of the members of the Advisory Board.  In addition, meetings of the Advisory Board shall be held at least once every twelve (12) months, commencing on or after the Outside Admission Date, to discuss the general affairs of the Partnership.  Notice of each meeting shall be given by electronic mail, U.S. mail, courier, telecopier or hand delivery to each member of the Advisory Board at least (10) Business Days prior to the date on which the meeting is to be held.  Attendance at any meeting of the Advisory Board shall constitute waiver of such notice.  The quorum for a meeting of the Advisory Board shall be a majority of its members.  Members of the Advisory Board may participate in a meeting of the Advisory Board by means of conference telephone or similar

41

communications equipment by means of which all Persons participating in the meeting can hear each other.  All actions taken by the Advisory Board shall be by a vote of a majority of the members present at a meeting thereof or by a written consent setting forth the action so taken and signed by a majority of the members of the Advisory Board.  Except as expressly provided in this Section 9.4, the Advisory Board shall conduct its business in such manner and by such procedures as a majority of its members deems appropriate.  The Advisory Board may meet without the General Partner being present.

(e)     Expenses, etc.  The members of the Advisory Board shall serve without compensation, but shall be reimbursed by the Partnership and the Parallel Funds for all reasonable out-of-pocket expenses incurred in attending meetings of the Advisory Board, and shall be indemnified by the Partnership as provided in Article X and by the Parallel Funds as provided in provisions of the Parallel Fund Agreements that are equivalent to Article X.

9.5     Meetings of the Partners.  Meetings of the Partners may be called by the General Partner at any time, and from time to time, to consider matters for which the consent, approval, disapproval, review or waiver of the Limited Partners is required by this Agreement or is requested by the General Partner.  In addition, the General Partner shall call a meeting of the Partners promptly after receipt of a written request for such a meeting signed by a Majority in Interest.  Notice of each meeting shall be given by electronic mail, U.S. mail, courier, telecopier or hand delivery to each Partner at least ten (10) Business Days prior to the date on which the meeting is to be held; provided that a Partner may waive notice before or after such meeting and attendance by such Partner at any meeting such meeting shall constitute waiver of such notice. Partners may participate in a meeting of the Partners by proxy or designated representative or by means of conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other.  Except as otherwise specified in this Agreement, any action by the Limited Partners may be by a vote of, or by a written consent setting forth the action so taken signed by, 66⅔% in Interest; provided that notice of any action by written consent shall be promptly given to all Partners.

9.6     Limited Partner Information.  Each Limited Partner shall promptly provide to the Partnership and the General Partner such information concerning such Limited Partner and its business as the General Partner may reasonably request so as to permit the Partnership and the General Partner to comply or determine its compliance with any law, opinion, directive, order, ruling or regulation of any governmental or self-regulatory agency or authority applicable to the Partnership or the General Partner.

ARTICLE X

INDEMNIFICATION

10.1     Indemnification of General Partner, etc.

(a)     Indemnification Generally.  The Partnership shall and hereby does, to the fullest extent permitted by applicable law, indemnify, hold harmless and release each Covered Person from and against all claims, demands, liabilities, costs, expenses, damages, losses, suits,

proceedings and actions, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("Claims"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the business and affairs of, or activities undertaken in connection with, the Partnership, any Portfolio Investment or any involvement with a Portfolio Company, or otherwise relating to or arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and reasonable counsel fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "Proceeding"), whether civil or criminal (all of such Claims and amounts covered by this Section 10.1 and all expenses referred to in Section 10.2 are referred to as "Damages"); provided that, (i) if such Covered Person is not an Advisory Board Representative, then such Damages shall not have been adjudicated by a court of competent jurisdiction to have arisen from Disabling Conduct of such Covered Person, and (ii) if such Covered Person is an Advisory Board Representative, then such Damages shall not have been adjudicated by a court of competent jurisdiction to have arisen from fraud or willful malfeasance on the part of such Covered Person.  The termination of any Proceeding by settlement shall not, of itself, create a presumption that any Damages relating to such settlement arose from Disabling Conduct of any Covered Person.  The indemnification protection afforded by this Section 10.1(a) shall not extend to any Covered Person as plaintiff, except to the extent necessary to enforce or establish its rights hereunder, or as otherwise may be advisable to avoid any Claim or Damages against it.  Subject to the last sentence of this Section 10.1(a), the satisfaction of any indemnification, holding harmless or release pursuant to this Section 10.1(a) shall be from and limited to the Partnership's assets (including the Remaining Capital Commitments of each of the Partners), and no Partner shall have any personal liability on account thereof, provided that each Partner shall be obligated to return any amounts distributed to it in order to fund any deficiency in the Partnership's indemnity obligations hereunder to the extent provided in Section 10.1(b).

(b)      Return of Distributions.  Notwithstanding anything in this Agreement to the contrary, and subject to the limitations set forth in Section 10.1(c), at any time and from time to time, the General Partner may require each Partner (including any former Partner) to return any and all distributions made to such Partner up to an amount equal to such Partner's pro rata share of the Partnership's indemnity obligations for Damages under Section 10.1(a), regardless of whether the Portfolio Investments which gave rise to such distributions are related to the Damages for which indemnity is sought.  For the purposes of the foregoing sentence, a Partner's pro rata share of each of the Partnership's indemnity obligations under Section 10.1(a) shall be based, (i) if such obligation is related to a specific Portfolio Investment, on the percentage received by such Partner of the aggregate distributions (other than any GP Carry) received by all Partners arising out of such Portfolio Investment (it being understood that any Limited Partner that did not receive a distribution related to such Portfolio Investment shall not be required to return any distributions for indemnity obligations related to such Portfolio Investment), and (ii) if such obligation is not related to any specific Portfolio Investment, on the percentage received by such Partner of the aggregate distributions (other than any GP Carry) received by all Partners arising out of all Portfolio Investments.

(c)      Restrictions on Return of Distributions.  A Partner's obligation under Section 10.1(b) to return distributions made to such Partner for the purpose of meeting the

Partnership's indemnity obligations under Section 10.1(a) shall be subject to the following limitations:

> (i)      No Partner shall be required to return any particular distribution after the second anniversary of the date of such distribution; <u>provided</u> that if at the end of the second anniversary of the date of such distribution, there are any Proceedings then pending or any Claim (whether outstanding, contingent or otherwise), the General Partner shall so notify the Partners (which notice shall include a brief description of each such Proceeding (and of the liabilities asserted in each such Proceeding) or of such Claim) and the obligation of the Partners to return such particular distribution to the Partnership pursuant to Section 10.1(b) shall survive with respect to each such Proceeding or Claim set forth in such notice (or any related Proceeding or Claim based upon the same or a similar Claim) until the date that such Proceeding or Claim is ultimately resolved and satisfied.

> (ii)      Each Limited Partner's obligation to return distributions under Section 10.1(b) shall not exceed, in the aggregate, twenty-five percent (25%) of such Limited Partner's Capital Commitment.

> (d)      <u>Treatment of Return of Distributions.</u>  Any distributions returned pursuant to Section 10.1(b) shall not be treated as Capital Contributions, but shall be treated as returns of distributions and reductions in Distributable Cash, in making subsequent distributions pursuant to Section 6.3 and 13.2(a) and in determining the amount that the General Partner is required to contribute to the Partnership pursuant to Sections 13.2(b) and 13.2(c).

> (e)      <u>No Third Party Rights</u>.  Nothing in this Section 10.1, express or implied, is intended or shall be construed to give any Person other than the Partnership, the Partners or the Manager any legal or equitable right, remedy or claim under or in respect of this Section 10.1 or any provision contained herein.

> (f)      <u>Other Sources</u>.  The General Partner shall cause the Partnership to use its reasonable best efforts to obtain the funds needed to satisfy its indemnification obligations from Persons other than the Partners (for example, out of Partnership assets or pursuant to insurance policies or Portfolio Company indemnification arrangements) before causing the Partnership to make payments pursuant to Section 10.1(a) and before requiring the Limited Partners to return distributions to the Partnership pursuant to Section 10.1(b).  Notwithstanding the foregoing, nothing in this Section 10.1(f) shall prohibit the General Partner from causing the Partnership to make such payments or requiring that the Limited Partners return such distributions if the General Partner determines that the Partnership is not likely to obtain sufficient funds from such other sources in a timely fashion, or that attempting to obtain such funds would be futile or not in the best interests of the Partnership.  Without limiting the generality of the foregoing, nothing in this Section 10.1(f) shall require the General Partner to cause the Partnership to sell any Portfolio Investment before such time as the General Partner in its sole discretion deems advisable.

> 10.2      <u>Expenses, etc</u>.

(a)     Reasonable expenses incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder may be advanced by the Partnership prior to the final disposition thereof upon receipt of an undertaking by or on behalf of such Covered Person to repay such amount if it shall be adjudicated by a court of competent jurisdiction that such Covered Person is not entitled to be indemnified hereunder; <u>provided</u> that the Partnership shall not advance any such expenses to such Covered Person if (i) such Claim arises from an action brought by at least a Majority in Combined Interest against such Covered Person, (ii) such action alleges Disabling Conduct on the part of such Covered Person, and (iii) such Covered Person has been determined by independent counsel selected pursuant to Section 10.5, in a written opinion addressed to the Partnership, to have more likely than not engaged in such Disabling Conduct.

(b)     The right of any Covered Person (including the General Partner and the Manager) to the indemnification provided herein shall be cumulative with, and in addition to, any and all rights to which such Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall extend to such Covered Person's successors, assigns and legal representatives.  All judgments against the Partnership and either or both of the General Partner or the Manager, in respect of which the General Partner or the Manager is entitled to indemnification, shall first be satisfied from Partnership assets, including Capital Contributions, insurance proceeds (if any) and any payments under Section 10.1(b), before the General Partner or the Manager, as the case may be, shall be responsible therefor.

10.3     <u>Notices of Claims, etc</u>.  Promptly after receipt by a Covered Person of notice of the commencement of any Proceeding, such Covered Person shall, if a claim for indemnification in respect thereof is to be made against the Partnership, give written notice to the Partnership of the commencement of such Proceeding, <u>provided</u> that the failure of any Covered Person to give notice as provided herein shall not relieve the Partnership of its obligations under this Article X, except to the extent that the Partnership is actually prejudiced by such failure to give notice.  In case any such Proceeding is brought against a Covered Person (other than a derivative suit in right of the Partnership), the Partnership will be entitled to participate in and to assume the defense thereof to the extent that the Partnership may wish, with counsel reasonably satisfactory to such Covered Person.  After notice from the Partnership to such Covered Person of the Partnership's election to assume the defense of such Proceeding, the Partnership will not be liable for expenses subsequently incurred by such Covered Person in connection with the defense thereof.  No Covered Person may enter into any settlement or compromise which would result in an obligation of the Partnership to indemnify such Covered Person without the prior written consent of the General Partner (not to be unreasonably withheld or delayed).  The General Partner shall not, and shall not permit the Partnership to, consent to entry of any judgment or enter into or consent to any settlement or compromise, with respect to any Claim involving a Covered Person, that does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Covered Person of a release from all liability in respect to such Claim.

10.4     <u>No Waiver</u>.  Nothing contained in this Article X shall constitute a waiver by any Partner of any right that it may have against any party under United States federal or state securities laws.

45

10.5     <u>Independent Counsel Investigations</u>.  At any time, and from time to time, if the Advisory Board or a Majority in Combined Interest shall allege in good faith, by written notice to the General Partner, that an Investigated Party has engaged in Disabling Conduct, which notice shall set forth in reasonable detail the bases of such allegation, then the General Partner shall cause the Partnership to retain independent counsel for purposes of investigating such allegations in accordance with the following procedures:

(a)     The General Partner shall call a meeting of the Advisory Board, which meeting shall be held no later than thirty (30) days after the General Partner's receipt of such written notice of such allegation.  In preparation for such meeting, the General Partner shall develop a list of no fewer than three candidates to serve as such independent counsel.  Each such candidate shall be a law firm of reputation (<u>i</u>) which is not then providing, and which has not provided during the three-year period prior thereto, legal services to such Investigated Party or its Affiliates, and (<u>ii</u>) which has indicated to the General Partner that it would be willing to serve as such independent counsel if retained by the Partnership.  Each Limited Partner shall promptly provide such information as may be reasonably requested by the General Partner to determine whether any potential candidate is then providing, or has provided during the three-year period prior thereto, legal services to such Limited Partner or any of its Affiliates.

(b)     At such meeting of the Advisory Board, the General Partner shall present the list of candidates to serve as independent counsel and shall recommend one of such candidates to the Advisory Board.  The Partnership shall retain the candidate recommended by the General Partner to serve as such independent counsel, unless the Advisory Board shall have disapproved of such recommendation during such meeting, in which case, the Advisory Board shall select an alternate candidate from such list, and the Partnership shall instead retain such alternate candidate to serve as such independent counsel.

(c)     Such independent counsel shall conduct a reasonably detailed investigation into whether such Investigated Party engaged in the alleged Disabling Conduct and shall provide the Partnership with a written opinion setting forth its finding with respect to such investigation, including whether it believes it to be more likely than not that such Investigated Party has engaged in such Disabling Conduct and the reasons in support of such belief.  Such independent counsel shall conduct such investigation in a manner and in accordance with procedures determined by such independent counsel in its reasonable discretion and shall not be obligated to comply with any instruction from the General Partner or the Advisory Board, except to the extent that such instruction is from both the General Partner and the Advisory Board.

(d)     All costs and expenses of such investigation, including the reasonable fees and expenses of such independent counsel, shall be borne by the Partnership.

## ARTICLE XI

## TRANSFER OF LIMITED PARTNER INTERESTS; WITHDRAWAL OF LIMITED PARTNERS

11.1     <u>Admission, Substitution and Withdrawal of Limited Partners; Assignment</u>.

(a)     General.  Except as set forth in this Article XI or in Article V, no Additional Limited Partners or Substitute Limited Partners may be admitted to, and no Limited Partner may withdraw from, the Partnership prior to the dissolution and winding up of the Partnership.  Except as set forth in this Article XI or in Section 5.4, no Limited Partner shall sell, transfer, assign, convey, pledge, mortgage, encumber, hypothecate or otherwise dispose of ("Transfer") all or any part of its interest in the Partnership.  Notwithstanding the foregoing, any Limited Partner may, with the prior written consent of the General Partner and upon compliance with Sections 11.1(b) and (c), Transfer all or a portion of such Limited Partner's interest in the Partnership.  The consent of the General Partner referred to in the preceding sentence to a Transfer by a Limited Partner may be withheld in the sole discretion of the General Partner, except that if such Transfer is (i) a merger of a Limited Partner that is a trust subject to ERISA into another such trust, (ii) to an Affiliate of the Limited Partner requesting consent to such Transfer or (iii) to another Limited Partner in good standing, such consent will not be unreasonably withheld or delayed.

(b)     Conditions to Transfer.  Any purported Transfer by a Limited Partner pursuant to the terms of this Article XI shall, in addition to requiring the prior written consent referred to in Section 11.1(a), be subject to the satisfaction of the following conditions:

(i)     the Limited Partner that proposes to effect such Transfer (a "Transferring Limited Partner") or the Person to whom such Transfer is to be made (a "Transferee") shall undertake to pay all reasonable expenses, including legal and accounting fees, incurred by the Partnership or the General Partner on behalf of the Partnership in connection therewith;

(ii)     the Partnership shall receive from the Transferee (and in the case of clause (C) below, from the Transferring Limited Partner to the extent specified by the General Partner) (A) such documents, instruments and certificates as may be reasonably requested by the General Partner, pursuant to which such Transferee shall agree to be bound by this Agreement, which instrument may be a counterpart of this Agreement executed by or on behalf of such Transferee, (B) a certificate to the effect that the representations set forth in the Subscription Agreement are (except as otherwise expressly disclosed in writing to the General Partner) true and correct with respect to such Transferee as of the date of such Transfer and (C) such other documents, opinions, instruments and certificates as the General Partner shall reasonably request;

(iii)     such Transferring Limited Partner or Transferee shall, prior to making any such Transfer, deliver to the Partnership the opinion of counsel described in Section 11.1(c);

(iv)     the General Partner shall be given at least thirty (30) days prior written notice of such desired Transfer;

(v)     such Transfer will not be effected on or through an "established securities market" or a "secondary market or the substantial equivalent thereof" as such terms are used in Treasury Regulations § 1.7704-1; and

47

(vi)     such Transfer would not result in the Partnership at any time during its taxable year having more than one hundred (100) partners, within the meaning of Treasury Regulations § 1.7704-1(h)(1)(ii) (taking into account Treasury Regulations § 1.7704-1(h)(3)).

The General Partner may waive any or all of the conditions set forth in this Section 11.1(b) other than clauses (ii)(A) and (vi) above if, in its sole discretion, it deems it in the best interests of the Partnership to do so.

(c)     <u>Opinion of Counsel</u>.  The opinion of counsel referred to in Section 11.1(b)(iii) shall be in form and substance satisfactory to the General Partner, shall be from counsel satisfactory to the General Partner and shall be substantially to the effect that (unless specified otherwise by the General Partner) the consummation of the Transfer contemplated by the opinion:

(i)     will not require registration under, or violate any provisions of, the Securities Act or any applicable non-U.S. securities laws;

(ii)     will not require the General Partner or the Partnership to register as an investment company under the Investment Company Act; and that the Transferee is a Person who counts as one beneficial owner for purposes of Section 3(c)(1) of the Investment Company Act and a "qualified purchaser" as such term is defined in Section 2(a)(51) of the Investment Company Act;

(iii)     will not require the Manager, the General Partner or any Affiliate of the Manager or the General Partner that is not registered under the Advisers Act, or the Partnership, to register as an investment adviser under the Advisers Act;

(iv)     will not cause the Partnership to be taxable as a corporation or association under the Code; and

(v)     will not violate the laws, rules or regulations of any state or any governmental authority applicable to such Transfer.

In giving such opinion, counsel may, with the consent of the General Partner, rely as to factual matters on certificates of the Transferring Limited Partner, the Transferee and the General Partner.

(d)     <u>Substitute Limited Partners</u>.  Notwithstanding anything in this Agreement to the contrary, any Transferee of a Transferring Limited Partner's interest in the Partnership (including in a Transfer permitted or consented to pursuant to Section 11.1(a)) may be admitted to the Partnership as a substitute Limited Partner of the Partnership (a "<u>Substitute Limited Partner</u>") only with the consent of the General Partner, which consent may be withheld in the sole discretion of the General Partner.  In the event of the admission of such Transferee as a Substitute Limited Partner, all references herein to the Transferring Limited Partner shall be deemed to apply to such Substitute Limited Partner, and such Substitute Limited Partner shall succeed to all rights and obligations of the Transferring Limited Partner hereunder.  A Person

48

shall be deemed admitted to the Partnership as a Substitute Limited Partner at the time that the foregoing conditions are satisfied, the General Partner's approval is obtained and such Person executes an instrument evidencing its agreement to be bound by the terms and conditions of this Agreement and such Person is listed as a limited partner of the Partnership on Schedule A hereto. If a Transferring Limited Partner is assigning all of its interest in the Partnership in accordance with this Agreement, the admission of such Transferee as a Substitute Limited Partner shall be deemed to take effect immediately prior to the assignment of the interest in the Partnership of the Transferring Limited Partner and immediately after the effectiveness of such admission and effectiveness of the assignment, the Transferring Limited Partner shall cease to be a limited partner of the Partnership.

(e)     Transfers in Violation of Agreement Not Recognized.  No attempted Transfer or substitution shall be recognized by the Partnership and any purported Transfer or substitution shall, to the fullest extent permitted by law, be void unless effected in accordance with and as permitted by this Agreement.

(f)     Certain Changes in Record Ownership.  A change in record ownership of an interest in the Partnership by reason of a change in the identity of the trustee or other fiduciary of an ERISA Limited Partner or Public Limited Partner shall not be deemed a Transfer within the meaning of this Section 11.1, provided that the Limited Partner affected by such change shall notify the General Partner in writing of such change promptly and in no event later than thirty (30) days after such event.  The records of the Partnership and Schedule A hereto shall be changed by the General Partner to reflect the identity of the new trustee or other fiduciary upon receipt of such notice and the execution and delivery of such documents as the General Partner shall require in connection with the change.  Pending the receipt of such notice and documentation, the Partnership and the General Partner shall be entitled to rely on the records of the Partnership for all purposes in connection with the affected interest.

11.2    Additional Limited Partners.

(a)     Conditions to Admission.  In addition to the admission of Limited Partners at the Initial Closing, the General Partner, in its sole discretion, may schedule one or more additional Closings on any date not later than the Outside Admission Date for such Person or Persons seeking admission to the Partnership as an additional limited partner of the Partnership (an "Additional Limited Partner", which term shall include any Person who is a Partner immediately prior to such additional Closing and wishes to increase the amount of its Capital Commitment, but shall not include a Substitute Limited Partner), subject to the determination by the General Partner in the exercise of its good faith judgment that in the case of each such admission or increase the following conditions have been satisfied:

(i)     The Additional Limited Partner shall have executed and delivered such instruments and shall have taken such actions as the General Partner shall deem necessary or desirable to effect such admission or increase, including the execution of (A) a Subscription Agreement containing representations and warranties by the Additional Limited Partner that are substantially the same as those made by Limited Partners and contained in the Subscription Agreements executed at the Initial Closing and (B) a counterpart of this Agreement.

(ii)     Such admission or such increase shall not result in a violation of any applicable law, including the United States federal securities laws, or any term or condition of this Agreement and, as a result of such admission or such increase, the Partnership shall not be required to register as an Investment Company under the Investment Company Act, none of the General Partner, the Manager or any Affiliate of the General Partner or the Manager would be required to register as an investment adviser under the Advisers Act and the Partnership shall not become taxable as a corporation or association.

(iii)     Subject to Section 11.2(d), on the date of its admission to the Partnership or the date of such increase, as the case may be, such Additional Limited Partner shall have paid or unconditionally agreed to pay to the Partnership (for application as provided in Section 11.2(b)), an amount equal to the sum of:

(A)     in the case of each Portfolio Investment then held by the Partnership as to which such Additional Limited Partner is not an Excused Limited Partner, the percentage of such Additional Limited Partner's Capital Commitment or (if the Additional Limited Partner is increasing its Capital Commitment) the percentage of the amount of the increase of such Additional Limited Partner's Capital Commitment that is equal to a fraction, (1) the numerator of which is the aggregate of the Capital Contributions of the previously admitted Partners used to fund the cost of such Portfolio Investment and (2) the denominator of which is the sum of the aggregate of (x) the Capital Commitments of the previously admitted Partners that made Capital Contributions used to fund the cost of such Portfolio Investment and (y) (without duplication) the Capital Commitments of all Additional Limited Partners that are not Excused Limited Partners with respect to such Portfolio Investment, and

(B)     the percentage of such Additional Limited Partner's Capital Commitment or (if such Additional Limited Partner is increasing its Capital Commitment) the percentage of the amount of the increase of such Additional Limited Partner's Capital Commitment that is equal to a fraction, (1) the numerator of which is the aggregate of the Capital Contributions of the previously admitted Limited Partners in respect of all Drawdowns which have theretofore been funded and not returned to the Partners, other than Drawdowns made and used to fund the cost of a Portfolio Investment or the payment of the Management Fee, and (2) the denominator of which is the sum of the aggregate of (x) the Capital Commitments of all previously admitted Partners and (y) (without duplication) the Capital Commitments of all Additional Limited Partners,

together with, in the case of clauses (A) and (B) above, an amount calculated as interest thereon at a rate per annum equal to the Prime Rate plus two hundred (200) basis points from the date of such contribution to the date that the payment required to be made by

such Additional Limited Partner pursuant to this Section 11.2(a)(iii) is made, and less such amount as is necessary to take into account all distributions theretofore made.

      (iv)    On the date of its admission to the Partnership or the date of such increase, as the case may be, such Additional Limited Partner shall have paid or unconditionally agreed to pay to the Partnership (which shall pay such amounts to the Manager) amounts equal to the Management Fee that, in each case, would have been previously paid with respect to such Additional Limited Partner's Capital Commitment or (if such Additional Limited Partner is increasing its Capital Commitment) with respect to the amount of the increase of such Additional Limited Partner's Capital Commitment, as the case may be, if such Limited Partner had been admitted to the Partnership or had increased its Capital Commitment, as the case may be, on the Initial YAAF Closing Date, together with an amount calculated as interest thereon at a rate per annum equal to the Prime Rate plus two hundred (200) basis points from the dates that such amounts would have been paid if such Limited Partner had been admitted to the Partnership or had increased its Capital Commitment, as the case may be, on the Initial YAAF Closing Date, to the date that such amounts are paid.

      (v)    Such admission or such increase shall not cause aggregate capital commitments with respect to the Partnership and any Parallel Funds to exceed one billion dollars ($1,000,000,000).

A Person shall be deemed admitted to the Partnership as an Additional Limited Partner at the time that the foregoing conditions are satisfied and when such Person is listed as a limited partner of the Partnership on Schedule A hereto. The General Partner may waive any or all of the conditions set forth in this Section 11.2(a) (other than paragraphs (iii) and (v) above) if, in its sole discretion, it deems it in the best interests of the Partnership to do so.

      (b)    <u>Certain Payments and Transfers</u>.  Subject to Section 11.2(d), any amount paid by an Additional Limited Partner pursuant to Section 11.2(a)(iii)(A) with respect to a Portfolio Investment (and any interest paid thereon) shall be remitted promptly to the previously admitted Partners, <u>pro rata</u> in accordance with their Capital Contributions used to fund such Portfolio Investment (before giving effect to the adjustments referred to in the following clause), and the Partners' Sharing Percentages for such Portfolio Investment shall be appropriately adjusted.  Subject to Section 11.2(d), any amount paid by an Additional Limited Partner pursuant to Section 11.2(a)(iii)(B) to fund its share of Partnership Expenses (other than the Management Fee) or Organizational Expenses, and any interest paid thereon shall be remitted promptly to the previously admitted Partners, <u>pro rata</u> in accordance with their prior payments with respect to such amounts.  Such payments and remittances shall be treated for all purposes of this Agreement and for all accounting and tax reporting purposes as payments made directly from the Additional Limited Partner to the previously admitted Partners and not as items of Partnership income, gain, loss, deduction, contribution or distribution.  Such Additional Limited Partner shall succeed to the Capital Contributions of the previously admitted Partners attributable to the portion of the amount remitted to such previously admitted Partners pursuant to Section 11.2(a)(iii) (excluding any amount calculated as interest thereon), as appropriate, and the Capital Contributions of the previously admitted Partners shall be decreased accordingly.  In addition,

the Remaining Capital Commitments of the previously admitted Limited Partners shall be increased by such amount remitted (excluding any amount calculated as interest thereon), and the amount of such increase in Remaining Capital Commitments may be called again by the Partnership.  The Remaining Capital Commitment of the Additional Limited Partner shall be appropriately determined by the General Partner.  Schedule A hereto shall be amended by the General Partner as appropriate to show the name and business address of each Additional Limited Partner and the amount of its Capital Commitment.  Neither the admission of an Additional Limited Partner nor an increase in the amount of an Additional Limited Partner's Capital Commitment shall be a cause for dissolution of the Partnership.  The transactions contemplated by this Section 11.2 shall not require the consent of the Advisory Board or of any of the Limited Partners.

(c)  Optional Revaluations.  The General Partner may, in its sole discretion, determine to adjust the amount of Capital Contributions and other amounts payable by an Additional Limited Partner pursuant to this Section 11.2, to the extent it determines it is reasonable to do so as a result of a substantial increase or decrease in the value of any previously funded Portfolio Investments prior to the additional Closing with respect to such Additional Limited Partner.  The General Partner shall make such adjustments to the distribution, allocation and other terms of this Agreement as it deems reasonably necessary to properly reflect the economic effect of any such adjustment.

(d)  Adjustments Due to Parallel Funds.  For the avoidance of doubt, Section 11.2 shall be interpreted in a manner consistent with the last sentence of Section 2.4(a), including by adjusting the amounts to be paid by an Additional Limited Partner pursuant to Section 11.2(a)(iii) and by remitting portions of such amounts to Parallel Fund Investors (rather than to the Partners), in each case, as may be appropriate to reflect any reallocation of investments and expenses between the Partnership and the Parallel Funds pursuant to Section 2.4(a) in connection with the admission (or the increase in the Capital Commitment) of such Additional Limited Partner.

11.3   ERISA and Public Limited Partners.

(a)  Subject to Sections 11.3(b) and 11.3(c), any ERISA Limited Partner or Public Limited Partner may elect, upon written notice of such election to the General Partner, to withdraw from the Partnership, or upon written demand by the General Partner, shall withdraw from the Partnership, at the time and in the manner provided in this Section 11.3, if such ERISA Limited Partner or Public Limited Partner, as applicable, or the General Partner shall obtain and deliver to the other an opinion of counsel (which opinion and counsel shall be reasonably acceptable to such ERISA Limited Partner or Public Limited Partner, as applicable, and the General Partner; provided that such ERISA Limited Partner or Public Limited Partner shall not be required to deliver such an opinion if its election to withdraw under this Section 11.3(a) is in response to an inability on the part of the General Partner to certify, pursuant to Section 4.3(b), after the Partnership has made its first Portfolio Investment, that the Partnership qualifies as a VCOC) to the effect that there is a material likelihood that (each an "ERISA Event"):

(i)  such ERISA Limited Partner, Public Limited Partner or the Partnership, as a result of a change in applicable law occurring after such ERISA

Limited Partner's or Public Limited Partner's admission to the Partnership, would be in material violation of ERISA or any state or local law, regulation or governmental administrative policy similar to ERISA, in each case, if such ERISA Limited Partner or Public Limited Partner were to continue as a Limited Partner of the Partnership; or

(ii)     all or any portion of the assets of the Partnership would constitute "plan assets" for the purposes of ERISA or any state or local law, regulation or governmental administrative policy similar to ERISA, in each case, applicable to such ERISA Limited Partner or Public Limited Partner; or

(iii)     the Partnership would be deemed to have engaged in a transaction prohibited under ERISA or any state or local law, regulation or governmental administrative policy similar to ERISA, in each case, to the extent that such prohibitions are applicable to the Partnership.

(b)     If the ERISA Event described in such withdrawal notice pertains only to a particular ERISA Limited Partner or Public Limited Partner, then the General Partner shall have, in its sole discretion, a period of ninety (90) days following receipt of the opinion described in Section 11.3(a) (or delivery of notice by the General Partner to such ERISA Limited Partner or Public Limited Partner demanding its withdrawal, if applicable) to attempt to eliminate the necessity for such withdrawal to the reasonable and mutual satisfaction of such ERISA Limited Partner or Public Limited Partner, as applicable, and the General Partner, including by:

(i)     prohibiting such ERISA Limited Partner or Public Limited Partner from making a Capital Contribution with respect to any and all future Portfolio Investments and reducing its Remaining Capital Commitment to any amount greater than or equal to zero;

(ii)     offering to each Partner other than Defaulting Limited Partners or ERISA Limited Partners (and, if determined to be appropriate by the General Partner, Public Limited Partners), the opportunity to purchase a portion of such ERISA Limited Partner's or Public Limited Partner's interest in the Partnership at the Value thereof (such interest may, in the General Partner's sole discretion, include all or any portion of such ERISA Limited Partner's or Public Limited Partner's Remaining Capital Commitment as calculated prior to giving effect to paragraph (i) of this Section 11.3(b));

(iii)     offering to any third party the opportunity to purchase, or purchasing itself, at the Value thereof, all or any portion of such ERISA Limited Partner's or Public Limited Partner's interest that remains after operation of paragraph (ii) of this Section 11.3(b);

(iv)     liquidating all or any portion of such ERISA Limited Partner's or Public Limited Partner's interest in the Partnership or making a special distribution in respect of such interest to such Limited Partner, in which case such ERISA Limited Partner's or Public Limited Partner's right to receive future

distributions pursuant to Articles VI and XIII shall be appropriately adjusted in good faith by the General Partner, and the General Partner shall make a distribution and may, in its sole discretion, choose to distribute cash, cash equivalents and Securities or any combination of the foregoing, in an amount (or having a Value) equal to the Value of such interest;

(v)    renegotiating the non-financial terms of any Portfolio Investment or otherwise modify the manner in which the Partnership conducts its business; or

(vi)    dissolving and winding up the Partnership and distributing the Partnership assets in accordance with Article XIII.

If such cause for withdrawal under Section 11.3(a) is not cured within such ninety (90) day period, then such ERISA Limited Partner or Public Limited Partner shall be permitted to withdraw from the Partnership, effective as of the end of such ninety (90) day period.  For the purposes of clauses (ii), (iii) and (iv) of this Section 11.3(b), Value shall be as determined by an independent, nationally recognized investment banking, accounting or other appraisal firm selected by the General Partner, which firm has not been reasonably objected to, within thirty (30) days after notice identifying such firm is given, by such ERISA Limited Partner or Public Limited Partner.  The reasonable fees and costs of such firm in connection with such determination shall be borne by the Partnership.

(c)    If the ERISA Event described in such withdrawal notice pertains to more than one ERISA Limited Partner or Public Limited Partner, then the General Partner shall deliver a copy of such withdrawal notice, and of the opinion of counsel that serves as the basis of such withdrawal notice, to each ERISA Limited Partner and Public Limited Partner to which such ERISA Event pertains.  The General Partner shall have, in its sole discretion, a period of ninety (90) days following receipt of the opinion described in Section 11.3(a) (or delivery of notice by the General Partner to such ERISA Limited Partners and Public Limited Partners demanding their withdrawal, if applicable) to attempt to eliminate the necessity for such withdrawal to the reasonable and mutual satisfaction of a majority in interest (as determined by Capital Commitments) of such ERISA Limited Partners and Public Limited Partners, as applicable, and the General Partner, including by:

(i)    prohibiting all such ERISA Limited Partners and Public Limited Partners from making a Capital Contribution with respect to any and all future Portfolio Investments, reducing, on a pro rata basis based on the Capital Commitments of such ERISA Limited Partners and Public Limited Partners, the Capital Contributions to be made by such ERISA Limited Partners and Public Limited Partners with respect to any and all future Portfolio Investments, and reducing, on a pro rata basis based on the Capital Commitments of such ERISA Limited Partners and Public Limited Partners, the respective Remaining Capital Commitments of such ERISA Limited Partners and Public Limited Partners to any amount greater than or equal to zero;

(ii)    offering to each Partner other than Defaulting Limited Partners or ERISA Limited Partners (and, if determined to be appropriate by the General

Partner, Public Limited Partners), the opportunity to purchase a portion of such ERISA Limited Partners' and Public Limited Partners respective interests in the Partnership at the Value thereof (such interests may, in the General Partner's sole discretion, include all or any portion of such ERISA Limited Partners' and Public Limited Partners' respective Remaining Capital Commitment as calculated prior to giving effect to paragraph (i) of this Section 11.3(c)), provided that the portion to be purchased from each such ERISA Limited Partner or Public Limited Partner shall be determined on a pro rata basis based on the Capital Commitments of such ERISA Limited Partners and Public Limited Partners;

       (iii)     offering to any third party the opportunity to purchase, or purchasing itself, at the Value thereof, all or any portion of such ERISA Limited Partners' and Public Limited Partners' respective interests that remains after operation of paragraph (ii) of this Section 11.3(c), provided that the portion to be purchased from each such ERISA Limited Partner or Public Limited Partner shall be determined on a pro rata basis based on the Capital Commitments of such ERISA Limited Partners and Public Limited Partners;

       (iv)     liquidating all or any portion, on a pro rata basis based on the Capital Commitments of such ERISA Limited Partners and Public Limited Partners, of such ERISA Limited Partners' and Public Limited Partners' respective interests in the Partnership or making a special distribution in respect of such interest to such Limited Partners, in which case such ERISA Limited Partners' and Public Limited Partners' right to receive future distributions pursuant to Articles VI and XIII shall be appropriately adjusted in good faith by the General Partner, and the General Partner shall make a distribution and may, in its sole discretion, choose to distribute cash, cash equivalents and Securities or any combination of the foregoing, in an amount (or having a Value) equal to the Value of such interests;

       (v)     renegotiating the non-financial terms of any Portfolio Investment or otherwise modify the manner in which the Partnership conducts its business; or

       (vi)     dissolving and winding up the Partnership and distributing the Partnership assets in accordance with Article XIII.

If such cause for withdrawal under Section 11.3(a) is not cured within such ninety (90) day period, then such ERISA Limited Partners and Public Limited Partners shall be permitted to withdraw from the Partnership, effective as of the end of such ninety (90) day period. For the purposes of clauses (ii), (iii) and (iv) of this Section 11.3(c), Value shall be as determined by an independent, nationally recognized investment banking, accounting or other appraisal firm selected by the General Partner, which firm has not been reasonably objected to, within thirty (30) days after notice identifying such firm is given, by a majority in interest (based on Capital Commitments) of such ERISA Limited Partners and Public Limited Partners. The reasonable fees and costs of such firm in connection with such determination shall be borne by the Partnership.

(d)     Documentation, etc.  Subject to the requirements of Section 11.2(a)(ii), the details and documentation relating to any transaction or transactions effected pursuant to this Section 11.3 shall be as determined by the General Partner in the good faith exercise of its judgment and shall not require the consent of the Advisory Board or of any of the Limited Partners.  Upon the closing of any transaction or transactions effected pursuant to this Section 11.3, the General Partner (i) may, in its sole and absolute discretion, admit each purchaser (which is not already a Partner immediately prior to the time of such purchase) to the Partnership as a Substitute Limited Partner on such terms and upon the delivery of such documents, including the execution by such purchaser of a counterpart signature page to this Agreement or of an instrument evidencing its agreement to be bound by this Agreement, as the General Partner, in its sole discretion, shall deem in good faith to be appropriate, and (ii) shall make such additional adjustments to the Capital Accounts, Capital Commitments, Sharing Percentages, Remaining Capital Commitments and Capital Contributions of the ERISA Limited Partner or Public Limited Partner and of all Partners and Substitute Limited Partners who have purchased interests pursuant to this Section 11.3 as it shall deem in good faith to be appropriate.  The General Partner shall make such revisions of Schedule A hereto as may be necessary or appropriate to reflect the changes in Capital Commitments contemplated hereby.

## ARTICLE XII

## BANKRUPTCY, DISSOLUTION, ETC. OF PARTNERS

12.1     Bankruptcy or Dissolution of the General Partner.  In the event of the bankruptcy or dissolution and commencement of winding up of the General Partner or the occurrence of any other event that causes the General Partner to cease to be a general partner of the Partnership under the Act, the Partnership shall be dissolved and wound up as provided in Article XIII, unless the business of the Partnership is continued pursuant to Section 13.1(c).  The General Partner shall not have the right to withdraw from the Partnership or to Transfer its interest in the Partnership without the consent of 75% in Interest.  A transferee of all or any part of the General Partner's interest in the Partnership assigned in accordance with this Section 12.1, shall be admitted as a general partner of the Partnership upon its execution of a counterpart to this Agreement or other instrument evidencing its agreement to be bound by all the terms and conditions of this Agreement.  In the event that the General Partner assigns its entire interest in the Partnership in accordance with this Agreement, such transferee shall be deemed admitted to the Partnership as a general partner effective immediately prior to the assignment and such transferee is hereby authorized to and shall continue the business of the Partnership without dissolution.

12.2     Bankruptcy, Dissolution or Withdrawal of a Limited Partner.  The bankruptcy, dissolution or withdrawal of a Limited Partner shall not in and of itself dissolve or terminate the Partnership.

## ARTICLE XIII

## DISSOLUTION AND TERMINATION OF PARTNERSHIP

13.1   <u>Dissolution Events</u>.  There will be a dissolution of the Partnership and its affairs shall be wound up upon the first to occur of any of the following events:

(a)   the expiration of the Term as provided in Section 1.4;

(b)   the last Business Day of the Fiscal Year in which all assets acquired, or agreed to be acquired, by the Partnership during the Commitment Period and all Follow-On Investments have been sold or otherwise disposed of;

(c)   the withdrawal, bankruptcy or dissolution and commencement of winding up of the General Partner, or the assignment by the General Partner of its entire interest in the Partnership, or the occurrence of any other event that causes the General Partner to cease to be a general partner of the Partnership under the Act, <u>unless</u> (i) at the time of the occurrence of such event there is at least one remaining general partner of the Partnership that is hereby authorized to and does (unanimously in the case of more than one general partner) elect to continue the business of the Partnership without dissolution or (ii) the business of the Partnership is otherwise continued by the Limited Partners without dissolution pursuant to the provisions of the Act;

(d)   a decision, made by the General Partner in its sole discretion, to dissolve the Partnership because it has determined that there is a substantial likelihood that due to a change in the text, application or interpretation of the provisions of the United States federal securities laws (including the Securities Act, the Investment Company Act and the Advisers Act) or the provisions of ERISA (including the applicable DOL Regulations), or any other applicable statute, regulation, case law, administrative ruling or other similar authority (including changes that result in the Partnership being taxable as a corporation under United States federal income tax law), the Partnership cannot operate effectively in the manner contemplated herein or, to the extent applicable, will or does not constitute a VCOC after the General Partner has used its commercially reasonable efforts to remedy the circumstances resulting in the General Partner's determination pursuant to this subsection (d);

(e)   the entry of a decree of judicial dissolution pursuant to section 17-802 of the Act;

(f)   a decision to dissolve the Partnership made by the General Partner pursuant to Section 11.3(b)(vi) or 11.3(c)(vi);

(g)   written notice by the Limited Partners to the General Partner of a decision to dissolve the Partnership made by 85% in Combined Interest;

(h)   in the event that the General Partner is removed in accordance with Section 2.6, a decision to dissolve the Partnership made within one hundred twenty (120) days of such removal by 66⅔% in Interest;

(i)   in the event that the Commitment Period shall end and the restrictions set forth in Section 4.6 shall become permanent restrictions, in each case pursuant to Section 4.6, a decision to dissolve the Partnership made by 75% in Interest; or

57

(j)      there are no limited partners of the Partnership unless the business of the Partnership is continued in accordance with the Act.

13.2    Distribution Upon Dissolution.

(a)      Liquidation of Assets.  Upon the dissolution of the Partnership, the General Partner (or, in lieu of the General Partner, a duly elected liquidating trustee of the Partnership or other representative designated by 85% in Interest) shall proceed, subject to the provisions of this Article XIII, to liquidate the Partnership and apply the proceeds of such liquidation, or in its sole discretion to distribute Partnership assets, in the following order of priority:

(i)      First, to creditors in satisfaction of debts and liabilities of the Partnership, whether by payment or the making of reasonable provision for payment (including any loans or advances that may have been made by any of the Partners to the Partnership), and the expenses of liquidation, whether by payment or the making of reasonable provision for payment, any such reasonable reserves (which may be funded by a liquidating trust) to be established by the General Partner (or any duly elected liquidating trustee or other duly designated representative) in amounts deemed by it to be reasonably necessary for the payment of the Partnership's expenses, liabilities and other obligations (whether fixed or contingent); and

(ii)      Second, to the Partners in accordance with the positive balances of the Partners' Capital Accounts, as determined after taking into account all adjustments to Capital Accounts for the Partnership taxable year during which the liquidation occurs, provided that liquidating distributions shall be made in the same manner as distributions under Article VI if such distributions would result in the Partners receiving a different amount than would have been received pursuant to a liquidating distribution based on Capital Account balances.  For purposes of the application of this Section 13.2(a) and determining Capital Accounts on liquidation, all unrealized gains, losses and accrued income and deductions of the Partnership shall be treated as realized and recognized immediately before the date of distribution.

(b)      Clawback.  If, upon liquidation of the Partnership, after giving effect to all distributions made pursuant to Article VI and Sections 13.2(a) and 13.2(c), (i) the General Partner has received, in its capacity as General Partner, before giving effect to this Section 13.2(b), distributions pursuant to Section 6.3(b) and Section 6.3(c) (collectively the "GP Carry") attributable to any Limited Partner (other than a Defaulting Limited Partner) that exceed twenty percent (20%) of the sum of (A) distributions to such Limited Partner pursuant to Sections 6.3(a)(iii) and 6.3(c) and (B) distributions to the General Partner of the GP Carry attributable to such Limited Partner, or (ii) the General Partner has received a GP Carry attributable to any Limited Partner (other than a Defaulting Limited Partner) that did not receive distributions sufficient to provide to such Limited Partner the 8% internal rate of return described in Section 6.3(a)(iii), then the General Partner shall contribute to the Partnership, and the Partnership shall, subject to Section 6.12, the Act and other applicable law, distribute to such Limited Partner, an

58

amount equal to the greater of (x) the excess described in the foregoing clause (i) or (y) the amount necessary to provide such Limited Partner with the 8% internal rate of return contemplated by clause (ii); provided that the cumulative amount required to be contributed by the General Partner under this Section 13.2(b) and Section 13.2(c) (taking into account all prior contributions (if any) by the General Partner under this Section 13.2(b) and Section 13.2(c)) shall not, in the aggregate, exceed the GP Carry attributable to such Limited Partner, minus the amount of taxes (including taxes borne by the General Partner and its direct and indirect members) imposed on allocations of taxable income related to such GP Carry (calculated by reference to the Applicable Tax Rate and treating Securities distributed in-kind as if such Securities were sold at their Value on the date of distribution), as adjusted to take into account any actual tax benefit to the General Partner or its direct or indirect members, for the year such contribution is made, as a result of such contribution or a related allocation of deduction or loss (which tax benefit shall be calculated and certified by the accountants of the General Partner or such direct or indirect member, as the case may be, and be deemed final for all purposes hereunder, it being understood that nothing herein shall require any such direct or indirect member to furnish to any Person, including any Limited Partner, any tax return filed by such member or provide any other information regarding the finances of such member).

(c)   Interim Clawback.  Within thirty (30) days after the date on which the financial reports with respect to the first, fourth and seventh full Fiscal Year after the termination of the Commitment Period have been sent to the Limited Partners pursuant to Section 9.2(a), and unless the Partnership is earlier dissolved pursuant to this Article XIII, the General Partner shall convene the Advisory Board meeting required to be convened by the General Partner under Section 8.4(d).  In connection therewith, the General Partner shall (i) reasonably estimate the amounts that would be distributed to each Partner and (ii) determine the amount (if any, and subject to the limits set forth in the proviso to Section 13.2(b)) that the General Partner would be required to return to the Partnership pursuant to Section 13.2(b) (the "Interim Clawback Obligation"), in each case, as if the Partnership were dissolved as of the end of such Fiscal Year, its assets liquidated at their Value (regardless of whether such assets were previously carried at cost on the books of the Partnership or otherwise), and the proceeds therefrom distributed pursuant to Section 13.2(a).  Subject to the last sentence of this Section 13.2(c), the General Partner shall have one hundred twenty (120) days after such Advisory Board meeting to contribute to the Partnership an amount equal to the Interim Clawback Obligation, which shall, subject to the Act and other applicable law, be distributed to each Limited Partner in the manner set forth in Section 13.2(b) and treated as if such distribution was made pursuant to Section 6.3; provided that in the event the Advisory Board disapproves of the Value of any Portfolio Investment pursuant to Section 8.4(d), and such Value is determined by an independent, nationally recognized investment banking, accounting or other appraisal firm pursuant to Section 8.4(d), then the General Partner shall, subject to the last sentence of this Section 13.2(c), instead have one hundred twenty (120) days after such determination to make such contribution.

(d)   Guarantee of Clawback.  Subject to the last sentence of this Section 13.2(d), the General Partner shall cause each natural person who receives a portion of the GP Carry from the General Partner or its Affiliates to, as a condition of such natural person's receipt of such portion of the GP Carry, execute and deliver a guarantee substantially similar in form and substance in all material respects to the form of guarantee attached as Exhibit I hereto.  In addition, subject to the last sentence of this Section 13.2(d), if the guarantees executed pursuant

to the first sentence of this Section 13.2(d) cover, in the aggregate, less than 100% of the General Partner's obligations under Sections 13.2(b) and 13.2(c), then the General Partner shall cause one or more Persons to execute and deliver a guarantee, substantially similar in form and substance in all material respects to the form of guarantee attached as Exhibit II hereto, to the extent necessary to cover the deficiency.  Notwithstanding anything herein to the contrary, the General Partner shall not be required to cause any Person to guarantee the General Partner's obligations under Section 13.2(b) and 13.2(c) with respect to any portion of the GP Carry that the General Partner elects to retain in reserve (in lieu of distributing such portion to the General Partner), in an escrow account in the name of the Partnership, for purposes of satisfying the General Partner's potential obligations under Sections 13.2(b) and 13.2(c).

13.3    Distributions in Cash or in Kind.  Upon the dissolution of the Partnership, the General Partner (or, upon the election of 85% in Interest, a liquidating trustee of the Partnership or other representative designated by 85% in Interest) shall use its commercially reasonable efforts to liquidate all of the Partnership assets in an orderly manner and apply the proceeds of such liquidation as set forth in Section 13.2(a), provided that if in the good faith business judgment of the General Partner (or such liquidating trustee or other representative) a Partnership asset should not be liquidated, the General Partner (or such liquidating trustee or other representative) shall allocate, on the basis of the Value of any Partnership assets not sold or otherwise disposed of, any unrealized gain or loss based on such Value to the Partners' Capital Accounts as though the assets in question had been sold on the date of distribution and, after giving effect to any such adjustment, distribute said assets in accordance with Section 13.2(a), subject to the priorities set forth in Section 13.2(a), and provided further that the General Partner (or such liquidating trustee or other representative) will in good faith attempt to liquidate sufficient Partnership assets to satisfy in cash (or make reasonable provision for) the debts and liabilities referred to in Section 13.2(a)(i).

13.4    Time for Liquidation, etc.  A reasonable time period shall be allowed for the orderly winding up and liquidation of the assets of the Partnership and the discharge of liabilities to creditors so as to enable the General Partner to seek to minimize potential losses upon such liquidation.  The provisions of this Agreement shall remain in full force and effect during the period of winding up and until the filing of a certificate of cancellation of the Partnership with the Secretary of State.

13.5    Termination.  Upon completion of the foregoing, the General Partner (or any duly elected liquidating trustee or other duly designated representative) shall execute, acknowledge and cause to be filed a certificate of cancellation of the Certificate with the Secretary of State, provided that the winding up of the Partnership will not be deemed complete and such certificate of cancellation will not be filed by the General Partner (or such liquidating trustee or other representative) prior to the second anniversary of the last day of the Term unless otherwise required by law.

13.6    General Partner Not Liable for Return of Capital Contributions.  Except as provided in Sections 13.2(b) and 13.2(c), none of the General Partner or any of its Affiliates shall be liable for the return of the Capital Contributions of any Partner, and such return shall be made solely from available Partnership assets, if any, and each Limited Partner hereby waives any and all claims it may have against the General Partner or any Affiliate thereof in this regard; provided

that, for the avoidance of doubt, the foregoing waiver is not intended to operate as a waiver of damage claims any Limited Partner may have against the General Partner.

ARTICLE XIV

DEFINITIONS

14.1   Definitions.  As used herein the following terms have the meaning set forth below:

"Act" shall mean the Delaware Revised Uniform Limited Partnership Act, 6 Del. C. § 17-101 et seq., as amended, and any successor to such statute.

"Additional Limited Partner" shall have the meaning set forth in Section 11.2(a).

"Adjustment Date" shall mean the last day of each Fiscal Year or any other date determined by the General Partner, in its sole discretion, as appropriate for an interim closing of the Partnership's books.

"Advisers Act" shall mean the Investment Advisers Act of 1940, as amended, and the rules and regulations of the Securities and Exchange Commission promulgated thereunder.

"Advisory Board" shall have the meaning set forth in Section 9.4.

"Advisory Board Representatives" shall have the meaning set forth in the definition of Covered Person.

"Affiliate" shall mean, with respect to any specified Person, a Person (other than a mere agent or independent contractor) who directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, the Person specified; provided that (a) Portfolio Companies shall not be deemed to be "Affiliates" of the Manager, the General Partner, the Partnership, the Parallel Funds, the Principal, any Dedicated Investment Professionals or any of their respective Affiliates, (b) CalPERS shall not be deemed to be an "Affiliate" of the Manager, the General Partner, the Partnership, the Parallel Funds, the Principal, any Dedicated Investment Professional or any of their respective Affiliates, (c) the Principal shall be deemed to be an "Affiliate" (i) of the Manager for so long as he controls the Manager and (ii) of the General Partner for so long as he controls the General Partner, and (d) each Dedicated Investment Professional (for so long as such Person is a Dedicated Investment Professional) shall be deemed to be an Affiliate of the General Partner.  For the avoidance of doubt, no Person shall be deemed to be an "Affiliate" of the Manager, the General Partner, the Partnership, the Parallel Funds, the Principal, any Dedicated Investment Professional or any of their respective Affiliates by virtue of being a member of the Advisory Board or the Council of Advisors.

"Affiliated Limited Partner" shall mean any Limited Partner that is an Affiliate of the General Partner or the Manager.

"Affiliated Parallel Fund Investor" shall mean any Parallel Fund Investor that is an Affiliate of the General Partner or the Manager.

"Agent" shall have the meaning set forth in Section 2.5(b).

"Agreement" shall have the meaning set forth in the preamble hereto.

"Alien" shall mean (a) a citizen of a country other than the United States (a "Foreign Citizen"), (b) an entity organized under the laws of a jurisdiction other than those of the United States or any state, territory or possession of the United States (a "Foreign Entity"), (c) an entity of which any officer or more than one-fourth of the directors are Foreign Citizens (a "Foreign-Controlled Entity"), (d) a government other than the government of the United States or of any state, territory or possession of the United States (a "Foreign Government"), (e) a corporation of which, in the aggregate, more than one-fourth of the capital stock is owned of record or voted by Foreign Citizens, Foreign Entities, Foreign-Controlled Entities, Foreign Corporations (as defined herein) or Foreign Partnerships (a "Foreign Corporation"), (f) a general or limited partnership of which any general or limited partner is a Foreign Citizen, Foreign Entity, Foreign-Controlled Entity, Foreign Government, Foreign Corporation or Foreign Partnership (a "Foreign Partnership"), or (g) a representative of, or entity controlled by, any of the foregoing.

"Alternative Vehicle" shall have the meaning set forth in Section 4.8.

"Applicable Tax Rate" shall mean, with respect to any Person, the highest effective marginal combined federal, state and local tax rate generally applicable to such Person (taking into account the character of the income (e.g., ordinary vs. capital gains, short-term capital gains vs. long-term capital gains, special rates that may apply for longer holding periods, ordinary dividend income subject to capital gains rates), the deductibility of state and local income taxes, and loss carry forwards).

"Available Assets" shall mean as of any date, the excess of the cash, cash equivalent items and Temporary Investments held by the Partnership over the sum of the amount of such items determined by the General Partner to be reasonably necessary for the payment of the Partnership's expenses, liabilities and other obligations (whether fixed or contingent), and for the establishment of appropriate reserves for such expenses, liabilities and obligations as may arise, including the maintenance of adequate working capital for the continued conduct of the Partnership's business.

"Bridge Financing" shall mean any financing transaction involving debt or equity securities (including a loan guarantee) entered into between the Partnership and any Person that is intended to facilitate the consummation of a Portfolio Investment, or to enhance or protect any existing Portfolio Investment, and is intended at the time it is made to be repaid within three hundred sixty-five (365) days.

"Business Day" shall mean any day on which banks located in Los Angeles, California, are not required or authorized by law to remain closed.

"CalPERS" shall mean the California Public Employees' Retirement System, an agency of the State of California.

"Capital Account" shall have the meaning set forth in Section 6.1.

"Capital Commitment" shall mean, with respect to any Partner, the amount set forth opposite the name of such Partner on Schedule A hereto.

"Capital Contribution" shall mean, with respect to any Partner, the amount of capital contributed pursuant to a single Drawdown or the aggregate amount of such contributions made, as the context may require, by such Partner to the Partnership pursuant to Section 5.1 and the other provisions of this Agreement.

"Certificate" shall have the meaning set forth in Section 1.4.

"Claims" shall have the meaning set forth in Section 10.1.

"Closing" shall mean a closing of a sale to a Partner, and the subscription for and purchase by a Limited Partner, of a limited partner interest in the Partnership.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Co-Investment Percentage" shall mean (a) with respect to the 2004 calendar year, a percentage specified in writing by the General Partner to the Limited Partners prior to the Partnership's first Portfolio Investment, and (b) with respect to any calendar year thereafter, a percentage specified in writing by the General Partner to the Limited Partners on or prior to December 31 of the preceding calendar year.  In the event that no percentage is specified as the Co-Investment Percentage pursuant to the preceding sentence for any calendar year, then the Co-Investment Percentage for such calendar year shall be equal to zero.  Notwithstanding anything in this Agreement to the contrary, the Co-Investment Percentage shall not exceed 5%.

"Commitment Period" shall mean the period commencing on the Initial Closing and ending on the earliest to occur of (a) October 1, 2009, (b) the first date on which all Remaining Capital Commitments (net of amounts reserved by the General Partner for payment of Partnership Expenses throughout the Term, funding of Follow-On Investments and funding of any written commitments of the Partnership) are zero, (c) the date of any termination of the Commitment Period pursuant to Section 4.6, and (d) the date on which the General Partner receives written notice from the Limited Partners of a decision to terminate the Commitment Period made by 85% in Combined Interest.

"Communications Act" shall mean the Communications Act of 1934, as amended, or any successor statute thereto.

"Competing Fund" shall have the meaning set forth in Section 2.4(a).

"Council of Advisors" shall have the meaning set forth in Section 4.9.

"Covered Person" shall mean the General Partner, the Manager, and each of their respective Affiliates; and each of the shareholders, officers, directors, employees, partners, members and managers of any of the General Partner, the Manager and each of their respective Affiliates; and agents of any of the General Partner, the Manager and each of their respective Affiliates; and each Person serving, or who has served, as a member of the Advisory Board and, with respect to such service, the Limited Partner such Person represents and each of such Limited Partner's officers, directors, employees, partners, members, managers and agents (collectively, "Advisory Board Representatives"); and each Person serving, or who has served, on the Council of Advisors; provided that Covered Persons do not include Parallel Funds, Permitted Funds, and Portfolio Companies.

"Damages" shall have the meaning set forth in Section 10.1.

"Dedicated Investment Professionals" shall mean those individuals (other than the Principal) designated by the General Partner, from time to time, as members of the Partnership's investment management team; provided that the General Partner shall have consulted with the Advisory Board in advance prior to the designation of each such individual as a Dedicated Investment Professional and the Advisory Board shall not have disapproved of the designation of such individual as a Dedicated Investment Professional during such consultation (such disapproval to be exercised subject to the Advisory Board's reasonable discretion); provided further that any such individual shall cease to be a Dedicated Investment Professional upon the earlier of (a) such time as such individual shall have ceased to have any material responsibilities with respect to the Partnership or (b) notice by the General Partner to the Advisory Board of the General Partner's revocation of such individual's designation as a Dedicated Investment Professional.

"Default" shall have the meaning set forth in Section 5.5(a).

"Defaulted Capital Commitments" shall have the meaning set forth in Section 5.5(a).

"Defaulting Limited Partner" shall have the meaning set forth in Section 5.5(a).

"Directors' Fees" shall mean the sum of all directors' fees, including the Value of any options, warrants, and other non-cash compensation, paid by Portfolio Companies to Dedicated Investment Professionals and other employees of the Manager or its Affiliates for their service as members of the Boards of Directors of such Portfolio Companies, in each case only to the extent any such fees are actually received by such employees and related exclusively to the performance of services in connection with the Partnership; provided that the Value of options and warrants that constitute Directors Fees shall be determined in accordance with Section 8.4(e).  For the avoidance of doubt, Directors' Fees excludes (a) any Fee Income, (b) any compensation granted or paid to any member of the Council of Advisors, (c) salary, stock options or other compensation granted or paid by Portfolio Companies to Dedicated Investment Professionals and other employees

of the Manager or its Affiliates who are seconded to serve in bona fide management capacities as officers of Portfolio Companies, regardless of whether such Person is also a director of any Portfolio Company, (<u>d</u>) options, warrants and other Securities acquired by or granted to the Partnership in connection with any Portfolio Investment, and (<u>e</u>) options, warrants and other Securities acquired by or granted to any Dedicated Investment Professional or other employee of the Manager or its Affiliates in connection with a bona fide investment by such Dedicated Investment Professional or other employee in a Portfolio Company.

"<u>Disabling Conduct</u>" shall mean, with respect to any Person, (<u>a</u>) any breach of this Agreement having a Material Adverse Effect that has not been cured within a reasonable time after receipt of written notice from the party claiming breach, (<u>b</u>) fraud, (<u>c</u>) willful malfeasance, (<u>d</u>) a violation of law having a Material Adverse Effect (unless the Person had no reasonable cause to believe such conduct was unlawful), (<u>e</u>) gross negligence, (<u>f</u>) a felony (other than a motor vehicle related felony for which no custodial penalty is actually imposed) of which such Person has been convicted or to which such Person has pled guilty or no contest, or (<u>g</u>) subject to the provisions of this Agreement (including Section 2.5), breach of fiduciary duty to the Partnership.

"<u>Distributable Cash</u>" shall mean the excess of (<u>a</u>) the sum of cash receipts of all kinds, other than Capital Contributions that are being held by the Partnership pending investment, over (<u>b</u>) cash disbursements for expenses of the Partnership (or amounts reserved against liabilities, contingent or otherwise, or other obligations of the Partnership to pay Partnership Expenses or to pay Organizational Expenses). Distributable Cash shall be distributed in accordance with Article VI and shall not be reinvested in a Portfolio Company.

"<u>DOL</u>" shall mean the United States Department of Labor.

"<u>DOL Regulations</u>" shall have the meaning set forth in Section 4.3.

"<u>Drawdown Notice</u>" shall have the meaning set forth in Section 5.1(b).

"<u>Drawdowns</u>" shall mean the Capital Contributions made to the Partnership pursuant to Section 5.1 from time to time by the Partners pursuant to a Drawdown Notice.

"<u>ERISA</u>" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"<u>ERISA Event</u>" shall have the meaning set forth in Section 11.3(a).

"<u>ERISA Limited Partner</u>" shall mean a Limited Partner that is an employee benefit plan subject to the fiduciary responsibility provisions of part 4 of Title I of ERISA.

"<u>Excess Organizational Expenses</u>" shall mean all costs and expenses of the Partnership that are incurred in the formation and organization of, and sale of interests in,

the Partnership, including legal, accounting, printing, consultation, travel, administrative and filing fees and expenses, less any amounts constituting Organizational Expenses.

"Excused Investment" shall have the meaning set forth in Section 5.4(a).

"Excused Limited Partner" shall mean, with respect to any Portfolio Investment, any Limited Partner that, pursuant to Section 5.4, is excused from making a Capital Contribution in respect thereof.

"FCC" shall mean the Federal Communications Commission, or any governmental entity which succeeds to the powers and functions thereof.

"FCC Insulation Policies" shall have the meaning set forth in Section 6.7.

"Fee Income" shall mean the sum of the excess of (a) the sum of all transaction fees, investment banking fees, break-up fees, advisory fees, consulting fees, management fees (other than the Management Fee), monitoring fees or other similar fees, in each case only to the extent any such fees are actually received by the General Partner, the Manager or any of their respective Affiliates and, in each case, related exclusively to the performance of services in connection with the Partnership, over (b) any unreimbursed expenses (other than costs and expenses described in clause (a) of the definition of "Manager Expenses") incurred by the Manager, the General Partner or any of their respective Affiliates or the Partnership, in each case, in connection with investigating investment opportunities in portfolio investment transactions that are not consummated or in connection with any Portfolio Investment. For the avoidance of doubt, Fee Income excludes (w) any Directors' Fees, (x) any salary, bonuses or other compensation granted or paid by the Manager, the General Partner or their respective Affiliates to a Dedicated Investment Professional in connection with such Dedicated Investment Professional's employment with such Person or the provision of services by such Dedicated Investment Professional in connection with the Partnership, (y) any compensation granted or paid to any member of the Council of Advisors and (z) any salary, stock options or other compensation granted or paid by Portfolio Companies to Dedicated Investment Professionals and other employees of the Manager or its Affiliates who are seconded to serve in bona fide management capacities as officers of Portfolio Companies, regardless of whether such Person is also a director of any Portfolio Company. The General Partner shall use reasonable efforts to use the fees described in clause (a) above to reimburse the unreimbursed expenses described in clause (b) above in order to minimize the need to use Capital Contributions to reimburse such expenses.

"Fee Percentage" shall mean the weighted average of (a) two percent (2.00%) per annum for the first five hundred million dollars ($500,000,000) of aggregate Capital Commitments, (b) one and one-half percent (1.50%) per annum for the second five hundred million dollars ($500,000,000) of aggregate Capital Commitments, and (c) one and three-quarters percent (1.75%) per annum for any portions of aggregate Capital Commitments in excess of one billion dollars ($1,000,000,000).

"Final Closing Date" shall mean the earlier of (a) the later of (i) the date on which the last Limited Partner is admitted to the Partnership or (ii) the date on which the last Parallel Fund Investor is admitted to the applicable Parallel Fund and (b) the Outside Admission Date.

"Fiscal Year" shall mean the fiscal year of the Partnership, as determined pursuant to Section 1.5.

"Follow-On Investment" shall mean Securities of a Portfolio Company or a company whose business is complementary to that of (and under post-investment common management with) a Portfolio Company in which, in the sole judgment of the General Partner, it is appropriate or necessary for the Partnership to invest, for the purpose of preserving, protecting or enhancing the Partnership's prior investment in such Portfolio Company.

"Foreign Citizen" shall have the meaning set forth in the definition of Alien.

"Foreign-Controlled Entity" shall have the meaning set forth in the definition of Alien.

"Foreign Corporation" shall have the meaning set forth in the definition of Alien.

"Foreign Entity" shall have the meaning set forth in the definition of Alien.

"Foreign Government" shall have the meaning set forth in the definition of Alien.

"Foreign Partnership" shall have the meaning set forth in the definition of Alien.

"Forfeited Distributions" shall have the meaning set forth in Section 5.5(a).

"General Partner" shall mean Yucaipa American Alliance Fund I, LLC, a Delaware limited liability company and any additional or successor general partner of the Partnership in its capacity as the general partner of the Partnership.

"GP Carry" shall have the meaning set forth in Section 13.2(b).

"Gross Asset Value" shall mean, with respect to any Partnership asset, the asset's adjusted basis for federal income tax purposes, except that the Gross Asset Value of all Partnership assets may be adjusted to equal their respective fair market values (as determined by the General Partner), in accordance with the rules set forth in Treasury Regulations § 1.704-1(b)(2)(iv)(f), immediately prior to (i) the date of the acquisition of any additional Partnership interest by any new or existing Partner in exchange for more than a de minimis Capital Contribution or (ii) the date of distribution of more than a de minimis amount of Partnership property (other than a pro rata distribution) to a Partner, provided that adjustments pursuant to clause (i) or (ii) above shall be made only if the General Partner determines in its sole discretion that such adjustments are necessary or appropriate to reflect the relative economic interests of the Partners.  The Gross Asset Value of any Partnership asset distributed to any Partner shall be adjusted immediately

prior to such distribution to equal its fair market value, as reasonably determined by the General Partner.  In the case of any asset that has a Gross Asset Value that differs from its adjusted tax basis, Gross Asset Value shall be adjusted by the amount of depreciation calculated for purposes of the definition of Profits and Losses, rather than the amount of depreciation determined for federal income tax purposes.

"Independent Person" shall mean a Person who is not an Affiliate of the General Partner, the Manager or the Principal.

"Initial Closing" shall mean the first Closing under which Limited Partners have acquired limited partner interests in the Partnership pursuant to the Subscription Agreements.

"Initial Limited Partner" shall mean Robert P. Bermingham, a natural person, in his capacity as the initial limited partner of the Partnership.

"Initial YAAF Closing Date" shall mean June 17, 2002.

"Interim Clawback Obligation" shall have the meaning set forth in Section 13.2(c).

"Investigated Party" shall mean (x) any of the General Partner, the Manager, the Principal or any Dedicated Investment Professional, or (y) any other Covered Person to the extent such Covered Person is seeking advancement of expenses under Section 10.2(a) in connection with a Claim arising from an action brought by at least a Majority in Combined Interest against such Covered Person.

"Investment Company Act" shall mean the Investment Company Act of 1940, as amended, and the rules and regulations of the Securities and Exchange Commission promulgated thereunder.

"Limited Partner" shall have the meaning set forth in Section 1.1, and shall include its successors and permitted assigns.  For purposes of the Act, the Limited Partners shall constitute a single class or group of limited partners.

"Majority (or other specified percentage) in Combined Interest" shall mean Limited Partners (excluding Affiliated Limited Partners) and Parallel Fund Investors (excluding Affiliated Parallel Fund Investors) who, in the aggregate, at the time in question, have, respectively, Capital Commitments and Parallel Fund Commitments aggregating more than fifty percent (50%) (or such other specified percentage, as the case may be) of the sum of (x) all Capital Commitments of all the Non-Defaulting Limited Partners (excluding Affiliated Limited Partners), plus (y) all Parallel Fund Commitments of all non-defaulting Parallel Fund Investors (other than Affiliated Parallel Fund Investors).

"Majority (or other specified percentage) in Interest" shall mean Limited Partners (excluding Affiliated Limited Partners) who, at the time in question, have Capital Commitments aggregating more than fifty percent (50%) (or such other specified

percentage, as the case may be) of all Capital Commitments of all the Non-Defaulting Limited Partners (excluding Affiliated Limited Partners).

"Management Fee" shall have the meaning set forth in Section 7.2(a).

"Manager" shall mean Yucaipa Alliance Management, LLC, a Delaware limited liability company, and any successor thereto.

"Manager Expenses" shall mean the reasonable costs and expenses incurred by the Manager in providing for its or the General Partner's normal operating overhead, including salaries of the Manager's employees, and rent and other expenses incurred in maintaining the Manager's or the General Partner's principal place of business.

"Marketable Securities" shall mean Securities that are (a) tradable on a national securities exchange or (b) reportable through NASDAQ and in each case, that the General Partner determines, in its sole discretion, are transferable promptly after receipt by the Limited Partners without any restrictions that would be likely to prevent such transfer and are marketable at a price approximating their Value.

"Material Adverse Effect" shall mean a material adverse effect on the business, assets, properties, financial condition or results of operation of the Partnership.

"Materially Adverse Legal Impact" shall mean (a) a material violation of a statute, rule, regulation or governmental administrative policy applicable to a Partner of a federal, state or non-U.S. governmental authority, (b) an occurrence that is reasonably likely to subject a Portfolio Company or an Affiliate thereof or the Partnership, the General Partner, the Manager or any of their respective Affiliates or any Partner or any Affiliate of any such Partner or, with respect to an ERISA Limited Partner, the sponsor of such ERISA Limited Partner or any of such sponsor's Affiliates, to any material regulatory requirement to which it would not otherwise be subject, or which is reasonably likely to materially increase any such regulatory requirement beyond what it would otherwise have been, or (c) an occurrence that is reasonably likely to result in any Securities or other assets owned by the Partnership being deemed to be "plan assets" under ERISA or that is reasonably likely to result in a "prohibited transaction" under ERISA.

"Media Company" shall mean any Portfolio Company that, directly or indirectly, owns, controls or operates a broadcast radio or television station, a cable television system, a "daily newspaper" (as such term is defined in Section 73.3555 of the FCC's rules and regulations, as they may be amended from time to time), or any communications facility operated pursuant to a license granted by the FCC and subject to the provisions of Section 310(b) of the Communications Act or that engages in "personal communications services" as defined in 47 C.F.R. § 24.5.

"NASDAQ" shall have the meaning set forth in Section 8.4.

"Non-Defaulting Limited Partners" shall have the meaning set forth in Section 2.4(a).

69

"Nonrecourse Deductions" shall have the meaning set forth in Treasury Regulations § 1.704-2(b).  The amount of Partnership Nonrecourse Deductions for a Fiscal Year equals the net increase, if any, in the amount of Partnership Minimum Gain during that Fiscal Year, determined according to the provisions of Treasury Regulations § 1.704-2(c).

"Organizational Expenses" shall mean all reasonable costs and expenses, not to exceed one million two hundred fifty thousand dollars ($1,250,000), that are incurred (whether before or after the date hereof) in planning for, the formation and organization of, and sale of interests in, the Partnership and Parallel Funds, including out-of-pocket legal, accounting, printing, consultation, travel, administrative and filing fees and expenses, but excluding Placement Fees.

"Original Agreement" shall have the meaning set forth in the preamble hereto.

"Outside Admission Date" shall mean March 31, 2005.

"Parallel Fund" shall have the meaning set forth in Section 2.4(a).  For the avoidance of doubt, the Parallel Funds include YAAF.

"Parallel Fund Agreement" shall mean any limited partnership agreement, limited liability company agreement or other equivalent governing document of a Parallel Fund, including the limited partnership agreement of YAAF.

"Parallel Fund Commitments" shall mean the capital commitments of Parallel Fund Investors to the Parallel Funds, including the capital commitments of the limited partners of YAAF to YAAF.

"Parallel Fund Investor" shall mean any limited partner or non-managing member of, or other investor in, any Parallel Fund, including any limited partner of YAAF.

"Partner Nonrecourse Debt Minimum Gain" shall mean an amount with respect to each partner nonrecourse debt as defined in Treasury Regulations § 1.704-2(b)(4)) equal to the Partnership Minimum Gain that would result if such partner nonrecourse debt were treated as a nonrecourse liability (as defined in Treasury Regulations § 1.752-1(a)(2)) determined in accordance with Treasury Regulations § 1.704-2(i)(3).

"Partner Nonrecourse Deductions" shall have the meaning set forth in Treasury Regulations § 1.704-2(i)(2).

"Partners" shall mean the General Partner and the Limited Partners, including any Person hereafter admitted to the Partnership as a Limited Partner or a General Partner, as the case may be, in accordance with the terms hereof, and excluding any Person who ceases to be a Partner in accordance with the terms hereof.

"Partnership" shall have the meaning set forth in the preamble hereto.

"Partnership Expenses" shall mean the costs, expenses and liabilities that, in the good faith judgment of the General Partner, are incurred by or arise out of the operation of the Partnership, including: the Management Fee; the reasonable fees and expenses relating to Temporary Investments, Portfolio Investments or potential investments that are not consummated, including the investigation, evaluation, acquisition, holding and disposition thereof, to the extent that such fees and expenses are not reimbursed by a Portfolio Company or other third Person; reasonable premiums for insurance protecting the Partnership, the General Partner, the Manager, any of their respective Affiliates, members of the Advisory Board, members of the Council of Advisors, and any of their respective officers, directors, members, partners, employees and agents from liabilities to third Persons in connection with Partnership affairs; reasonable legal, custodial and accounting expenses (including expenses associated with the preparation of the Partnership's financial statements, tax returns and Schedules K-1); reasonable auditing expenses; reasonable consulting expenses for services different from the type, or beyond the level, ordinarily provided by managers of private equity funds of similar size and scope as the Partnership; reasonable appraisal expenses; reasonable expenses related to organizing companies through or in which Portfolio Investments will be made; reasonable reimbursement of the expenses of the Advisory Board and the Council of Advisors; costs and expenses that are classified as extraordinary expenses under generally accepted accounting principles; taxes or other governmental charges payable by the Partnership; Damages; reasonable costs of reporting to the Partners; costs of winding up and liquidating the Partnership; and reasonable expenses incurred pursuant to Section 5.5; but not including Organizational Expenses or Manager Expenses.

"Partnership Minimum Gain" shall have the meaning set forth in Treasury Regulations §§ 1.704-2(b)(2) and 1.704-2(d).

"Payment Date" shall have the meaning set forth in Section 7.2(a).

"Period" shall mean, for the first period, the period commencing on the date of this Agreement and ending on the next Adjustment Date.  All succeeding Periods shall commence on the day after an Adjustment Date and end on the next Adjustment Date.

"Permitted Activities" shall mean (a) investment and monitoring activities in connection with or relating to any Permitted Fund and any investment in which the Principal currently has or in the future will have a financial interest; (b) service by the Principal as a member of the board of directors, board of trustees, advisory board or similar governing body of any Person; (c) charitable, political and community activities; and (d) any other activity otherwise approved by the Advisory Board.

"Permitted Funds" shall mean (a) YCI, (b) YASSF, (c) YGPF, and (d) any Person, investment vehicle or activity (other than any Parallel Fund or private equity buyout fund with substantially similar investment objectives as those of the Partnership as set forth in Section 1.3(b)) sponsored, formed, organized, created or managed by YAF, Yucaipa, the Principal or any Affiliate of YAF, Yucaipa or the Principal.

"Person" shall mean any individual, entity, corporation, partnership, association, limited liability company, limited liability partnership, joint-stock company, trust or unincorporated organization.

"Placement Fees" shall mean the fees and any interest on deferred fees charged by, and expenses reimbursable to, any placement agent designated by the General Partner or the Partnership for the marketing and sale of limited partner interests in the Partnership.

"Portfolio Company" shall mean an entity in which a Portfolio Investment is made by the Partnership directly or through one or more intermediate entities of the Partnership.

"Portfolio Investment" shall mean any debt or equity (or debt with equity) investment (other than Temporary Investments, but including Bridge Financings) made by the Partnership.

"Prime Rate" shall mean the rate of interest publicly announced by JP Morgan Chase Bank from time to time in New York City as its prime rate.

"Principal" shall mean Ron Burkle.

"Proceeding" shall have the meaning set forth in Section 10.l(a).

"Profits" and "Losses" shall mean, for each Fiscal Year or other period, the taxable income or loss of the Partnership, or particular items thereof, determined in accordance with the accounting method used by the Partnership for federal income tax purposes with the following adjustments: (a) all items of income, gain, loss or deduction specially allocated pursuant to Section 6.10(b) shall not be taken into account in computing such taxable income or loss; (b) any income of the Partnership that is exempt from federal income taxation and not otherwise taken into account in computing Profits and Losses shall be added to such taxable income or loss; (c) if the Gross Asset Value of any asset differs from its adjusted tax basis for federal income tax purposes, any gain or loss resulting from a disposition of such asset shall be calculated with reference to such Gross Asset Value; (d) upon an adjustment to the Gross Asset Value of any asset (other than an adjustment in respect of depreciation) pursuant to the definition of Gross Asset Value, the amount of the adjustment shall be included as gain or loss in computing such taxable income or loss; (e) if the Gross Asset Value of any asset differs from its adjusted tax basis for federal income tax purposes, the amount of depreciation, amortization or cost recovery deductions with respect to such asset shall, for purposes of determining Profits and Losses, be an amount which bears the same ratio to such Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deductions bears to such adjusted tax basis (provided that if the federal income tax depreciation, amortization or other cost recovery deduction is zero, the General Partner may use any reasonable method for purposes of determining depreciation, amortization or other cost recovery deductions in calculating Profits and Losses); and (f) any expenditures of the Partnership not deductible in computing taxable income or loss, not properly capitalizable

and not otherwise taken into account in computing Profits and Losses pursuant to this definition shall be treated as deductible items.

"Public Limited Partner" shall mean a Limited Partner that is a governmental plan or a church plan within the meaning of Sections 3(32) and 3(33)(A), respectively, of ERISA.

"Remaining Capital Commitment" shall mean, in respect of any Partner, the amount of such Partner's Capital Commitment, determined at any date, which has not been contributed as a Capital Contribution, as adjusted as contemplated hereby (including pursuant to the last sentence of Section 5.3 and the fifth sentence of Section 11.2(b)), provided that if such date is after delivery of a Drawdown Notice but before the related Drawdown, the amount specified in such Drawdown Notice (as the same may be amended by a subsequent Drawdown Notice related thereto) shall not be included in any Partner's Remaining Capital Commitment unless such investment is abandoned or unless and to the extent that such investment by such Partner is an Excused Investment. Notwithstanding the foregoing, any distribution to a Partner (including any distribution relating to a Bridge Financing that is repaid, refinanced or sold to a third party within one year of such financing) during the first eighteen (18) months following the consummation of a Portfolio Investment not exceeding the aggregate of (a) the cost basis of such Portfolio Investment and (b) the Partnership Expenses attributable to such Portfolio Investment, shall be subject to recall by the General Partner for reinvestment.

"Retained Distributions" shall have the meaning set forth in Section 5.5(a).

"Runoff Activities" shall mean (a) holding and disposing of the investments of the Partnership, (b) making Temporary Investments and Follow-On Investments, (c) any investment with respect to which the Partnership has entered, prior to the termination or suspension of the Commitment Period, into a binding letter of intent or other binding written commitment to make such an investment, (d) issuing Drawdown Notices in respect of, and paying, Organizational Expenses and Partnership Expenses, (e) engaging in the other non-investment activities of the Partnership and (f) engaging in other activities necessary, advisable, convenient or incidental to the foregoing.

"Secretary of State" shall have the meaning set forth in Section 1.4.

"Securities" shall mean shares of capital stock, partnership interests, limited liability company interests, warrants, options, bonds, notes, debentures and other equity and debt securities, interests and obligations of whatever kind of any Person, whether readily marketable or not.

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations of the Securities and Exchange Commission promulgated thereunder.

"Sharing Percentage" shall mean with respect to any Partner and any Portfolio Investment, a fraction, expressed as a percentage, the numerator of which is the aggregate amount of the Capital Contributions of such Partner used to fund the cost of such Portfolio Investment and the denominator of which is the aggregate amount of the Capital

Contributions of all of the Partners used to fund the cost of such Portfolio Investment, taking into account the payments, if any, by Additional Limited Partners pursuant to Section 11.2 attributable to such Portfolio Investment.

"Subscription Agreements" shall mean the several Subscription Agreements entered into by the respective Limited Partners in connection with their purchases of limited partner interests in the Partnership.

"Substitute Limited Partner" shall have the meaning set forth in Section 11.1(d).

"Suspension Date" shall have the meaning set forth in Section 4.6(a).

"Suspension Event" shall have the meaning set forth in Section 4.6(a).

"Temporary Investments" shall mean investments in (a) cash or cash equivalents, (b) marketable direct obligations issued or unconditionally guaranteed by the United States of America, or issued by any agency thereof, maturing within one year from the date of acquisition thereof, (c) money market instruments, commercial paper or other short-term debt obligations having at the date of purchase by the Partnership the highest or second highest rating obtainable from either Standard & Poor's Ratings Services or Moody's Investors Service, Inc. or their successors, (d) interest bearing accounts at a registered broker-dealer, (e) money market mutual funds, (f) certificates of deposit maturing within one year from the date of acquisition thereof issued by commercial banks incorporated under the laws of the United States of America or any state thereof or the District of Columbia, each having at the date of acquisition by the Partnership combined capital and surplus of not less than one hundred million dollars ($100,000,000), (g) overnight repurchase agreements with primary Fed dealers collateralized by direct U.S. government obligations or (h) pooled investment vehicles or accounts which invest only in Securities or instruments of the type described in (a) through (g).

"Term" shall have the meaning set forth in Section 1.4.

"Transfer" shall have the meaning set forth in Section 11.1(a).

"Transferee" shall have the meaning set forth in Section 11.1(b)(i).

"Transferring Limited Partner" shall have the meaning set forth in Section 11.1(b)(i).

"Treasury Regulations" shall mean the Regulations of the Treasury Department of the United States issued pursuant to the Code.

"Unrealized Loss" shall mean with respect to any Portfolio Investment the excess, if any, of the aggregate Capital Contributions of the Partners used to fund the cost of such Portfolio Investment over the carrying value of such Portfolio Investment, provided that "carrying value" for such purpose shall mean, with respect to any Portfolio Investment, the cost thereof, provided further that if the General Partner shall determine in good faith

that any Portfolio Investment has suffered a significant and permanent impairment in value, the General Partner shall write down the carrying value thereof to its then fair market value, and provided further that if the General Partner shall subsequently determine that, due to changed circumstances, the value of such Portfolio Investment has increased, then the General Partner may write up the carrying value thereof to its then fair market value, but not above its acquisition cost.

"Value" shall mean, with respect to any Securities or other assets owned (directly or indirectly) by the Partnership at any time, or interests in the Partnership, the fair market value of such Securities or other assets or interests, determined as provided in Section 8.4 and/or 11.3(b) and/or 11.3(c), as applicable.

"VCOC" shall have the meaning set forth in Section 4.3.

"YAAF" shall mean Yucaipa American Alliance Fund I, LP, a Delaware limited partnership.

"YAF" shall mean Yucaipa American Funds, LLC, a Delaware limited liability company.

"YASSF" shall mean Yucaipa Special Situations Fund I, L.P, a Delaware limited partnership, any parallel funds thereof, any successor funds thereto, and any parallel funds of such successor funds.

"YCI" shall mean Yucaipa Corporate Initiatives Fund I, L.P., a Delaware limited partnership, any parallel funds thereof, any successor funds thereto, and any parallel funds of such successor funds.

"YGPF" shall mean Yucaipa Global Partnership Fund, L.P., a Cayman Islands exempted limited partnership, any parallel funds thereof, any successor funds thereto, and any parallel funds of such successor funds.

"Yucaipa" shall mean Yucaipa American Management, LLC, a Delaware limited liability company.

"Yucaipa Co-Investors" shall mean Yucaipa, Affiliates of Yucaipa (including Affiliated Limited Partners) and partners, members, directors, officers, stockholders or employees of Yucaipa and such Affiliates that, in each case, are designated by Yucaipa to make co-investments allocated to Yucaipa pursuant to Section 4.7(b), including any investment partnership or other vehicle organized to facilitate the making of such co-investments.

14.2    Interpretation.  Unless the context clearly indicates otherwise: (a) each definition herein includes the singular and the plural; (b) each reference herein to any gender includes the masculine, feminine, and neuter where appropriate; (c) the word "including" when used herein means "including, but not limited to," and the word "include" when used herein means "include, without limitation"; (d) references herein to specified article or section numbers refer to the specified article or section of this Agreement; and (e) references herein to schedules

and exhibits refer to the schedules and exhibits to this Agreement.  The words "hereof," "herein," "hereto," "hereby," "hereunder," and derivative or similar words refer to this Agreement as a whole and not to any particular provision of this Agreement.  The words "applicable law" and any other similar references to the law include all applicable statutes, laws (including common law), treaties, orders, rules, regulations, determinations, orders, judgments, and decrees of any national, federal, state, county, municipal, local or other government, governmental, regulatory, self-regulatory or administrative authority, agency or commission, or any court, tribunal or judicial or arbitral body, whether domestic or foreign.  For purposes of Section 13.2, references to "direct or indirect member" means, with respect to any Person, any other Person who holds an equity ownership interest in such first Person.

ARTICLE XV

AMENDMENTS; POWER OF ATTORNEY

15.1   <u>Amendments</u>.  Any modifications or amendments duly adopted in accordance with the terms of this Agreement may be executed in accordance with Section 15.2.  The terms and provisions of this Agreement may be modified or amended at any time and from time to time with the written consent of (<u>a</u>) the General Partner and (<u>b</u>) 66⅔% in Interest; <u>provided</u> that, without the consent of any of the Limited Partners, the General Partner:

(i)      may amend <u>Schedule A</u> hereto to reflect changes validly made, pursuant to the terms of this Agreement, in the amount of (and the obligation to fund the full amount of) the Capital Commitment of any Partner or in the membership of the Partnership;

(ii)      may enter into agreements with Persons who are Transferees of the interests in the Partnership of Limited Partners, pursuant to the terms of this Agreement, providing in substance that such Transferees will be bound by this Agreement and will become Substitute Limited Partners in the Partnership;

(iii)      may amend this Agreement as may be required to implement (<u>A</u>) Transfers of interests of Limited Partners as contemplated by Section 11.1, (<u>B</u>) the admission of any Substitute Limited Partner or any Additional Limited Partner, and any related changes in Capital Commitments, as contemplated by Section 11.1, 11.2 or 11.3 or (<u>C</u>) any changes in <u>Schedule A</u> hereto due to a Defaulting Limited Partner;

(iv)      may amend this Agreement (<u>A</u>) to satisfy any requirements, conditions, guidelines or opinions contained in any opinion, directive, order, ruling or regulation of the Securities and Exchange Commission, the Internal Revenue Service or any other United States federal or state agency, or in any United States federal or state statute, compliance with which the General Partner deems to be in the best interests of the Partnership, or (<u>B</u>) to change the name of the Partnership, so long as such amendment under this clause (iv) does not adversely affect the interests of the Limited Partners under this Agreement; and

76

(v)      may amend this Agreement in accordance with Section 2.6;

and provided further that, notwithstanding the foregoing, no amendment of this Agreement shall

(1)      increase any financial obligation or liability of a Limited Partner beyond that set forth herein or permitted hereby without the written consent of such Limited Partner;

(2)      materially and adversely affect the rights of a Limited Partner in a manner which discriminates against such Limited Partner vis-à-vis other Limited Partners without the written consent of such Limited Partner;

(3)      change the definition of "ERISA Limited Partner" in Section 14.1 or modify or amend Section 4.3, 5.4 or 11.3, without the written consent of non-defaulting ERISA Limited Partners having Capital Commitments aggregating more than 66⅔% of the Capital Commitments of all non-defaulting ERISA Limited Partners;

(4)      change the definition of "Public Limited Partner" in Section 14.1 or modify or amend Section 4.3, 5.4 or 11.3, without the written consent of non-defaulting Public Limited Partners having Capital Commitments aggregating more than 66⅔% of the Capital Commitments of all non-defaulting Public Limited Partners;

(5)      modify or amend the provisions of Article VI in a manner that would alter the amount or timing of distributions, or amount of allocation of income, without the written consent of 66⅔% in Interest;

(6)      modify or amend any section hereof calling for the consent, vote or approval of a specified percentage in Interest (or Combined Interest), without the written consent of such percentage in Interest (or Combined Interest), of the Limited Partners (or of the Limited Partners and the Parallel Fund Investors) to the modification or amendment of such Section; or

(7)      change the provisions of this Article XV without the consent of each Limited Partner.

Promptly after any modification or amendment to this Agreement pursuant to the terms hereof, including any revision or update to Schedule A pursuant to the terms hereof, the General Partner shall provide each Limited Partner with a copy of such modification or amendment (including a copy of a revised Schedule A to the extent of any revisions or updates thereto).

15.2   Power of Attorney.  Each Limited Partner does hereby irrevocably constitute and appoint the General Partner, or the successor thereof as general partner of the Partnership, with full power of substitution, the true and lawful attorney-in-fact and agent of such Partner, to execute, acknowledge, verify, swear to, deliver, record and file, in its or its assignee's name, place and stead, all instruments, documents and certificates which may from time to time be required by the laws of the United States of America, the State of Delaware, the State of

California, any other jurisdiction in which the Partnership conducts or plans to conduct business, or any political subdivision or agency thereof, to effectuate, implement and continue the valid existence and business of the Partnership, including the power and authority to execute, verify, swear to, acknowledge, deliver, record and file:

(a)　all certificates and other instruments, including any amendments to this Agreement or to the Certificate, which the General Partner reasonably deems appropriate to (i) form, qualify or continue the Partnership as a limited partnership (or other partnership in which the limited partners have limited liability) in the State of Delaware and all other jurisdictions in which the Partnership conducts or plans to conduct business and (ii) admit such Person as a Limited Partner in the Partnership;

(b)　all instruments which the General Partner reasonably deems appropriate to reflect any amendment to this Agreement or the Certificate (i) to satisfy any requirements, conditions, guidelines or opinions contained in any opinion, directive, order, ruling or regulation of the Securities and Exchange Commission, the Internal Revenue Service, or any other United States federal or state or non-U.S. governmental agency, or in any United States federal or state or non-U.S. statute, compliance with which the General Partner deems to be in the best interests of the Partnership, and (ii) to change the name of the Partnership;

(c)　all conveyances and other instruments which the General Partner deems appropriate to reflect and effect the dissolution, winding up and termination of the Partnership pursuant to the terms of this Agreement, including the filing of a certificate of cancellation as provided for in Article XIII;

(d)　all instruments relating to (i) Transfers of interests in the Partnership, or the admission of Substitute Limited Partners or Additional Limited Partners pursuant to Sections 11.1 and 11.2, (ii) the treatment of a Defaulting Limited Partner, an Excused Limited Partner, or a Limited Partner whose participation in an investment is excused, limited or discontinued pursuant to Section 5.4 or 11.3, or (iii) any change in the Capital Commitment of any Limited Partner, all in accordance with the terms of this Agreement;

(e)　all amendments to this Agreement duly approved and adopted in accordance with Section 15.1;

(f)　certificates of assumed name and such other certificates and instruments as may be necessary under the fictitious or assumed name statutes from time to time in effect in all jurisdictions in which the Partnership conducts or plans to conduct business; and

(g)　any other instruments determined by the General Partner to be necessary or appropriate in connection with the proper conduct of the business of the Partnership and which do not adversely affect the interests of the Limited Partners.

Such attorney-in-fact and agent shall not, however, have the right, power or authority to amend or modify this Agreement when acting in such capacities, except to the extent authorized herein. This power of attorney shall not be affected by the subsequent disability or incompetence of the principal.  This power of attorney shall be deemed to be coupled with an interest, shall be irrevocable, shall survive and not be affected by the dissolution, bankruptcy or legal disability of

any Limited Partner and shall extend to such Limited Partner's successors and assigns, except as otherwise provided in Section 2.6(h).  This power of attorney may be exercised by such attorney-in-fact and agent for all Limited Partners (or any of them) by a single signature of the General Partner acting as attorney-in-fact with or without listing all of the Limited Partners executing an instrument.  Any person dealing with the Partnership may conclusively presume and rely upon the fact that any instrument referred to above, executed by such attorney-in-fact and agent, is authorized, regular and binding, without further inquiry.  If required, each Limited Partner shall execute and deliver to the General Partner, within five (5) Business Days after receipt of a request therefor, such further designations, powers of attorney or other instruments as the General Partner shall reasonably deem necessary for the purposes hereof consistent with the provisions of this Agreement.

        15.3    <u>Further Actions of the Limited Partners</u>.  Each Limited Partner shall execute and deliver such other certificates, agreements and documents, and take such other actions, as may reasonably be requested by the General Partner in connection with the formation of the Partnership and the achievement of its purposes and consistent with the terms and provisions of this Agreement, to the extent the General Partner deems necessary or appropriate to form, qualify or continue the Partnership as a limited partnership in all jurisdictions in which the Partnership conducts or plans to conduct business.

ARTICLE XVI

MISCELLANEOUS

        16.1    <u>Notices</u>.  Each notice relating to this Agreement shall be in writing and shall be delivered (<u>a</u>) in person, by registered or certified mail or by private courier or (<u>b</u>) by telecopy or other facsimile transmission, confirmed by telephone to an officer or other representative of the recipient.  All notices to any Partner shall be addressed to such Partner and its trustee (if any) at their respective addresses set forth on <u>Schedule A</u> hereto or at such other address as such Partner may have designated by notice in writing.  Any Partner, other than the General Partner, may designate a new address by notice to that effect given to the General Partner.  The General Partner may designate a new address by notice to that effect given to each of the other Partners.  Unless otherwise specifically provided in this Agreement, a notice given in accordance with clause (a) above shall be deemed to have been effectively given three (3) days after such notice is mailed by registered or certified mail, return receipt requested, and one day after such notice is mailed by Federal Express or other one-day service provider, to the proper address, or when delivered in person or by private courier.  Any notice to the General Partner or to a Limited Partner by telecopy or other facsimile transmission shall be deemed to be given when sent and confirmed by telephone in accordance with clause (b) above.

        16.2    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which taken together shall constitute a single agreement.

79

16.3    Table of Contents and Headings.  The table of contents and the headings of the sections of this Agreement are inserted for convenience only and shall not be deemed to constitute a part hereof.

16.4    Successors and Assigns.  This Agreement shall inure to the benefit of the Partners and the Covered Persons, and shall be binding upon the parties, and, subject to Section 11.1, their respective successors and permitted assigns.

16.5    Severability.  Every term and provision of this Agreement is intended to be severable.  If any term or provision hereof is illegal or invalid for any reason whatsoever, such term or provision will be enforced to the maximum extent permitted by law and, in any event, such illegality or invalidity shall not affect the validity of the remainder of this Agreement.

16.6    Non-Waiver.  No provision of this Agreement shall be deemed to have been waived except if the giving of such waiver is contained in a writing, and no such waiver shall be deemed to be a waiver of any other or further obligation or liability of the party or parties in whose favor the waiver was given.

16.7    Governing Law.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO SHALL BE INTERPRETED AND ENFORCED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED WHOLLY WITHIN THAT JURISDICTION.

16.8    Confidentiality.  Each Limited Partner agrees that it shall not disclose without the prior consent of the General Partner (other than to such Limited Partner's employees, auditors or counsel) any information with respect to the Partnership or any Portfolio Company that is designated by the General Partner to such Limited Partner in writing as confidential, provided that a Limited Partner may disclose any such information (a) as has become generally available to the public, (b) as may be required or appropriate in any report, statement or testimony submitted to any municipal, state or national (including foreign) regulatory body having jurisdiction over such Limited Partner, or to the National Association of Insurance Commissioners or similar organizations and their successors, (c) as may be required or appropriate in response to any summons or subpoena or in connection with any litigation, (d) to the extent necessary in order to comply with any law, order, regulation, ruling or other governmental request applicable to such Limited Partner and (e) to its professional advisors, including for an ERISA Limited Partner such persons that are necessary for the proper administration of the ERISA plan.

16.9    Survival of Certain Provisions.  The obligations of each Partner pursuant to Section 6.12 and Article X shall survive the termination or expiration of this Agreement and the dissolution, winding up and termination of the Partnership.

16.10    Waiver of Partition.  Except as may otherwise be provided by law in connection with the dissolution and winding up of the Partnership, each Partner hereby irrevocably waives any and all rights that it may have to maintain an action for partition of any of the Partnership's property.

16.11   <u>Entire Agreement</u>.  This Agreement (including each schedule and exhibit hereto) and the Subscription Agreements constitute the entire agreement among the Partners and between the Partners with respect to the subject matter hereof, and supersede any prior agreement or understanding among them with respect to such subject matter.  The representations and warranties of the General Partner and the Limited Partners in, and the other provisions of, the Subscription Agreements shall survive the execution and delivery of this Agreement.  Notwithstanding the provisions of this Agreement, including Section 15.1, or of any Subscription Agreement, it is hereby acknowledged and agreed that the General Partner on its own behalf or on behalf of the Partnership without the approval of any Limited Partner or any other Person may enter into a side letter or similar agreement to or with a Limited Partner which has the effect of establishing rights under, or altering or supplementing the terms of, this Agreement or of any Subscription Agreement.  The parties hereto agree that any terms contained in a side letter or similar agreement to or with a Limited Partner shall govern with respect to such Limited Partner notwithstanding the provisions of this Agreement or of any Subscription Agreement.

16.12   <u>Partnership Advisors</u>.  The attorneys, accountants and other experts who perform services for the Partnership also perform services for the General Partner, the Manager and certain of their Affiliates.  This dual representation may continue.  The Limited Partners acknowledge that (<u>a</u>) these advisors are not representing the Limited Partners or any of them in connection with the Partnership or this Agreement, or any related matters, and (<u>b</u>) the continued representation of the Partnership, the General Partner, the Manager and certain Affiliates of the General Partner or the Manager by these advisors will not be deemed to be the representation by these advisors of any Limited Partner, notwithstanding any prior or current representation of any Limited Partner on other matters.  If any such advisor has a past or current representation of any Limited Partner on other matters, that Limited Partner, by execution hereof consents to such advisor's representation of the Partnership, the General Partner, the Manager and any Affiliates of the General Partner or the Manager.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]

1057503.4

IN WITNESS WHEREOF, the undersigned have duly executed this Amended and Restated Limited Partnership Agreement of Yucaipa American Alliance (Parallel) Fund I, LP as of the date first above written.

GENERAL PARTNER:

**YUCAIPA AMERICAN ALLIANCE FUND I, LLC**

By its Managing Member, YUCAIPA AMERICAN FUNDS, LLC

By its Managing Member, YUCAIPA AMERICAN MANAGEMENT, LLC

By: _____

Name:      Robert P. Bermingham

Title:      Vice President

LIMITED PARTNERS:

_____ *
[Type or Write Name of Limited Partner]

By: _____ *

Name:

Title:

---

\*      Executed by or on behalf of each of the Limited Partners listed on Schedule A hereto.

1057503

IN WITNESS WHEREOF, the undersigned have duly executed this Amended and Restated Limited Partnership Agreement of Yucaipa American Alliance (Parallel) Fund I, LP as of the date first above written.

GENERAL PARTNER:

**YUCAIPA AMERICAN ALLIANCE FUND I, LLC**

By its Managing Member, YUCAIPA AMERICAN FUNDS, LLC

By its Managing Member, YUCAIPA AMERICAN MANAGEMENT, LLC

By: _____

Name:   Robert P. Bermingham

Title:   Vice President

INITIAL LIMITED PARTNER:

ROBERT P. BERMINGHAM

_____

1057503

IN WITNESS WHEREOF, the undersigned have duly executed this Amended and Restated Limited Partnership Agreement of Yucaipa American Alliance (Parallel) Fund I, LP as of the date first above written.

GENERAL PARTNER:

YUCAIPA AMERICAN ALLIANCE FUND I, LLC

By its Managing Member, YUCAIPA AMERICAN FUNDS, LLC

By its Managing Member, YUCAIPA AMERICAN MANAGEMENT, LLC

By: _____
Name:    Robert P. Bermingham
Title:    Vice President


LIMITED PARTNERS:

UNITE TEXTILE WORKERS PENSION FUND

By: _____
Name:    Richard N. Rust
Title:    Fund Manager

1057503

IN WITNESS WHEREOF, the undersigned have duly executed this Amended and Restated Limited Partnership Agreement of Yucaipa American Alliance (Parallel) Fund I, LP as of the date first above written.

GENERAL PARTNER:

**YUCAIPA AMERICAN ALLIANCE FUND I, LLC**

By its Managing Member, YUCAIPA AMERICAN FUNDS, LLC

By its Managing Member, YUCAIPA AMERICAN MANAGEMENT, LLC

By: _____
Name:   Robert P. Bermingham
Title:   Vice President

LIMITED PARTNERS:

**ILGWU DEATH BENEFIT FUND**
By: _____
Name:
Title:   Secretary

IN WITNESS WHEREOF, the undersigned have duly executed this Amended and Restated Limited Partnership Agreement of Yucaipa American Alliance (Parallel) Fund I, LP as of the date first above written.

GENERAL PARTNER:

YUCAIPA AMERICAN ALLIANCE FUND I, LLC

By its Managing Member, YUCAIPA AMERICAN FUNDS, LLC

By its Managing Member, YUCAIPA AMERICAN MANAGEMENT, LLC

By: _____
Name:    Robert P. Bermingham
Title:    Vice President

LIMITED PARTNERS:

WESTERN CONFERENCE OF TEAMSTERS PENSION TRUST

By: _____  2/24/05
Name:  Anthony C. Lock
Title:  Chairman

By: _____
Name:  Bernard T. Eilerts
Title:  Co-Chairman/Secretary

IN WITNESS WHEREOF, the undersigned have duly executed this Amended and Restated Limited Partnership Agreement of Yucaipa American Alliance (Parallel) Fund I, LP as of the date first above written.

GENERAL PARTNER:

**YUCAIPA AMERICAN ALLIANCE FUND I, LLC**

By its Managing Member, YUCAIPA AMERICAN FUNDS, LLC

By its Managing Member, YUCAIPA AMERICAN MANAGEMENT, LLC

By: _____
Name:     Robert P. Bermingham
Title:      Vice President

LIMITED PARTNERS:

**WESTERN CONFERENCE OF TEAMSTERS PENSION TRUST**

By: _____
Name:  Anthony C. Lock
Title:  Chairman

By: _____  2-23-05
Name:  Bernard T. Eilerts
Title:  Co-Chairman/Secretary

IN WITNESS WHEREOF, the undersigned have duly executed this Amended and Restated Limited Partnership Agreement of Yucaipa American Alliance (Parallel) Fund I, LP as of the date first above written.

GENERAL PARTNER:

**YUCAIPA AMERICAN ALLIANCE FUND I, LLC**

By its Managing Member, YUCAIPA AMERICAN FUNDS, LLC

By its Managing Member, YUCAIPA AMERICAN MANAGEMENT, LLC

By: _____
Name: Robert P. Bermingham
Title: Vice President


LIMITED PARTNERS:

_____

**UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION PENSION PLAN FOR EMPLOYEES**

By: _____
Name: Anthony Marc Perrone
Title: International Secretary - Treasurer


\* ~~Executed by or on behalf of each of the Limited Partners listed on Schedule A hereto.~~

IN WITNESS WHEREOF, the undersigned have duly executed this Amended and Restated Limited Partnership Agreement of Yucaipa American Alliance (Parallel) Fund I, LP as of the date first above written.

GENERAL PARTNER:

YUCAIPA AMERICAN ALLIANCE FUND I, LLC

By its Managing Member, YUCAIPA AMERICAN FUNDS, LLC

By its Managing Member, YUCAIPA AMERICAN MANAGEMENT, LLC

By: _____
Name:     Robert P. Bermingham
Title:     Vice President

LIMITED PARTNERS:

CARPENTERS PENSION TRUST FUND FOR NORTHERN CALIFORNIA

By: _____ Management Trustee
Name:
Title: _____ Labor Trustee

IN WITNESS WHEREOF, the undersigned have duly executed this Amended and Restated Limited Partnership Agreement of Yucaipa American Alliance (Parallel) Fund I, LP as of the date first above written.

*March 19, 2005.*

GENERAL PARTNER:

**YUCAIPA AMERICAN ALLIANCE FUND I, LLC**

By its Managing Member, YUCAIPA AMERICAN FUNDS, LLC

By its Managing Member, YUCAIPA AMERICAN MANAGEMENT, LLC

By: _____
Name:    Robert P. Bermingham
Title:    Vice President

LIMITED PARTNERS:

**AUTOMOTIVE MACHINISTS PENSION TRUST**

By: _____
Name:
Title:

1057503

IN WITNESS WHEREOF, the undersigned have duly executed this Amended and Restated Limited Partnership Agreement of Yucaipa American Alliance (Parallel) Fund I, LP as of t~~he date first above written~~.

*March 19, 2005*

GENERAL PARTNER:

**YUCAIPA AMERICAN ALLIANCE FUND I, LLC**

By its Managing Member, YUCAIPA AMERICAN FUNDS, LLC

By its Managing Member, YUCAIPA AMERICAN MANAGEMENT, LLC

By: _____
Name:     Robert P. Bermingham
Title:     Vice President


LIMITED PARTNERS:

**UNITE NATIONAL RETIREMENT FUND**
**an employee benefit plan**

By its administrator, UNITE FUND ADMINISTRATORS

By: _____
Name:  Mark Schwartz
Title:  Secretary

IN WITNESS WHEREOF, the undersigned have duly executed this Amended and Restated Limited Partnership Agreement of Yucaipa American Alliance (Parallel) Fund I, LP as of the date first above written.

*March 19, 2005*

GENERAL PARTNER:

**YUCAIPA AMERICAN ALLIANCE FUND I, LLC**

By its Managing Member, YUCAIPA AMERICAN FUNDS, LLC

By its Managing Member, YUCAIPA AMERICAN MANAGEMENT, LLC

By: _____
Name:      Robert P. Bermingham
Title:      Vice President

LIMITED PARTNERS:

**UNITE STAFF RETIREMENT PLAN**
**an employee benefit plan** *Unite Full Administrators Inc by*

By: *Mark Schweitzer Secretary*
Name: *Mark Schweitzer*
Title: *Secretary*

1057503

The undersigned is hereby executing and delivering this Agreement solely for the purpose of agreeing to the provisions of Sections 1.3, 2.1, 2.2, 2.4, 2.5, 2.6, 4.6, 5.5, 7.1, 7.2, 7.3, 10.1, 10.2 and 10.3 but shall not thereby become or be deemed a Partner.

MANAGER:

**YUCAIPA ALLIANCE MANAGEMENT, LLC**

By its Managing Member, YUCAIPA AMERICAN FUNDS, LLC,

By its Managing Member, YUCAIPA AMERICAN MANAGEMENT, LLC

By: _____

Name:   Robert P. Bermingham

Title:   Vice President